1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF PENNSYLVANIA

2

3   UNITED STATES OF AMERICA      )   2:13-cr-00669-CDJ-1
                                  )   September 9, 2014
4   vs.                           )   Tuesday
                                  )   Philadelphia, PA
5   JAMAHL SIMMONS                )   11:35 a.m.–5:34 p.m.

6

7            HEARING ON DEFENDANT'S MOTION TO SUPPRESS
            BEFORE THE HONORABLE C. DARNELL JONES II

8

9   APPEARANCES:

10  For United States of       SOZI PEDRO TULANTE, ESQ.
    America:                   U.S. ATTORNEY'S OFFICE
11                             615 Chestnut Street
                               Suite 1250
12                             Philadelphia, PA  19106

13  For Defendant:             ROBERT E. H. MILLER, ESQ.
                               LAW OFFICES OF ROBERT MILLER
14                             524 E. Johnson Street
                               Philadelphia, PA  19144

15

16

17

18

19

20

21

22
              Veritext National Court Reporting Company
23                      Mid-Atlantic Region
                 1801 Market Street – Suite 1800
24                    Philadelphia, PA 19103
                        1-888-777-6690
25

```
 1                    I N D E X

 2    WITNESSES          DIRECT   CROSS   REDIRECT  RECROSS

 3    SEAN MCSTRAVICK      14       28      118       119

 4    ANDREW KATERMAN     142      170      174

 5    CHRISTINE KELLIHER  176

 6

 7

 8

 9                  E X H I B I T S

10    NO.              IDENTIFICATION                 PAGE

11    Government's:

12    A         Application and affidavit of search   16
                warrant, search warrant in Case No.
13              13-1285-M

14    B         Application for search warrant,       25
                search warrant, and affidavit in Case
15              No. 13-1294

16    C         Application for a search warrant,     25
                affidavit and the search warrant in
17              Case No. 13-1293-M

18    Defendant's:

19    None

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2               THE COURT:  We are here for purposes of
 3   litigating a suppression motion in this case.  Let me
 4   first ask counsel, Mr. Miller, to state for the record
 5   the basis for the motion and exactly what it is
 6   counsel is seeking to suppress.
 7               MR. MILLER:  Yes, sir, Your Honor, and
 8   thank you for giving me the opportunity to speak at
 9   this time.
10               Exactly what I'm seeking to suppress,
11   Your Honor, would be the warrant and any of the
12   proceeds or the fruit, as result of the search, based
13   on the warrant that ends in 581.  That would be the
14   Maximillian Settlement (ph) warrant, I say warrant
15   that ends in 581, but the package, the priority mail
16   package that is -- ends in numbers 581; specifically
17   those numbers are 9505, 5000, 1165, 3316, 000581.
18   That would be search warrant Case No. 13-293-M, and
19   any -- not only what was obtained as a result of that
20   warrant, but also anything that was obtained as a
21   result of the fruits of that warrant.
22               THE COURT:  All right.  Just one
23   minute, please.
24               MR. TULANTE:  Yes, sir.
25               THE COURT:  All right.
```

1                    MR. MILLER:  Also, I would like to bear

2     the Court's attention to also the warrant that deals

3     with the package that ends in the numbers 391.  The

4     complete priority mail package is –– the numbers for

5     it, the parcel numbers of 9505 5000 148533 16000 391.

6     That search warrant is labeled as Case No. 13-1294-M.

7                    Also, if I may, just make sure this is

8     correct, Judge.  Also, the package that ends with

9     apartment priority mail package that ends in the

10    number 072.  That complete priority mail number is

11    9505 5000 1479 3313 000072.  That Case No. on that

12    search warrant is 13-1285-M.  I believe that's an 8.

13                    Okay.  And so –– and not just that

14    warrant, Judge, but also if I may on all these

15    warrants, not just what was seized as a result of that

16    warrant, but anything that was seized as a result of

17    the fruits of that warrant, or the fruits as a result

18    of or the fruits of any proceeds or implication that

19    was obtained as a result of the execution of those

20    warrants.

21                    I'm trying to say it correctly, Judge.

22    And, Judge, specifically the arrest warrant, I mean,

23    is part of the fruit as a result of these warrants,

24    the arrest warrant of my client is one of the things

25    that –– specifically not all of them.  I mean, there

 1   are a number of things was obtained, but the arrest

 2   warrant also included in that.

 3               Also, Judge, there is one that I don't

 4   know, I really didn't discuss this with counsel, but

 5   there's one that I think that we may be able to agree

 6   on, I don't know, but dealing with I believe the

 7   packet number is -- ends in 689, parcel 689.

 8               And that parcel number is 4201 942 895

 9   055 0014 853 301 000 689.  I believe we may be able to

10   agree that this package was never seized, it was not

11   searched, and that -- well, at least we can at least

12   stipulate I believe to that extent, that that package

13   was never seized and never searched.  Am I correct?

14               MR. TULANTE:  Yes, Your Honor, we put

15   that in our motion, that's why I'm surprised Mr.

16   Miller mentioned it, because it was never seized, nor

17   searched, so I don't understand there'd be a basis for

18   suppression.

19               MR. MILLER:  Well --

20               MR. TULANTE:  There was no search

21   warrant accompanying it, no affidavit --

22               MR. MILLER:  Well --

23               MR. TULANTE:  -- so that's -- I just

24   wanted to make sure --

25               THE COURT:  All right.  That's a

1   priority mail package that ends in 0689; is that

2   correct?

3                   MR. TULANTE:  That's correct, Your

4   Honor.

5                   MR. MILLER:  That's correct, Your

6   Honor.

7                   THE COURT:  All right.  You may

8   continue.

9                   MR. MILLER:  That pretty much is it for

10  the purposes of suppression here today, Judge.

11                  THE COURT:  And once again, you are

12  asking the Court to suppress it because the warrants

13  that were issued -- which were issued without probable

14  cause?

15                  MR. MILLER:  Yes, that's correct,

16  Judge.  I can get -- I can really give it to you in

17  real close -- I mean, very, very tight summation form.

18  The one that ends in 391, the warrant was not signed.

19                  MR. TULANTE:  Your Honor, just to --

20  for ease of reference and so everybody's on the same

21  page, I put before the Court the exhibits that reflect

22  the three warrants, just so we're talking about the

23  same affidavits.

24                  THE COURT:  All right.

25                  MR. TULANTE:  I've given copies to Mr.

1    Miller as well.

2              THE COURT:  All right.

3              MR. TULANTE:  And I can put that on the

4    record if the Court would like, because we attached

5    two to the response, we attached -- we identified an

6    additional one of the 1293 one, and then we didn't

7    include that in our response we have in here that we

8    gave to the Court, so.

9              THE COURT:  Very well.

10             MR. TULANTE:  So that's Exhibit C is

11   the 1293.  I'm going in the order in which Mr. Miller

12   addressed them.  The warrant in Magistrate No. 13-

13   1293, that's the one ending in 581.  That's Exhibit C

14   that we have before the Judge.

15             The warrant in 1294, Magistrate No. 13-

16   1294, the priority mail package ending in 391, that's

17   Exhibit B.  It was also Exhibit B to our response.

18   And the one in 13-1285, the priority mail, the last

19   three digits is 072, and that's Exhibit A.

20             THE COURT:  Thank you.

21             MR. MILLER:  And, Your Honor, if I may,

22   I did also make some copies of those warrants and

23   their affidavits, and other supporting documentation,

24   postal data records, that type of thing.  I would ask

25   that that packet at this time be at least marked as

1    Defense Exhibit A, collectively.

2                    THE COURT:  Okay.  Any objection?

3                    MR. TULANTE:  No objection, Your Honor.

4                    THE COURT:  Now which packet?  That

5    one?

6                    MR. MILLER:  No, not that one, that's

7    the Assistant U.S. Attorney's.

8                    THE COURT:  All right.  Thank you.

9                    MR. MILLER:  I apologize, Your Honor.

10                   THE COURT:  That's all right.

11                   MR. MILLER:  Mine are not marked and

12   labeled as the Assistant District -- as the Government

13   has marked them.

14                   THE COURT:  All right.  So you wish --

15   are you going to --

16                   MR. TULANTE:  Your Honor, just --

17                   THE COURT:  I'm sorry.

18                   MR. TULANTE:  I apologize, Your Honor.

19   Just to clarify, we don't object to them being marked,

20   but I don't know what Mr. Miller intends to do with

21   them, we'd object to them being --

22                   THE COURT:  All right.  We'll cross

23   those bridges when we come to them --

24                   MR. TULANTE:  Okay.

25                   THE COURT:  -- but at this juncture, it

1    is being marked as Defense Exhibit?

2                    MR. MILLER:  A, yes, Your Honor.

3                    THE COURT:  Defendant A.

4                    MR. MILLER:  And to an extent, it

5    duplicates what's already the common -- I'm sorry,

6    that the Government has already presented and had

7    marked.

8                    THE COURT:  Is the Government's

9    corresponding Exhibit A, B and C or something else?

10                   MR. MILLER:  Yes.  I think 391, 581 and

11   when I'm speaking, when I'm giving those numbers,

12   those are the numbers of the priority mail package,

13   the last three digits of those packages.  And that

14   would be 581, 391 and 072.

15                   I think that there's a duplication of

16   the records in that regard and the exhibits.

17                   THE COURT:  Do you agree with that,

18   Counsel?

19                   MR. TULANTE:  Yeah, Your Honor, I don't

20   know, it seems like this is a mismatch of the report,

21   there's excerpts from some of the -- some discovery,

22   some of the tracking information, so I don't --

23                   MR. MILLER:  That's true.

24                   MR. TULANTE:  -- understand the purpose

25   of that.  What I was just simply trying to do is to

1   make it very clear on the record that the -- for each

2   search -- for each warrant he's challenging, I've

3   provided in each exhibit a copy of the application for

4   a search warrant, the search warrant itself, and the

5   affidavit, just so there's the -- the Court and

6   defense and the Government were all on the same page

7   with respect to what's at issue.

8               THE COURT:  All right.  Then the Court

9   will allow counsel to mark these as Defense Exhibit A

10  without any further notation, because they are

11  somewhat different.

12              MR. MILLER:  They are somewhat

13  different, Your Honor, that's correct.

14              THE COURT:  All right.

15              All right.  Government, you may

16  proceed.

17              MR. TULANTE:  Yes, Your Honor.  I -- in

18  the suppression motion, the defendant challenges each

19  affidavit, each search warrant on the basis that they

20  lack probable cause.  And with respect to going

21  forward today, we submit that on the papers this Court

22  can look at the four corners of the affidavit, and

23  identify that there is probable cause.  And in any

24  event, even failing that, this Court can uphold the

25  search warrants, on the basis of United States v Leon,

1    because the inspector here, he relied on them in good

2    faith.

3              We will, though, put in some evidence

4    on two of the warrants specifically the ones 1293 and

5    1294 because the defense argues that they were

6    invalidly issued, because they were not signed by the

7    Magistrate Judge, Judge Caracappa.  We -- as we said

8    in our response, believe under Rule 4.1 that we

9    proceeded properly, that the Court -- that Judge

10   Caracappa directed the Government to sign them, and

11   actually affirmed that the next day.

12             So we want to put -- there obviously

13   needs to be evidence with respect to that, and we want

14   to put -- present evidence from Inspector McStravick

15   solely on that issue, Your Honor.  We believe that

16   this Court, as it has in the past, can determine the

17   motion to suppress with respect to lack of probable

18   cause on the basis of what's already presented in the

19   affidavit, given that there's a dog, given that the

20   inspector testified based on his training and

21   experience put forth in the affidavit that the address

22   for each package does not match, the addressee.

23             And so on that basis, Your Honor, we'll

24   rest on our paper, and then go forward simply on the

25   issue of whether or not the warrants, those two

1    warrants were validly issued.

2              Your Honor, I would move to call

3    Inspector McStravick unless --

4              THE COURT:  You may proceed.

5              MR. TULANTE:  All right.

6              THE COURT:  Counsel, is there a motion

7    for sequestration?  Are there any other witnesses in

8    this case that need to be sequestered?

9              MR. MILLER:  Yes, Your Honor.  I would

10   ask that Mr. Katerman exit at this time, and he may be

11   called as a witness, and I believe that's the only

12   witness.

13             MR. TULANTE:  And, Your Honor, we would

14   --

15             MR. MILLER:  I'm sorry.  But we do have

16   -- I did subpoena another witness, and I'm thinking

17   for some reason, I'm a little confused here, Judge, I

18   messed up, Ms. (indiscernible) Kelly?

19             UNIDENTIFIED:  Kellehearn (ph).

20             MR. MILLER:  Right.  I did have her

21   subpoenaed and she may have to testify.  She was

22   actually the one -- the handler of the canine

23   involved, and I would ask that she be sequestered at

24   this time also.

25             THE COURT:  All right.  There's an

1    outstanding Government motion opposing that witness;

2    is that correct?

3                   MR. TULANTE:  That's correct, Your

4    Honor.  We believe that there's no -- he's not

5    established --

6                   THE COURT:  We'll litigate that after

7    this witness testifies.

8                   MR. TULANTE:  We don't object to the

9    sequestration for the moment.

10                  THE COURT:  Very well, thank you.

11   Madame, will you please exit the courtroom?

12                  Thank you.

13                  THE CLERK:  Good morning.  Would you

14   spell your name and (indiscernible).

15                  MR. MCSTRAVICK:  Sean McStravick, S-e-

16   a-n, M-c-S-t-r-a-v-i-c-k.

17                  THE CLERK:  Okay.  And you are?

18                  MR. MCSTRAVICK:  U.S. Postal Inspector.

19                  THE CLERK:  (indiscernible)

20                  MR. MCSTRAVICK:  6576.

21                  THE CLERK:  Thank you.

22                  MR. MCSTRAVICK:  You're welcome.

23                  THE CLERK:  Would you raise your right

24   hand?

25                  SEAN MCSTRAVICK, WITNESS, SWORN

1          THE CLERK:  Thank you.  You may be

2    seated.

3          THE WITNESS:  Thank you.

4          THE COURT:  You may proceed.

5          MR. TULANTE:  Thank you, Your Honor.

6                DIRECT EXAMINATION

7    BY MR. TULANTE:

8        Q.   Good morning, Inspector.

9        A.   Good morning.

10       Q.   And where do you work?

11       A.   United States Postal Inspection Service.

12       Q.   And how long have you been there?

13       A.   Since April 2012.

14       Q.   And were you involved in the investigation

15   of Jamahl Simmons?

16       A.   Yes, I was.  I was the lead case agent.

17       Q.   Explain to the Court generally what you did.

18       A.   Information was developed into Mr. Simmons'

19   mailing parcels which contained narcotics from

20   California to the Philadelphia region.

21       Q.   As part of your investigation, did you seize

22   and search any parcels delivered through the U.S.

23   mail?

24       A.   Yes, I did.

25       Q.   And explain to the Court when's the first

1    time you did that.

2         A.   The first one I did -- the first one was

3    identified on November 12th.

4         Q.   And what happened on November 12th?

5         A.   On November 12th, we identified a parcel.  I

6    prepared a federal search warrant, application,

7    affidavit, and actual search warrant.  I prepared -- I

8    sent it to the U.S. Attorney's office to your

9    attention to receive the approvals.

10              MR. TULANTE:  And, Your Honor, we have

11   Exhibit A, which I've provided to the Court

12   previously.

13        Q.   Do you have it in front of you, Inspector

14   McStravick --

15        A.   Yes, I do.

16        Q.   -- Government Exhibit A?  That's

17   Government's Exhibit A.

18              Do you recognize Exhibit A?

19        A.   Yes, I do.

20        Q.   And what is that?

21        A.   Exhibit A is my application and affidavit

22   for a search warrant, as well as an affidavit.

23              MR. TULANTE:  And, Your Honor, we move

24   for the admission of Government Exhibit A, which for

25   the record is application and affidavit of search

1  warrant, and the search warrant itself in Case No. 13-

2  1285-M.

3              THE COURT:  Any objection?

4              MR. MILLER:  No objection, Your Honor.

5              THE COURT:  Admitted.

6       (Government's Exhibit A received)

7  BY MR. TULANTE:

8       Q.   And when you obtained -- did you obtain a

9  search warrant?

10      A.   Yes, I did.

11      Q.   And how did you do that?  Just explain that

12  briefly.

13      A.   On this particular search warrant, I went

14  before U.S. Magistrate Judge Caracappa, and swore out

15  the search warrant.

16      Q.   And did you execute that search warrant?

17      A.   Yes, I did.

18      Q.   What, if anything, did you find when you

19  executed it?

20      A.   Upon executing this search warrant, 2

21  kilograms of cocaine were discovered inside the

22  parcel, approximately 2 kilograms.

23      Q.   And did you take any additional

24  investigative steps after finding the cocaine?

25      A.   Yes, I did.  After finding the cocaine, we

1    then applied for a beeper, GPS, as well as an

2    anticipatory search warrant for the Blue LLC address.

3         Q.   For the package direct to the Blue LLC

4    address?

5         A.   Correct.

6         Q.   And did you prepare an affidavit in support

7    of that?

8         A.   Yes, I did.

9         Q.   And again explain briefly the steps you took

10   to obtain the approval for a tracker warrant.

11        A.   We -- I took the information from this

12   particular warrant, as well as the narcotics that we

13   discovered upon executing this warrant, drew up a new

14   affidavit, which was sent over to the U.S. Attorney's

15   office for approvals.  The U.S. Attorney's office then

16   reached out to Magistrate Judge Caracappa, who advised

17   us that we would need to do this telephonically.

18        Q.   And then, let's be clear, when you say U.S.

19   Attorney's office, you're not talking about some

20   nominal thing, you're referring to me --

21        A.   Yourself, sir, yes.

22        Q.   And what happened after that, after you were

23   advised by Judge Caracappa to proceed telephonically?

24        A.   So for this particular warrant, AUSA

25   Tulante, yourself and I were in the U.S. Attorney's

1    office where Judge Caracappa was on a conference call

2    with yourself, myself, where she advised that she had

3    read and approved of the warrant.

4           She indicated on the conference call that

5    she directed you to mark the date and the time that

6    evening that she approved of that warrant.

7    Q.   And just to be clear, we're talking about

8    the tracker warrant, right?

9    A.   Tracker warrant, correct.

10   Q.   Okay.

11   A.   Not the exhibit that's in front of me.

12   Q.   Okay.  So let's move to the next day, what

13   happened on November 13th, 2013?

14   A.   Well, on that day she actually had told us

15   on the telephone call before we hung up, she had

16   advised us that we were to come to her chambers the

17   next morning so that she could physically see me again

18   and swear it out, as I did previously on the 12th

19   earlier in that day.

20          So on the 13th, we went to her chambers, we

21   signed out the warrant, ultimately controlled delivery

22   was conducted, and Kenneth Griffin was taken into

23   custody.

24   Q.   Did -- during the time you were working on

25   the box to Blue LLC, did you identify any additional

1   boxes that were suspicious?

2                 MR. MILLER:  Objection, leading.

3                 THE COURT:  Overruled.

4                 THE WITNESS:  Yes, two additional boxes

5   were identified.

6   BY MR. TULANTE:

7        Q.   Explain to the Court what happened.

8        A.   The two additional boxes were identified,

9   they were intercepted at the inner mail facility at

10  the Philadelphia International Airport.  They were --

11  while they were in transit, and I identified them, I

12  contacted yourself, the U.S. Attorney's office, and

13  began to prepare the affidavit for a search warrant

14  for both of those boxes.

15               The game plan was, the affidavit would be

16  prepared, and would be on standby for when I presented

17  these boxes to Detective Kelliher for a canine hit.

18  If the dog did not indicate, then we would not be

19  applying for a search warrant.

20       Q.   And did you learn whether the magistrate

21  judge approved of that plan?

22       A.   Yes.  The magistrate judge approved of that

23  plan, and requested yourself e-mail all the documents

24  to her, and instructed you to contact her if we were

25  going to proceed with the warrant after a canine had

1    indicated on the boxes, if such that would be

2    required.

3         Q.   Let me show you -- you should have in front

4    of you what's been marked as Exhibit D.

5         A.   Yes, sir.

6              MR. TULANTE:  Defense counsel?

7              MR. MILLER:  Yes.  You said B?

8              MR. TULANTE:  D, D as in David.

9              MR. MILLER:  I only have but three, A,

10   B and C.  Okay.  Yes.

11             MR. TULANTE:  Your Honor, this is

12   Exhibit D, for the record is an e-mail from myself to

13   Judge Caracappa with her e-mail address redacted.

14   BY MR. TULANTE:

15        Q.   And have you seen Exhibit D before?

16        A.   Yes, I have, sir.

17        Q.   And is this consistent with the plan that

18   was -- you just -- you described earlier, the game

19   plan?

20        A.   This is consistent, and the time indicates

21   at the time we had discussed transmitting these

22   warrants to Magistrate Judge Caracappa electronically.

23        Q.   And have you reviewed that -- you see

24   Exhibit D is a transmittal e-mail with attachments to

25   it.  Have you compared the attachments to what you

1  ultimately executed?

2        A.    Correct.

3        Q.    And are they identical?

4        A.    They're identical.

5        Q.    So let's proceed.  What -- did the boxes,

6  the two boxes ever arrive at the -- in Philadelphia?

7        A.    Yes, they did.

8        Q.    And what happened when they did?

9        A.    Upon the boxes arriving in Philadelphia,

10  they were presented to Detective Kelliher and Canine

11  Kirby.  Canine Kirby ultimately alerted Detective

12  Kelliher, who advised me that the canine indicated to

13  the presence of the odor of narcotics within those

14  boxes.

15             Upon Detective Kelliher advising me that

16  Kirby had positively hit on the boxes, I contacted

17  yourself to let you know that we could proceed with

18  the plan, to contact Magistrate Judge Caracappa in

19  order to proceed with the search warrants.

20        Q.    And when you contacted me, what happened at

21  that time?

22        A.    Essentially I contacted, you had contacted

23  me right back, and said you had spoke to the --

24        Q.    We're talking about contact, I'm sorry to

25  cut you off.  Telephonically?

1      A.    Telephonically.

2      Q.    Telephonically.

3      A.    I called telephonically, you advised me to

4  standby I believe, at which time you contacted Judge

5  Caracappa --

6                  MR. MILLER:  Objection.

7                  THE COURT:  Basis?

8                  MR. MILLER:  Hearsay.  I know it's

9  admissible, but he's testifying about what Mr. Tulante

10 did, and he wasn't there.

11                 MR. TULANTE:  Well, he was there.  He

12 said he --

13                 MR. MILLER:  No, he said he contacted

14 you telephonically I thought.

15                 THE COURT:  Just a moment, please.  The

16 witness did testify that he did this telephonically,

17 correct?

18                 MR. TULANTE:  That's correct, Your

19 Honor.

20                 THE COURT:  And now he purports to

21 testify as to what you were doing, or you did while he

22 was on the other end of the phone?

23                 MR. TULANTE:  No, Your Honor, what he's

24 -- I can rephrase it.

25                 THE COURT:  Go ahead.

Page 23

1    BY MR. TULANTE:

2        Q.   So when you called, what happened next as

3    far as your involvement?

4        A.   I contacted you.  You advised me -- you

5    placed me on hold.  The next thing that happened was

6    your voice was back on the phone, as well as Your

7    Honor, Judge Caracappa's voice.

8        Q.   Okay.  And then what did Judge Caracappa --

9    and just to be clear for the record, at this point,

10   who's on the phone?

11       A.   At this point, I'm on the phone, yourself,

12   Sozi Tulante, U.S. Magistrate Judge Caracappa are all

13   on a three-way conference call.

14       Q.   And what did Judge Caracappa say to you?

15       A.   I recall Judge Caracappa advising me that

16   she remembered me from being in her chambers.  She had

17   read and approved of the warrants, and she advised you

18   to indicate today's date, and I believe it was 9:20

19   p.m. as the time that she telephonically approved the

20   two search warrants.

21       Q.   And what did you understand that to mean?

22       A.   I understood that to mean that she approved

23   the search warrants.  She swore me in and approved my

24   warrant -- approved my submission for a warrant.

25       Q.   And what happened next with respect to the

1   search warrants?

2        A.   Again she advised us to follow the same

3   procedure we followed earlier in that day, to come

4   back to her chambers the following day where she would

5   actually ink her name on the documents.

6             Upon hanging up the phone, the two search

7   warrants were executed.  Contained inside the box that

8   was addressed to Maximillian Settlements was

9   approximately 2 kilograms of cocaine, and inside the

10  box that was addressed to Jackson Law Group (ph) was

11  approximately 1 kilogram of cocaine.

12       Q.   And what did you do the next day, and this

13  is November 14th, 2013?

14       A.   On November 14th, we again applied for an

15  anticipatory search warrant, a GPS and beeper device

16  for Maximillian Settlements, we did not apply for an

17  anticipatory search warrant for Jackson Law Group.  We

18  went before Judge Caracappa where she signed the

19  previous night's warrants, she had me sign as the

20  affiant, and she signed her name, anywhere I signed,

21  she also signed.

22       Q.   I think it'll make it easier if I actually

23  show you the exhibits.  I have Exhibit B and Exhibit C

24  before you.

25       A.   Yes, sir.

1                    MR. TULANTE:  For the record, Exhibit B

2     is an application for a search warrant, the search

3     warrant, and affidavit in Case No. 13-1294, respect to

4     priority mail, a box with the last three digits of

5     391.

6                    And Exhibit C is application, affidavit

7     -- application for a search warrant, affidavit and the

8     search warrant itself in Case No. 13-1293-M, reference

9     to a priority mail box with the last three digits of

10    581.

11                   Counsel, do you have a copy?

12                   MR. MILLER:  Yes.

13                   MR. TULANTE:  Your Honor, I move for

14    their admission.

15                   THE COURT:  Any objection?

16                   MR. MILLER:  No objection, Your Honor.

17                   THE COURT:  Admitted.

18         (Government's Exhibits B and C received)

19    BY MR. TULANTE:

20         Q.   And let's look at Exhibit B first,

21    Inspector.  Do you see the first page?

22         A.   Yes, I do, application and affidavit for

23    search warrant.

24         Q.   And where is your signature on this page?

25         A.   My signature is on the lower right-hand

1    side, on top of the affiant, Sean McStravick, Postal

2    Inspector.

3         Q.   And when did you sign that?

4         A.   I signed this on the next day, which was the

5    14th.

6         Q.   And at the time you signed it, let's say

7    below your signature at the very bottom, can you read

8    what that says?

9         A.   That says "11/13, 2013 at 9:20 p.m.,

10   telephone auth" -- authorization maybe, I believe

11   that's your signature.

12        Q.   Okay.  And --

13              MR. MILLER:  That's Exhibit B, am I

14   correct, I'm sorry?

15              MR. TULANTE:  That is Exhibit B, yes.

16              MR. MILLER:  I'm sorry, I'm sorry.

17        Q.   And when did the Judge sign that?

18        A.   The Judge signed it on the 14th.

19        Q.   Okay.  And do you see her signature?

20        A.   I do.

21        Q.   And I ask you the same thing with Exhibit A

22   -- I'm sorry, Exhibit C.

23              MR. MILLER:  Excuse me, Your Honor, I

24   don't see the signature that you're talking about.

25   You're talking about at the bottom of the first page

1    of B?  Oh, okay, I'm sorry, go ahead, uh-huh.

2    BY MR. TULANTE:

3        Q.   And is that the same thing on -- just so we

4    can move this along, the same thing on Exhibit C?

5        A.   Exhibit C is a mirror of Exhibit B, my

6    signature is on the lower right-hand side, Judge

7    Caracappa's signature is on the lower left-hand side.

8    And the date again was as directed on the phone,

9    11/13, 2013, 9:20 p.m., telephone something, Sozi

10   Tulante.

11       Q.   And let's turn to the second page of both

12   exhibits, exhibit book -- Exhibit B and Exhibit C.  Do

13   they read the same thing in terms of the date and time

14   and my signature?

15       A.   That is correct, sir.

16       Q.   And the difference, do you see the Judge's

17   signature on one and not the other?

18       A.   That's correct.

19       Q.   Which is her signature on?

20       A.   Her signature is on Exhibit C.

21       Q.   But not on Exhibit B?

22       A.   Correct.

23       Q.   And finally, the last page of each exhibit,

24   do you see your signature anywhere?

25       A.   Yes, I do, again in the middle of the page

Page 28

1    on the right-hand side.

2        Q.   And what about the Judge's signature?

3        A.   Her signature is above on both exhibits, the

4    line that says 11/13, 2013 at 9:20 p.m., telephonic

5    Sozi Tulante.

6        Q.   All right.  And so once you met with the

7    Judge, what did you do with the documents?

8        A.   We filed the originals with the court

9    clerk's office.

10               MR. TULANTE:  Your Honor, I have no

11   further questions for this witness.

12               THE COURT:  All right.  You may cross-

13   examine.

14               MR. MILLER:  Thank you, Your Honor.

15               Your Honor, is it okay if I stand up at

16   the table?

17               THE COURT:  Sure.

18               MR. MILLER:  Thank you.

19                 CROSS-EXAMINATION

20   BY MR. MILLER:

21       Q.   Mr. McStravick --

22       A.   Yes, sir.

23       Q.   -- did I say that correctly?

24               Okay.  Thank you.  I think it's maybe good

25   afternoon right now or close thereof.

1          Sir, you referred to I think it was the

2    Government's Exhibit B, and the first page of that

3    exhibit, do you have it in front of you?

4          A.   Yes, sir, I do.

5          Q.   Okay, good.  And the first page of that

6    exhibit is merely the application and affidavit.  It's

7    marked application and affidavit and the search

8    warrant; am I correct?

9          A.   Yes, sir.

10         Q.   Okay.  Okay.  And let me make this be clear,

11   did you say that you were told that on I believe it

12   was November the 13th to -- by the Judge and

13   telephonically to go ahead and indicate that these

14   were to be signed or signed or approved as of 9:20

15   p.m. on November 13th; am I correct?

16         A.   Correct.  The Judge instructed the AUSA to

17   mark the date and time.

18         Q.   Okay.  And then you went back you said, you

19   went back the next day to the Judge's chambers.  What

20   happened?

21         A.   Per her instruction, she asked us to come

22   back where she would then sign her name to the

23   documents, it was her request that we come back the

24   next morning.

25         Q.   And that's what you did, right?

1        A.   Yes, sir.

2        Q.   Well, I'm just a little confused here

3   because when I look at, you know, the search warrant

4   which is the second page of Government Exhibit B, I

5   don't see the judge's signature on the search warrant

6   itself.  Am I correct?

7        A.   Yes, sir.

8        Q.   Okay.  So when you -- I think you stated

9   that the search warrant was signed the next day.

10       A.   The search warrant was approved on the 13th.

11       Q.   Right.  And that you went back on the next

12  day and the search warrant was signed; am I correct?

13       A.   She asked us to come back so she could sign

14  her name, so correct.

15       Q.   And then you said that that's what happened,

16  am I correct, that she signed the documents at that

17  time, without any exclusion; am I correct?

18       A.   That's correct, sir.

19       Q.   But there is an exclusion, because she did

20  not sign the second page, the actual search warrant,

21  or the second page of Exhibit B of the Government's

22  Exhibit B; am I correct?

23       A.   You're correct.

24       Q.   Okay.  Okay.  So would you agree that there

25  is no signed search warrant in regards to the parcel

1    that is -- ends in 391, which would be Exhibit B or

2    Case No. 13 -- search warrant for Case No. 13-1294-M?

3        A.   I disagree in that.  I was on the telephone

4    with Your Honor at 9:20 --

5              THE COURT:  In this instance, Her

6    Honor.

7              THE WITNESS:  Her Honor, I apologize,

8    Your Honor.  I disagree in that she advised me the

9    warrant was approved on this date at 9:20 p.m., and

10   instructed AUSA Tulante to actually write that on the

11   search warrant as her approval.

12   BY MR. MILLER:

13       Q.   Right.  But she did not sign it; am I

14   correct?

15       A.   That's correct.

16       Q.   Okay. Okay. Okay. Okay.  And let me just

17   ask you this now.  I believe this is Government

18   Exhibit D.  With regards to Exhibit B, okay -- right,

19   right, but I'm just going to deal with B right now, on

20   the first page of -- do you have it?

21       A.   I'm sorry, what exhibit?

22       Q.   D.  D as in David, I apologize.

23       A.   Yes, sir.  The first --

24       Q.   The very first page.

25       A.   Okay.

1      Q.   Let me see, I think that would be the next

2  to the last sentence at the top in the first

3  paragraph.  Do you see that?

4      A.   The next --

5      Q.   It reads, "The packages are on planes in

6  route to Philadelphia International Airport and are

7  not expected to be presented to the drug detection dog

8  until 9:30 p.m. tonight at the earliest."  Do you see

9  that?

10      A.   Yes, sir.

11      Q.   Okay.  Okay.  Now -- but now this was

12  something that Mr. Tulante forwarded to the Judge at

13  about 5:30 in the afternoon; am I right?

14      A.   Yes, sir.

15      Q.   Okay.  Okay.  Okay.  And according to I

16  believe it would be page one -- that would be page 4

17  of Exhibit D, but it's marked at the bottom page 3.

18           Now, I'm directing your attention there

19  because this affidavit indicates there, I believe it's

20  marked paragraph 5.  Do you see that?

21      A.   I'm still trying to find where --

22      Q.   Of Exhibit D, page 4.

23      A.   On page 4 of Exhibit --

24      Q.   D.  It says at the bottom page 3.  Exhibit D

25  as in David.  Which is the packet with the affidavit.

1    Take your time, take your time.

2         A.    They were all -- I apologize, they were --

3         Q.    No, that's okay, I understand, believe me.

4         A.    I'm on page 4.

5         Q.    Page 4 of Exhibit D, but it's actually at

6    the bottom it's marked page 3.  It's page 4 because

7    the cover page would be considered page 1 I think.

8         A.    Okay.  I think I'm where you -- can you tell

9    me the sentence you're speaking about please?

10        Q.    Well, I'm just looking at that page, and I'm

11   looking at the first sentence of paragraph 5, and it

12   says that -- I'm referring to the sentence that says

13   "On November 13, 2013 the subject parcel was exposed

14   to a drug detective canine, Kirby," and I'll stop

15   there.

16             Do you see that sentence?

17        A.    Yes, sir, I do.

18        Q.    Okay.  And you stated that you prepared --

19   you pre-prepared these affidavits, am I correct, in

20   advance?

21        A.    Yes, sir.

22        Q.    Okay.  And what time did you pre-prepare

23   them?

24        A.    It was some time before they were

25   transmitted at 5:30, I'm not sure.

1          Q.   Oh, it was before 5:30, before the -- on the

2    front, on the first page of D, at the top it says 5:30

3    p.m.

4          A.   Yes.  I'm not sure what time I prepared

5    them.  I would've -- they would've -- based on my

6    training and experience, I know when I prepare an

7    affidavit, it goes to the AUSA and then goes through

8    level of approval.  So I'm not sure what time I

9    actually would've prepared this in order that it

10   would've been transmitted to the Judge at 5:30.  I'm

11   not certain.

12         Q.   Okay.  But you -- all right, all right.  But

13   it was in advance of 5:30; am I correct?

14         A.   Yes, that's correct.

15         Q.   Okay.  Okay.  Okay.  Okay.

16              Now, paragraph 6 states that "the subject

17   parcel is located at the United States Postal

18   Inspection Service Narcotics Office within the Eastern

19   District of Pennsylvania."  Do you see that?

20         A.   That's correct, sir, yes.

21         Q.   So let me just ask you point blank, at the

22   time the Judge looked at this and read your affidavit,

23   the parcel was not at your office; am I correct?

24         A.   I'm not sure what time she read the warrants

25   though.

1        Q.    Okay.  Well then, let's go to the warrant

2    itself.  The warrant itself, let's just start with

3    391, I'm staying with B --

4        A.    Okay.

5        Q.    -- the warrant itself indicates 9:20; am I

6    correct?

7        A.    That's correct, sir.

8        Q.    Okay.  So at least by 9:20, would you agree

9    that the warrant was signed, or not signed, but

10   reviewed by the Judge, the warrant and its

11   accompanying affidavit of probable cause that you

12   prepared?

13       A.    Yes.

14       Q.    Okay.  So that would be in advance of 9:20.

15   Okay.  Now, let me see, that's 391.  That's 391, got

16   it.

17            Now, you see the first -- the cover page

18   though of D, am I correct?

19       A.    Yes.

20       Q.    And the cover page says, that the package is

21   not expected to be in Philadelphia until 9:30; am I

22   right?

23       A.    That's correct, sir.

24       Q.    But the affidavit that the Judge read

25   indicates that Kirby had already, or the canine had

Page 36

1  already been exposed to the package; am I right?

2       A.   Yes, sir.

3       Q.   So, in essence, just correct me if I'm

4  wrong, the package is not expected to get there until

5  9:30 at the earliest, but 9:20, the Judge has already

6  reviewed the affidavit, and approved it, in advance of

7  the package even getting there for Kirby to even be

8  exposed to the package?

9       A.   The 9:20 time -- the 9:30 time was merely --

10  I believe it was a discussion with the Judge as to

11  approximately the latest time that she could expect us

12  to be contacting her.  The 9:30 time that was

13  transmitted to her was in anticipation of about the

14  latest time we would be contacting her was 9:30, as we

15  were expecting the parcel to come in before 9:30, and

16  we would be contacting her prior to that.

17            She was asking us how late we would be

18  calling her, if I recall the actual conversation --

19       Q.   Okay.  But --

20       A.   -- and we had said basically no later than

21  9:30, we would've already had the parcel in our

22  possession and either had indicated a positive hit, or

23  we would be calling her and saying the warrants were

24  not going to be requested.

25       Q.   Okay.  But none of that is not in the

 1  warrant.  I mean, this says plainly on Exhibit D, let
 2  me make sure I'm reading this correctly, it says, "The
 3  packages are on planes," this is at 5:30 in the
 4  afternoon on the 13th, "The packages are on planes in
 5  route to Philadelphia International Airport, and
 6  they're not expected to be presented to the drug
 7  detective dog until 9:30 p.m. tonight at the
 8  earliest."  It has nothing -- it says nothing about
 9  the Judge being available or anything like that; am I
10  correct?
11       A.  You're correct, yes.
12       Q.  Oh, okay.  Do you have anything in writing,
13  or do you have any -- did you have any notes in
14  regards to the telephonic communication or any e-mails
15  where the Judge said that she would only be available
16  up till 9:30 or something like that?
17       A.  No, Your Honor -- no.  Your Honor, did not
18  give me --
19       Q.  Not me, please, no, no, no, no, I'm here,
20  sir.  Okay.  Okay.  All right.
21          And also in number 6 you state "the package
22  is --" that's on page 4 of the exhibit, but page 3,
23  it's more at page 3, it's paragraph number 6, it's one
24  sentence, "The subject parcel is presently located at
25  the United States Postal Inspection Service Narcotics

1  Office within the Eastern District of Pennsylvania."

2  You -- when she read this in advance of 9:20, based on

3  the time that's indicated on the face of the search

4  warrant, on the face of the application for the search

5  warrant, when she read this in advance or at least by

6  9:20, the package hadn't even gotten to Philadelphia;

7  am I correct?

8      A.   Again, I'm not sure what time she read the

9  -- I'm not sure what time she actually read the

10  affidavit.  The box arrived sometime before 9:20.

11      Q.   Okay.

12      A.   I'm not sure when Your Honor -- Her Honor

13  had read this.

14      Q.   All right.  So if the box got there let's

15  say at 9:20, 8:20 -- at 8:20, 7:20, but the package is

16  not expected to be in Philadelphia until no earlier

17  than 9:30; am I correct, sir?

18      A.   I think that was -- it's just -- it was a

19  point of reference for Judge Caracappa.  She had asked

20  for it.  She fully understood the -- I guess maybe --

21      Q.   Well, now hold on.

22          MR. TULANTE:  Objection.

23      Q.   I don't know if you can --

24          THE COURT:  Sustained.  Sustained.

25  BY MR. MILLER:

1          Q.    Let's go to package number --

2                MR. MILLER:  One second, Your Honor.

3          Q.    Let me just ask you this.  At the time that

4    you submitted the package, at the time -- I'm sorry,

5    I'm sorry.  At the time you submitted the affidavit,

6    was the package already at your office?

7          A.    No, sir, and that was communicated to Your

8    Honor -- to Her Honor, my apologies again.

9          Q.    Okay.  Well, it says it, though.  It says it

10   right here on number 6, "the subject package or parcel

11   is presently located at the United States Postal

12   Inspection Service Office within the Eastern District

13   of Pennsylvania."  Do you see that?

14         A.    Yes, sir.

15         Q.    Okay.  So when you let her see this, it

16   wasn't true that the package was there, because the

17   package didn't get there at least at the earliest

18   according to your first page here, 9:30; am I correct?

19         A.    Sir, I believe the package arrived somewhere

20   after 7:30.  It would've had to have been driven from

21   the air mail facility to my office, and then I

22   would've contacted the AUSA and advised him the

23   package was here, at which time he was to communicate

24   to Judge Caracappa that that warrant was ready for her

25   review.  That may be where it's -- the disconnect.

1           She was only to have these in advance, we

2    would contact her and advise her they were here, once

3    the parcel arrived, we were to contact her and advise

4    her, it was here.

5           Q.   So what you're saying is basically that this

6    sentence here on the cover of Exhibit D, is basically

7    -- I hate to say like this, a lie.  That the package

8    was already here in Philadelphia, at 7:30, but it's

9    indicated here in Mr. Tulante's correspondence, that

10   the doggoned package would not get to Philadelphia

11   International Airport, is not expected to be presented

12   to a drug detection dog till 9:30, that would be a

13   lie; am I correct?  That's a material misstatement of

14   the facts in this case, isn't it?

15          A.   We were providing an estimate to Judge

16   Caracappa as to when she would be hearing back from

17   us.

18          Q.   Doesn't -- is the word estimate anywhere on

19   the front page of Exhibit D?

20               MR. TULANTE:  Your Honor, objection.  I

21   think we've covered this quite extensively.

22               THE COURT:  Sustained.

23               MR. MILLER:  Okay.  Okay.  I just want

24   to be clear.  All right, fine.

25   BY MR. MILLER:

1    Q.   Let me go to parcel number 381, ending in

2   number 381, which will be the second parcel.

3    A.   Sir, could you give me the exhibit number?

4    Q.   I'm sorry, that would be your -- I said 381,

5   it's 391, that would be Government Exhibit B.

6    A.   I have it, sir, thank you.

7    Q.   Let me make sure I'm clear here.  Let me ask

8   you like this, you said there were two warrants that

9   you presented to the Judge on -- that were handled

10   telephonically on the 13th; am I correct?

11    A.   Yes.

12    Q.   Okay.  Which one of the government's

13   exhibits are you referring to that reflect the

14   affidavits or the search warrants that were presented

15   on -- to the judge telephonically on the 13th?  Would

16   it be B and C or what?

17    A.    I telephonically swore out Government

18   Exhibit B, and Government's Exhibit C.

19    Q.   Okay.  Okay.

20    A.   During the same telephonic phone call.

21    Q.   So that would be parcels ending in 391 and

22   581; am I right?

23    A.   Yes, sir.

24    Q.   Okay.  Okay.  Now, I think we -- with

25   regards to B, I think we're saying there's no search

1  -- there's no signature on B, am I correct, and we can

2  go to C; am I right?  We've already talked about

3  Exhibit B; am I right?

4       A.   Yes.

5       Q.   Okay.  And now we can go to Exhibit C; am I

6  right?  And that's the one ending -- the parcel ending

7  in 581, Case No. 13-1293-M.

8       A.   Yes, sir.

9       Q.   Okay.  Now, just one second here.  That's

10  581.  Now, this parcel, Government Exhibit C, the one

11  that's referred to in Government Exhibit C, ended in

12  581.  You say that parcel was also presented to the

13  drug -- the canine for -- to determine whether or not

14  it may have contained some type of -- something that

15  would be prohibited, right?

16       A.   I presented the parcel in front of Agent

17  Kelliher for the suspicion of narcotics.

18       Q.   Now, let me ask you this question.  Before

19  you presented it to Detective Kelliher, was the

20  package already -- what had you done with the package

21  to determine that it should be presented to Detective

22  Kelliher?

23       A.   If I could refer to my affidavit?

24       Q.   Sure.

25       A.   And just so I don't misspeak, you're

1   speaking about Government's Exhibit C, correct?

2        Q.   Yes, sir.

3        A.   On this particular parcel, I had identified

4   that the -- as you say, as I tell you in number 4, the

5   delivery address of the subject parcel to law

6   enforcement database accurate showed that the business

7   name Maximillian Settlement was not associated to that

8   delivery address.

9        Q.   Okay.

10       A.   And that address is actually Virtual Office

11  Facility.

12       Q.   All right.  So -- go ahead, I'm sorry.

13       A.   I can continue to say, based on my training

14  and experience, I know that the use of a virtual

15  office facility or some sort of mailing entity as a

16  virtual office facility is used to mask the true

17  identity of the individual who's supposed to receive

18  the parcel.

19       Q.   Okay.  Now, you said that based on the

20  database, was it Accurant (ph)?

21       A.   Accurate, yes, sir.

22       Q.   Accurate, okay.

23       Q.   You said that the business name is not

24  associated with the delivery address, right?

25       A.   Yes, sir.

1      Q.   I mean, I'm just curious but businesses move

2   frequently, don't they?

3      A.   Yes, I suppose.

4      Q.   Okay.  And they change their addresses

5   frequently, right?

6      A.   Again I suppose, yes.

7      Q.   Okay.  And you said it wasn't associated

8   with that, well, let me just -- I mean -- okay.  Okay.

9           You did some type of data computer search;

10   am I correct?

11      A.   Yes, sir.

12      Q.   And that computer search indicated some

13   parameters; am I right?

14      A.   Yes.

15      Q.   Okay.  And those parameters had something to

16   do with when the database that you were reviewing,

17   when that database was last updated; am I correct?

18      A.   I assume so.  I don't know the -- you know,

19   when they do updates, stuff like that.  I'm not sure

20   where they get their data from.

21      Q.   Okay.  Okay.  Okay.  So, in other words, you

22   don't know that, then it could be that Maximillian was

23   associated with that address at some time subsequent

24   to Accurant was updated; am I right?

25      A.   At the time I search Accurant, Maximillian

1    was not associated with that address.

2         Q.   Right.  But that's when you searched it, but

3    when was Accurant last updated?

4         A.   I couldn't tell you that, sir.

5         Q.   In other words, how stale, how old, how

6    ancient was the information in the database for

7    Accurant to determine whether or not Maximillian

8    really was a business at that address?

9         A.   I can tell you that information is as

10   current as 2012.  It's normally a month or two off,

11   where they kind of date and -- how do they do it, like

12   date and time it, month and date it, it's usually like

13   the previous month, a month prior to that.

14        Q.   You say 2012, well, this is 2013, right?

15        A.   Correction, 2013.  Any particular year, it's

16   usually about a month -- it can only tell you

17   obviously up until the 30th of the previous month is

18   my experience with that database.

19        Q.   Okay.  Well, what about on this particular

20   occasion?  Can you tell us what your experience was on

21   this particular occasion in regards to the update of

22   the data in that database when -- that you searched,

23   to determine whether or not Maximillian was associated

24   with that address?

25        A.   Certainly.  When I ran Maximillian

Case 2:13-cr-00669-CDJ   Document 79   Filed 09/17/14   Page 46 of 247

 1    Settlements to that address, no records were found.

 2         Q.   That wasn't my question really.  My question

 3    was, in essence, can you say specifically when the

 4    database was updated to determine whether or not

 5    Maximillian was associated with that address?

 6         A.   No.

 7         Q.   So in essence, sir, you can't tell us how

 8    accurate Accurant really was in regards to determining

 9    whether Maximillian was associated with that address;

10    isn't that right?

11         A.   I could tell you on the day that I searched

12    it using that address as well as the name, the name

13    did not associate to that address.  I searched it both

14    ways.

15         Q.   Okay.  Okay.  Now, after you -- that was

16    what you used, and you used that to identify this

17    package as a suspect package; am I correct?

18         A.   No.  That's --

19         Q.   Oh, you didn't do that?

20         A.   Let me -- correct.  That's one of the

21    criteria.  There's other criterias.

22         Q.   Okay.  What other criteria did you use

23    before the package was presented to Officer Kelliher

24    and her canine?

25                   MR. TULANTE:  Your Honor, may I object

Page 47

1    to the line of questioning.  I believe that the

2    defense counsel is trying to identify -- he's trying

3    to essentially do a Franks hearing here, and Mr. --

4    Inspector McStravick is testifying solely to provide

5    the Court the context and the timeline through which

6    the Government obtained these warrants; in other

7    words, whether or not they're signed or unsigned.

8              So I understand, you know, he was

9    asking about Accurant.  My concern, your Honor, he's

10   going to go paragraph-by-paragraph and really try to

11   attack the affidavit without identifying any basis for

12   any material omissions or --

13             THE COURT:  Sustained.

14   BY MR. MILLER:

15        Q.  Officer, what time was Officer Kelliher --

16   what time did Officer Kelliher actually, along with

17   her canine, exposed to the package, that's indicated

18   in Government Exhibit C?

19        A.  Sometime before 9:20, I'd say approximately

20   8:30 maybe, probably about 8:30.

21        Q.  You don't know?

22        A.  I do not know, sir.

23        Q.  Did you make any notes?

24        A.  I do not know, sir.

25        Q.  I'm sorry?

1     A.    No, I did not.

2     Q.    You do not or you did not?

3     A.    I did not, and I do not.

4     Q.    Okay.  Do you know whether or not the

5   Detective Kelliher made any notation as to the time

6   that she was exposed to the packages or to the package

7   with her canine?

8     A.    I do not.

9     Q.    Were you present at the time that Officer --

10   I'm sorry, Detective Kelliher presented -- was

11   presented with the package that's referred to in

12   Government Exhibit C?

13     A.    Yes, I was.

14     Q.    You were present, okay.

15           Now, where was that -- what was the

16   location, by just office number, not necessarily

17   street address, but what was the -- where was that?

18   Was that at the airport, was it at your office or?

19     A.    At our office, sir.

20     Q.    I'm sure a log is kept (indiscernible).

21           Now, regarding the actual -- you were

22   present, since you were present, did -- were you

23   involved in setting up any display of packages for the

24   dog, Kirby, which was Officer -- Detective Kelliher's

25   partner, the dog, the canine, were you involved in

Page 49

1    setting up the display?

2         A.   I honestly don't recall.

3         Q.   Was anybody else present besides you and

4    Detective Kelliher?

5         A.   Again, honestly I couldn't recall at this

6    time.

7         Q.   Okay.  And this package that's referred to

8    in C, is -- was at the same time package B, both were

9    on the same plane, or were they on different planes?

10        A.   Okay.  So you're saying the package

11   represented in Exhibit B as well as Exhibit C?

12        Q.   That's correct.

13        A.   Again, I'm not sure.  Multiple planes come

14   into the airport --

15        Q.   Okay.

16        A.   -- and it's delivered to the air

17   (indiscernible) facility.

18        Q.   Okay.  You talked about Accurant, but let me

19   ask you this, you are pretty much the person who is --

20   was in charge of this investigation; am I correct?

21        A.   Yes, sir, I was the case agent.

22        Q.   Okay.  And you're familiar with the postal

23   tracking system used by your post office; am I

24   correct?

25        A.   Yes, sir, I am.

Page 50

1       Q.   Let me just ask you this, can you tell us

2    how that tracking system would work with a package,

3    when a package arrives in Philadelphia, what happens,

4    is it scanned or what?

5       A.   It depends on a multitude of factors.  It

6    depends on the induction, the location of the package

7    into the area, not just Philadelphia, into any area,

8    it depends on where the package is coming from, where

9    it's going to.  There's a multitude of ways the

10   packages are inducted into the mail system here in

11   Philadelphia.

12      Q.   Okay.  Now, in regards to this particular

13   package, I believe this is included in what would be

14   Defense Exhibit C -- I'm sorry, Defense Exhibit A.

15   Let me see, I don't know if it's within -- it's not in

16   there.

17              MR. MILLER:  And yeah, do you have it?

18   May I see it for a second and make sure?

19      (Pause)

20              MR. MILLER:  Judge, I violated a rule

21   for copying in your courtroom.  I have one copy of

22   documentation that I received from the Government, and

23   I did not make a copy of it, Judge.

24              THE COURT:  Excuse me, 50 lashes.

25   We're going to recess, Counsel.  It is now 12:35.  We

1    will reconvene at 1:35 promptly, and you'll get time

2    to do that.

3              MR. MILLER:  Thank you, Judge.

4              THE COURT:  Thank you.

5         (Recessed at 12:35 p.m.; reconvened at 1:48 p.m.)

6              THE COURT:  Counsel, procedurally, I

7    understand that there is a second superseding

8    indictment in this matter?

9              MR. MILLER:  Yes, Your Honor, we have

10   -- that was issued by Mr. Tulante, and I received it.

11   I don't believe that at this point my client has been

12   arraigned on it.

13             THE COURT:  That's exactly where I'm

14   going.

15             MR. MILLER:  Yes, sir.

16             THE COURT:  Exactly where I'm going.

17             MR. MILLER:  Yes, sir.

18             THE COURT:  We should do that at this

19   time.

20             MR. MILLER:  We can, yes, sir, whatever

21   pleases the Court, Your Honor.

22             THE CLERK:  I'm sorry, would you stand,

23   please.  Would you raise your right hand?

24        (Defendant sworn)

25             THE CLERK:  Can I ask how would you

Page 52

1    like to be (indiscernible)?

2                    THE DEFENDANT:  Secured party.

3                    THE CLERK:  Secured party before

4    (indiscernible)?

5                    THE DEFENDANT:  Secured party as

6    authorized agent for (indiscernible).

7                    THE CLERK:  For secured party

8    (indiscernible)?

9                    THE DEFENDANT:  Yes.

10                   THE CLERK:  Secured party, you have

11   been charged in the second superseding indictment

12   charging you with Count I, conspiracy to distribute 5

13   kilograms or more of cocaine in violation of 21 United

14   States Code Section 846; Counts II and III, the

15   attempted distribution of 500 grams or more of cocaine

16   in violation of 21 United States Code Section 846;

17   Count IV, possession of a firearm in furtherance of a

18   drug trafficking crime in violation of 18 United

19   States Code Section 924(c)(1); and Counts V and VI,

20   possession of a firearm by a convicted felon, in

21   violation of 18 United States Code Section 922(g)(1).

22                   As to Count I, how do you plead guilty

23   or not guilty?

24                   THE DEFENDANT:  Before I can enter a

25   plea, I would like to get a clear understanding.  Is

Page 53

1    this a claim that's being placed against me?

2                   THE COURT:  Are you asking the deputy

3    clerk or are you asking the Court?

4                   THE DEFENDANT:  Whoever has the answer,

5    no disrespect, I just want to know, if this a claim

6    that's being placed against me?

7                   THE COURT:  What do you mean by claim?

8                   THE DEFENDANT:  Is someone claiming

9    that I harmed them?

10                  THE COURT:  This is an indictment.

11                  THE DEFENDANT:  Okay.

12                  THE COURT:  It is a charge lodged by

13   the grand jury.

14                  THE DEFENDANT:  Well, could the Court

15   please provide me with proof of authority?

16                  THE COURT:  I'm sitting here in a robe,

17   that's the best I can do for you.

18                  THE DEFENDANT:  So there's no evidence

19   of authority (indiscernible) you're sitting here

20   (indiscernible)?

21                  THE COURT:  For here, for now, yes,

22   sir.

23                  THE DEFENDANT:  Well, I will not be

24   able to make a decision (indiscernible) broken any

25   laws under that authority.

 1                    THE COURT:  Very well.  The Court will

 2     enter a plea of not guilty on the secured party's

 3     behalf.  You may be seated.  Let's go forward.  Thank

 4     you.

 5                    THE DEFENDANT:  Just for the record,

 6     please, I just want to object to you practicing law

 7     from the bench.

 8                    THE COURT:  The objection's noted,

 9     thank you.

10                    Where were we, Counsel?

11                    MR. MILLER:  Yes, Your Honor.  I

12     believe we -- I was cross-examining the witness at

13     this time.

14                    THE COURT:  You may continue.

15                    MR. MILLER:  Thank you, Your Honor.

16     Before I proceed, though, I would ask the Court to --

17     I presented some documents to your staff, Ms. Chavez

18     (ph) regarding a package -- a parcel number rather

19     that ends in 581.  That parcel -- that complete parcel

20     number is --

21                    MR. TULANTE:  Your Honor, we stipulate

22     to whatever the number, I want to save Mr. Miller the

23     trouble.

24                    MR. MILLER:  (indiscernible)

25                    THE COURT:  Is this the one Ms.

Page 55

1    Elchubach (ph) just handed me?

2                    MR. MILLER:  That's -- yes, sir, I

3    believe it is.  Yes, I just gave it to her --

4                    THE COURT:  All right.

5                    MR. MILLER:  -- yes, sir, Your Honor.

6                    THE COURT:  Now, it needs to be marked,

7    and we'll keep --

8                    MR. MILLER:  Yes, Your Honor, and I've

9    spoken with the Assistant District Attorney and he had

10   no --

11                   THE COURT:  Assistant United States

12   Attorney.

13                   MR. MILLER:  Oh, forgive me, Judge.

14                   THE COURT:  Several blocks away, but --

15                   MR. MILLER:  Judge, I was down there

16   this morning.  I was down there this morning.

17                   THE COURT:  I take offense.

18                   MR. MILLER:  In front of Judge Jiminez.

19                   THE COURT:  Not a problem.

20                   MR. MILLER:  I apologize, I apologize.

21                   THE COURT:  That's all right.

22                   MR. MILLER:  But I have -- spoke with

23   Assistant U.S. Attorney Mr. Tulante regarding the

24   titling of this document for -- just for marking it

25   for identification purposes, and that would be

1    addendum to or the addendum to Exhibit A, Defense

2    Exhibit A.

3                    THE COURT:  All right.  Just a moment,

4    please.

5                    MR. MILLER:  Yes, sir.

6                    THE COURT:  So marked.

7                    MR. MILLER:  Thank you.  May I proceed,

8    Your Honor?

9                    THE COURT:  Yes, sir.

10                   MR. MILLER:  Thank you, sir.  Your

11   Honor, is it all right if I sit down?

12                   THE COURT:  Surely.

13                   MR. MILLER:  Thank you, sir.  And I

14   apologize for being seated earlier, Judge, I believe I

15   was supposed to ask the Court permission to be seated.

16   I believe I read that in your rules.

17                   THE COURT:  Accepted and thank you very

18   much, you may be seated.

19                   MR. MILLER:  Thank you, sir, I meant no

20   disrespect, sir.

21                   THE COURT:  Not a problem.  Thank you

22   very much.

23                   MR. MILLER:  Thank you, sir.

24   BY MR. MILLER:

25        Q.   It's McStravick; am I correct, sir?

1          A.    McStravick, correct, sir.

2          Q.    All right.  Thank you, thank you.  And

3     again, good afternoon.

4          A.    Good afternoon, sir.

5          Q.    Mr. McStravick, you -- are you familiar with

6     the postal tracking system, product tracking system?

7          A.    Yes, sir, I am.

8          Q.    Okay.  What -- can you explain that system

9     to me?  I'm sorry --

10                   MR. TULANTE:  I don't believe the

11     witness has a copy, Your Honor.

12                   MR. MILLER:  I'm sorry.  And, Judge, I

13     have an extra copy.  I have extra copies.

14                   THE COURT:  Very well.

15                   MR. MILLER:  If I may approach your

16     court staff.

17                   THE COURT:  Yes, sir.

18                   MR. MILLER:  Thank you.  I did not mark

19     it, Judge, it's just plain.

20                   THE COURT:  All right.  It is addendum

21     to Defense Exhibit A.

22                   THE WITNESS:  Thank you.

23                   MR. MILLER:  Yes.  May I proceed, Your

24     Honor?

25                   THE COURT:  Yes, sir.

1            MR. MILLER:  Okay.  Thank you.

2   BY MR. MILLER:

3       Q.   Mr. McStravick, you say you're familiar with

4   the postal product tracking system, correct?

5       A.   Yes, sir, I am.

6       Q.   Just tell me how does that system operate?

7       A.   It's the tracking system the United States

8   Post Office uses to track their mail or parcels, boxes

9   that contain a tracking number.

10      Q.   Okay.  Now, you say in containers?

11      A.   No, and that contain the trucking number.

12      Q.   Oh, okay.

13      A.   I apologize, I have a cold, sorry.

14      Q.   No, no, it's all right.  I believe I'm

15   losing my hearing a little bit, too much hard rock

16   music, I'm sorry.

17           But at any rate, okay, then you said it's

18   the method that the post office uses to track various

19   parcels or letters or pieces of mail; am I correct?

20      A.   Yes, sir.

21      Q.   Okay.  Now, that system is -- is that a

22   system something that's mechanically, or is it

23   mechanized or that you use standards and stuff like

24   that?

25      A.   It's a database that standards are used on,

1    correct, sir.

2         Q.   Okay.  And then as packages arrive at

3    various locations, they are scanned; am I correct?

4         A.   Depending on the type of facility they're at

5    they would be scanned.

6         Q.   Okay.

7         A.   Again, it's hinged upon the type of

8    facility, where the package is.

9         Q.   Okay.  Here, Philadelphia International

10   Airport, okay, are the packages scanned?

11        A.   Not at the airport, no, sir.

12        Q.   Where are they scanned?

13        A.   Again, it depends on once they enter into

14   Philadelphia from the airport, it depends on where

15   they're then disbursed to.  There's two different, at

16   least two different central processing centers here in

17   Philadelphia.

18        Q.   Okay.  So they're scanned at the processing

19   center, right?

20        A.   Yes.

21        Q.   Okay.  Okay.  Now, those processing centers,

22   exactly where they're located, are they located in the

23   airport, are any located in the airport, or is it

24   downtown or what?

25        A.   Not at the air -- there's nothing at the

Page 60

1    airport.

2        Q.   Nothing at the -- (indiscernible) Street

3    Station, there used to be -- no?

4        A.   There's one on Lindberg Boulevard, and

5    there's one up in the northeast.

6        Q.   Okay.  So that's where packages are scanned.

7        A.   Correct.

8        Q.   That come into Philadelphia.

9        A.   Correct.

10       Q.   Okay.  And so they are -- if they come into

11   the airport, they come into the airport and then they

12   are driven to Lindberg Avenue or the northeast, am I

13   correct, by -- they're driven there; am I correct?

14       A.   Yes.

15       Q.   By vehicle, right?

16       A.   Yes.

17       Q.   Okay.  So in other words, what you're saying

18   is, is that when something is taken off of a plane,

19   there's nothing to indicate when that package is

20   actually -- initially arrived here in Philadelphia.

21       A.   That is correct, yes.

22       Q.   That's correct?

23       A.   Yes.

24       Q.   And now when it is scanned, usually is the

25   packet -- well, not when it's scanned, but prior to it

1    being scanned, how -- you say it's delivered by truck,

2    but in this instance the packages that were basically

3    identified as suspect, okay, were they identified as

4    suspect -- where were they identified as suspect?

5        A.   Once we actually had our hands on that

6    parcel.  Let me back up.  We -- some parcels our

7    system is able to capture an image, a different

8    database of the actual label of the parcel itself.

9             On -- if we're referring to November 12th,

10   images were captured of these labels, which I had very

11   early in the day right after they were entered into

12   the mail stream.  So at that point in time, I had a

13   picture of the label, at which time I could start

14   using my investigative techniques.

15       Q.   Okay.  So now you're saying that pictures

16   were taken of the label for the two packages that

17   ended in I believe it's 581 and 391 parcels; am I

18   correct?

19       A.   If I recall, I believe, yes.  I believe they

20   hit a machine that has a -- photo capability.

21       Q.   You believe, you're not sure.

22       A.   I believe.

23       Q.   So do you know or do you believe whether or

24   not you looked at these pictures?

25       A.   Okay.  I looked at the pictures prior to

1    them arriving in Philadelphia.

2         Q.   Prior to them arriving in Philadelphia?

3         A.   Yes.

4         Q.   And when you say arriving in Philadelphia,

5    you mean while they were in the air?

6              MR. TULANTE:  Your Honor, may I object.

7    I know Your Honor doesn't like speaking objections,

8    but I'm concerned based on the line of questioning,

9    given the limited purpose for which Inspector

10   McStravick has been offered, that is to establish the

11   timing and the procedure followed by the Government to

12   get the warrant issued with respect to Judge Caracappa

13   that I don't know where -- my concern is that defense

14   is asking a lot of questions that run far afield of

15   that and --

16             THE COURT:  Mr. Miller, can I ask for

17   an offer of proof?

18             MR. MILLER:  Sure, Judge.  Long and

19   short, I'll get right directly to it.  The postal

20   tracking record that's indicated as part of the

21   addendum to Defense Exhibit A indicates the time that

22   the package arrived here in Philadelphia.  And I'm not

23   trying to make sure that I understand (sic), and maybe

24   -- well, at least for my edification, and that make

25   sure that the Court, and I'm not sure, but to make

1    sure, to make sure the Court understands this process.

2    And I'm getting an education to an extent, but I

3    ultimately do have some questions in regards to the

4    material that's listed here in the addendum.

5              THE COURT:  All right.  Overruled for

6    now, you may proceed.

7              MR. MILLER:  Thank you.

8    BY MR. MILLER:

9        Q.   Now, sir, I'm just -- I'm curious.  You were

10   saying that the packages were initially arrived here

11   in Philadelphia, but you saw the packages by way of a

12   photograph before they arrived here in Philadelphia.

13       A.   Yes, sir.

14       Q.   And that was a picture of the package.  Was

15   that a picture of the package at its point of origin

16   when it was put into the mail stream, or is that a

17   picture of the package when the package was in the

18   air, or at what point?

19       A.   I believe that image had been captured at a

20   processing plant in Los Angeles, California.

21       Q.   At a processing plant, okay.  And is that

22   the label or the whole package?

23       A.   Just -- it's just the -- I mean, it

24   obviously depends on the way the package is laying on

25   the belt.  At times it's just the label, at times it's

1    the label as well as -- it just depends on how the

2    package falls on the belt.

3         Q.   Okay.  What did you see in this instance?

4         A.   This was the label, the actual --

5         Q.   Just the label?

6         A.   I believe so.  When I drew up my affidavit.

7         Q.   So you say you believe so, so you don't

8    really know what you looked at?  I'm just trying to

9    find out.  Did you look at the label or the whole

10   package?  You don't know if you did that?

11        A.   Honestly I recall, I had the tracking number

12   available to me, I had the return address available to

13   me, I had the dimensions of the parcel available to

14   me, and I had the address here in Philadelphia

15   available to me.

16        Q.   Could you see if the package was flat, or

17   whether it was rectangular, I mean, when I say

18   rectangular, I mean not rectangular flat, but was a

19   box like or could you tell whether it was flat, I

20   mean, how could you -- how would you be able to tell

21   that without seeing the whole, or could you tell?

22        A.   (indiscernible).

23        Q.   And just by looking at the label?

24        A.   This indicates right on here it's a medium

25   flat rate box, the documents you gave me.

1        Q.   Okay.  Okay.  Okay.  All right.  Okay.

2             So you're depending on the accuracy of this

3    document; am I correct?  This document is accurate and

4    correct, right?  The information contained in it.

5        A.   Correct.

6        Q.   All right.  Now, you said that the package

7    was indicated as suspect at some point; am I correct?

8        A.   That's correct.

9        Q.   And when was that?

10       A.   If I can backtrack to the prior day on

11   November 12th, as we indicated we had identified and

12   seized -- opened a parcel that contained 2 kilograms

13   of cocaine.  And while we were doing that, the other

14   investigative steps to be taken, to determine if the

15   method of payment for which that parcel -- which was

16   used to pay for that parcel --

17       Q.   Right.

18       A.   -- was paying for any additional parcels.

19   That revealed positive results, showing that the

20   credit card -- that was used to purchase the package

21   that was intercepted on November 12th.  That credit

22   card was also used at two additional post offices in

23   California to ship mail from California to

24   Philadelphia.

25             Based on that information, there's a review

1    of more postal databases that allow me to see what the

2    tracking number is, allow me to find out if an image

3    is available of the actual label, provides credit card

4    information, label images, numerous -- there's

5    numerous databases at my disposal during my

6    investigation.

7         Q.   I understand that.  Okay.  So but at what

8    point was the package -- did you identify the package

9    as being suspicious, the two packages as being --

10        A.   I would say the first point was when I

11   realized that a credit -- the same credit card was

12   used -- the credit card that was used for a parcel

13   which contained 2 kilograms of cocaine was also used

14   for two additional parcels.

15             Based on my training and experience, that's

16   automatically going to tell me that something could be

17   suspicious with this parcel that the same credit card

18   was used.

19             Next, I was able to obtain a picture of the

20   label.  Upon getting the picture of the label, as

21   we've gone through in both of my affidavits, I was

22   able to determine that Maximillian Settlements was not

23   associated to that address, based on the check of

24   Accurant, which is what began my entire investigative

25   process.

1            Ultimately I also looked at the second

2    parcel, which was addressed to Jackson Law Group at

3    the 1640 Nixon Drive.  1640 Nixon Drive is a UPS

4    store.  That's basically a mail receiving agent.  Once

5    again, based on my training and experience, a UPS

6    store, a CMRA, a virtual office, these are all

7    establishments that narcotics traffickers use in order

8    to --

9                    THE COURT:  And for the record, the

10   acronym CMRA is?

11                   THE WITNESS:  Commercial Mail Receiving

12   Agent, Your Honor.

13                   THE COURT:  Thank you.  You may

14   continue.

15                   THE WITNESS:  My apology.

16   BY MR. MILLER:

17       Q.   Well, let me just ask you this.  Okay.  Was

18   it on November 12th, November 13th, November 14th when

19   the package was identified as suspicious?

20       A.   We received those information on November

21   13th, for these -- for Exhibits C and B on November

22   13th when they entered the mail stream is when I

23   identified them as being suspicious.

24       Q.   Is there any reason why you're looking at

25   the U.S. Assistant Attorney?  Okay.  I just want to

1    make sure, is there any reason why you're looking at

2    him as you talk?

3         A.   No.

4         Q.   Okay.  Okay.  Okay.  Now, let me just ask

5    you, you said this was on the 13th when you made the

6    identification.

7         A.   For these two.

8         Q.   Okay.

9         A.   On the 12th, I had identified the first box

10   obviously.

11        Q.   Okay.  Now, let me ask you this.  You said

12   you made these identifications?

13        A.   Yes, correct.

14        Q.   Okay.  And you did it from your desk before

15   the packages got here, or once the packages were --

16   once you had the packages physically in your hand?

17        A.   I'm able to do a lot of --

18                  MR. TULANTE:  Asked and answered --

19                  THE COURT:  Sustained.

20                  MR. TULANTE:  -- I think it's already

21   been --

22                  THE COURT:  Sustained.

23                  MR. MILLER:  Okay.  Okay.  Okay.

24   BY MR. MILLER:

25        Q.   Now, once you identified the packages as

1  suspect, then what did you do, if anything?

2      A.   Okay.  Once they're identified, I began

3  preparing the affidavit, application for a search

4  warrant.

5      Q.   Okay.  Now, so you prepared the affidavits,

6  and you said you pre-prepared them prior to them being

7  presented; am I correct?

8      A.   That's correct, sir.

9      Q.   Okay.  Okay.  And where did you make --

10 where did you prepare these documents?  At your

11 office?

12     A.   Correct.

13     Q.   Okay.  And that was on the 13th?

14     A.   That's correct.

15     Q.   Okay.  And then after you prepared the

16 documents, you presented them to who?

17     A.   To the Assistant United States Attorney,

18 Sozi Tulante.

19     Q.   I see.  And when did you do that?

20     A.   Sometime in the afternoon of November 13th.

21     Q.   Sometime in the afternoon.

22     A.   I recall.

23     Q.   You don't recall?

24     A.   No, I said I'm recalling, it would've been

25 some time in the afternoon.

1        Q.   Now, how did you do that?  Did he come

2    physically to your office, or how did you do this?

3    Did you read it to him telephonically, or did you e-

4    mail them or what?

5        A.   I e-mailed them to him electronically.

6        Q.   You did?

7        A.   Yes, sir.

8        Q.   Okay.  So now, after you e-mailed them to

9    him, then as a result of information you received from

10   him, you later got basically in touch with somebody or

11   what?  Or what did you do after you -- after you e-

12   mailed him, let me ask about that.

13       A.   I continued my investigation.

14       Q.   What did you do when you continued your

15   investigation?

16       A.   Well, first of all, we had an individual in

17   custody for the box that was mailed -- first of all,

18   we had (indiscernible) we had just done a controlled

19   delivery, so we're handling numerous amount of things

20   with Mr. Griffin, who's currently in custody in my

21   office.

22            We are preparing forward the plane to come

23   in from California, so we can go down and intercept

24   the next two parcels, numerous things are going on.

25       Q.   Okay.  Now, you say you're preparing for the

1    plane --

2         A.   Uh-huh.

3         Q.   -- do you know what airline this was, or was

4    this a postal airline or I mean, specifically a U.S.

5    Postal plane, or was this a commercial airline?

6         A.   The -- we don't have any planes.

7         Q.   Okay.  So it was a commercial airliner?

8         A.   Yes.

9         Q.   Do you know what airline?  Was it Delta,

10   U.S. Air, who?

11        A.   I believe it's FedEx that brings our

12   packages in.

13        Q.   FedEx, okay.  Okay.  Now -- wow, the U.S.

14   uses FedEx.  Okay.

15             And you say you believe, you don't know?

16        A.   Again, I don't recall, I believe it's FedEx.

17   I wasn't physically plane side.

18        Q.   Okay.  Okay.  So you didn't retrieve the

19   actual package, right?

20        A.   I did not, no.

21        Q.   But the package -- well, who retrieved the

22   package?

23        A.   One of the inspectors from my team.

24        Q.   And that was at the airport?

25        A.   That's at our air mail facility.

1      Q.   Air mail facility, where is that?

2      A.   In Essington.

3      Q.   So that's right near the airport?

4      A.   Adjacent to the airport, yes, sir.

5      Q.   Adjacent to the airport, okay.  Okay.  And

6   so the package was retrieved at that point?

7      A.   Correct.

8      Q.   Yeah, at what time was that?

9      A.   Again, it's some time.  I couldn't -- planes

10  come in at 6 -- I want to say the first one's at 5:30,

11  one's -- the second one's at 6:30, I'm guesstimating

12  somewhere around there, depending on their delays,

13  weather conditions, and things like that.

14     Q.   You said 5:30 or 6:30?

15     A.   There's two planes generally.

16     Q.   Well, what about on this particular

17  instance, do you know what time the plane got there

18  and --

19     A.   Again, I don't recall exactly what time the

20  plane got there.

21     Q.   Do people leave their office to go meet the

22  plane?

23     A.   Yes.

24     Q.   Okay.  Well -- and you were at the office

25  when they left, right?

1       A.   Yes.

2       Q.   So you don't know what time they left and

3   they were right there at your office?

4            MR. TULANTE:  Your Honor, objection, I

5   think he's --

6            THE COURT:  Sustained.

7            MR. MILLER:  Withdraw the question,

8   withdraw the question, withdraw the question.

9   BY MR. MILLER:

10      Q.   Okay.  Who was it that -- who are the people

11  that left to go retrieve the package?

12      A.   I believe Inspector Zavorsky (ph) is the

13  inspector who actually brought the parcel.

14      Q.   You say you believe?

15      A.   Again, I recall it was Inspector Zavorsky

16  who brought the parcel to me.

17      Q.   You said Goborsky?

18      A.   Zavorsky.

19      Q.   Za.  And any particular reason why that name

20  comes up that he was the one?

21      A.   What, I'm sorry?

22      Q.   Any particular reason why you recall -- why

23  is it that you just recall, and you don't know for

24  sure, but why is it that his name is the one that

25  you're telling me right now?

Page 74

1        A.    Because he was one of the inspectors that

2   went to the in ramp (ph) facility.

3        Q.    He was one of them?

4        A.    Correct.

5        Q.    And there were others?

6        A.    I believe there was ten inspectors at the in

7   ramp facility.  There are thousands of parcels that

8   arrive at that facility.

9        Q.    Right, I understand.  But who are the ones

10  that left your office to go get these particular --

11  this particular parcel, these two particular parcels?

12  I'm just trying to find out.  I'm trying to basically

13  get a chain of custody basically really.

14       A.    Okay.  I have no idea who left the office

15  again that day.  We had executed a controlled

16  delivery, we took someone into custody, we were in the

17  process of interviewing Mr. Griffin, I'm on the phone

18  with the Assistant United States Attorney, ten

19  inspectors went down there.  I recall Inspector

20  Zavorsky bringing the parcels into my office prior to

21  me taking them to Detective Kelliher.

22       Q.    So he brought them in.  So what time was

23  that?

24       A.    Sir, again, it's some time in the evening

25  prior to us contacting Judge Caracappa to advise her

1   that canine Kirby positively indicated on the parcels.

2       Q.   And when you say evening, are you talking

3   about after 6 o'clock p.m.?

4       A.   Absolutely.

5       Q.   Okay.  But before 9 o'clock, though, right?

6       A.   Yes, sir.

7       Q.   Okay.  Between 6 and 9.  Now, you -- and

8   once you got the package, you had already prepared

9   your affidavit, and then you forwarded that affidavit

10  to someone, correct, you said Mr. Tulante, right?

11      A.   I'm not sure if I -- I don't know if you had

12  the order of that correct.

13      Q.   Okay.  Well all right, then you know what

14  time.  But anyway, the point is, is that you had the

15  package, and this was at about you say somewhere

16  between 6 and 9, but again, let me just go back, and

17  this is -- we're talking -- at one point, I was just

18  speaking about, I believe it was package 391.  But I

19  want to go specifically to package number -- I believe

20  it is 581.

21          And I believe it's the -- it's referred to

22  in your affidavit that's a part of the Government's

23  Exhibit D, if you -- it's Government Exhibit D.  And

24  it's actually the -- let me make sure, it's actually

25  the next to the last page of that exhibit.  Next to

1    the last page of Exhibit D of -- it's next to the last

2    page of Exhibit D, it's marked as page 3, but it's

3    actually next to the last page of Exhibit D.  Do you

4    see it?

5         A.   Yes.

6         Q.   All right.  Now, do you see paragraph 5

7    there?  It's marked paragraph 5, do you see that, at

8    the top?

9         A.   Yes.

10        Q.   Okay.  And paragraph 5 reads, would you

11   agree, exactly like -- this second to last page reads

12   exactly like this whole page, reads exactly like -- I

13   guess that would be the fourth page.  Let me see one

14   -- yeah, the fourth page of Exhibit D, which is marked

15   page 3 again.

16        A.   Okay.  Hold on.

17        Q.   The fourth page of Exhibit D, starting from

18   the front to the back, the fourth page of Exhibit D is

19   exactly like the next to the last page of Exhibit D.

20   That is exactly like --

21        A.   I'm really confused.  Okay.

22                  MR. MILLER:  If I may approach, Judge,

23   just to point out what I'm talking about.

24                  THE COURT:  Do you understand, sir?  Do

25   you need some assistance?  Would you like him to point

1    it out?

2                    THE WITNESS:  Certainly, Your Honor.

3                    MR. TULANTE:  Yeah, I think, Your

4    Honor, we'll have to disassemble Exhibit D, so.

5                    THE WITNESS:  I apologize.

6                    MR. MILLER:  I don't think you have to

7    disassemble it.

8                    THE WITNESS:  No, I think I

9    disassembled it.

10                    MR. MILLER:  Oh, I'm sorry.

11                    THE COURT:  You may approach, no

12   problem.

13                    MR. MILLER:  Thank you, Your Honor,

14   thank you.

15   BY MR. MILLER:

16        Q.   Okay.  Exhibit D --

17        A.   Are you referencing the two affidavits?

18        Q.   Yes.

19        A.   Okay.  Then I'm with you.

20        Q.   Paragraph 5 in the two affidavits.  Do you

21   see them?

22        A.   Right here, sir.

23                    MR. MILLER:  Thank you.  Your Honor,

24   may I be permitted to go back to my seat, Judge?

25                    THE COURT:  Yes, sir.

1           MR. MILLER:  Thank you.

2    BY MR. MILLER:

3        Q.   Would you agree that basically -- not

4    basically, exactly, to the letter and to the T, that

5    those two pages are exactly the same?

6        A.   I'm going to say they're probably very

7    close, if not exactly the same.  This is the language

8    I use when I have a positive indication on all of my

9    search warrant applications.

10       Q.   I would ask you to please point out any

11   differences between those two pages, other than let's

12   say, maybe the distance from the heading, the top to

13   the first line, and the distance from the bottom of

14   the page to the bottom line --

15       A.   Well, first and --

16       Q.   -- other than the margins, other than the

17   margins, are they exactly alike?

18       A.   Absolutely not, sir.

19       Q.   They're not?

20       A.   No.  On -- I'm just going to do it by the

21   tracking --

22       Q.   Okay.  They're not.

23       A.   By the tracking number 0581, if I can call

24   your attention, sir, to paragraph number 7.

25       Q.   Yes.

1        A.   I say, "The subject parcel contains

2   substances in from Los Angeles, California to Plymouth

3   Meeting, Pennsylvania via priority mail."

4        Q.   Right.

5        A.   To go over to the second affidavit, which

6   the last three digits would be -- I'm sorry, last four

7   digits would be 0391.

8        Q.   Okay.

9        A.   If I can point you to the same paragraph,

10  that's going to say --

11       Q.   Which paragraph was that?

12       A.   Paragraph number 7, sir.

13       Q.   Seven.

14       A.   That's going to say, "The subject parcel

15  contains controlled substances sent from Valley

16  Village, California to Morristown, New Jersey."

17       Q.   Okay.  Let me ask you this.  Looking at

18  paragraphs 5 and 6, okay?

19       A.   Uh-huh.

20       Q.   And specifically the first sentence of

21  paragraph five --

22       A.   Okay.

23       Q.   -- the sentence in the first -- sentence in

24  paragraph 5, and all of paragraph 6.

25       A.   Uh-huh.

Page 80

1      Q.   Are they exactly to the tee the same?

2      A.   I better read them.  My belief is going to

3  be yes.

4           Again, sir, this is standard search warrant

5  templates that I've executed hundreds of.

6      Q.   I understand that, but are they exactly the

7  same?

8      A.   Yes.

9      Q.   The first sentence of paragraph 5 and

10  entirety of paragraph 6 which is just one -- two

11  lines, one sentence.

12      A.   Yes, sir --

13      Q.   Okay.

14      A.   -- from what I can tell, they're exactly the

15  same.

16      Q.   Okay.  Okay.  Now, let me just make sure I'm

17  correct.  These facts are true, right?

18      A.   Absolutely, sir.

19      Q.   Okay.  Okay.  Okay.  Okay.  Now, if they are

20  true, then going to the first page of paragraphs -- of

21  Defense Exhibit D, are you familiar with that page, or

22  do you have it?

23      A.   I only have addendum to Defense A, that's

24  all in front of me.

25      Q.   You don't have Defense Exhibit D?

Page 81

1        A.    No, sir.

2              THE COURT:  It's Government's Exhibit

3    D.

4              MR. MILLER:  I'm sorry.

5              THE WITNESS:  I have Government's

6    Exhibit D.

7    BY MR. MILLER:

8        Q.    Government Exhibit D, I'm sorry.

9        A.    Okay.

10       Q.    Do you have that?

11       A.    I have that now, sir, yes.

12       Q.    The first page, okay.  Now, as we did

13   before, the next to the last sentence there, you know,

14   let me -- right.  And I'll just read it, and I'll just

15   see if you (indiscernible) you can see it, these

16   packages are on the planes in route to Philadelphia

17   International Airport, and they're not expected to be

18   presented to the drug detection dog until 9:30 p.m.

19   tonight at the earliest; am I correct?

20       A.    That's --

21       Q.    That's what it says.

22       A.    That's what you just read, correct, sir.

23       Q.    That's what it says, right?

24       A.    Yes, sir.  Yes.

25       Q.    Okay.  Okay.  Okay.  Yeah, and that was

1    submitted at about 5:30 p.m.; am I correct, up at the

2    top?

3                   MR. TULANTE:  Your Honor, I apologize

4    for --

5                   THE COURT:  Sustained.

6                   MR. TULANTE:  -- we've gone over this.

7                   MR. MILLER:  Well not with regards to

8    this package, though, okay, but I understand.  This is

9    package 581.  We did it for package 391, and I'm just

10   comparing, Judge, and I understand the Court's ruling.

11                  THE COURT:  All right.  Go ahead.

12                  MR. MILLER:  Thank you, sir.  Thank

13   you, Your Honor.

14   BY MR. MILLER:

15       Q.  So what's in the first paragraph on the

16   first page of the next to the last sentence, doesn't

17   that -- isn't that in contradiction to what you just

18   testified to on cross that you already had the package

19   between 6 and 9, and that's before 9:30, isn't it?

20       A.  Can you reask the question?

21       Q.  That was a compound question.  Let me make

22   it a little more simpler.  Did you just earlier

23   testify that you all had intercepted the package, you

24   and your other ten other officers, had intercepted the

25   package, and I'm talking about package 581,

1    (indiscernible) of 391, somewhere between 6 and 9

2    o'clock p.m. on the 13th; am I right?  Did you just

3    say that?

4         A.   Yes, I did.

5         Q.   Okay.  Okay.  You just said that.  Now, I'm

6    asking you on the front page for specifically though

7    for package number 581, okay.  That bottom line,

8    that's not true.  The last -- the next to the last

9    sentence on that page, on that paragraph, on the first

10   page of the Government's Exhibit D, that sentence is a

11   lie, isn't it?

12        A.   Sir, I didn't write this e-mail.

13        Q.   Oh, oh, I didn't ask you that.  All I asked

14   you, is it true and correct to the best of your

15   knowledge, information, and belief and you're under

16   oath.  Is that sentence the truth or a lie?  It says

17   it wasn't expected to get there.

18             THE COURT:  Counsel, let him answer the

19   question.

20             MR. MILLER:  I'm sorry.

21             THE WITNESS:  Sir, this sentence

22   indicates the packages are on the plane, they're in

23   route to Philadelphia International Airport, and are

24   not expected to be presented to the drug detection dog

25   until 9:30 tonight at the earliest.

Page 84

1          It was our belief that we were trying

2    to give Judge Caracappa a timeline as she had

3    requested from us, as to when she should make sure

4    she's available via telephone.  This was a

5    conversation we had ask -- where she asked us -- we

6    explained to her, Your Honor -- Her Honor, the parcels

7    are in route to Philadelphia, we identified this, we

8    wrote the warrant applications, we requested to her if

9    she wished, we could send them over in anticipation of

10   the boxes entering the Eastern District of

11   Pennsylvania.

12          Judge Caracappa requested that we send

13   the warrants over as AUSA Tulante indicated in this e-

14   mail, he did.  I don't think -- you're taking one

15   sentence of an e-mail that's not all encompassing.

16   Judge Caracappa was asking us, should I expect a call

17   from the inspectors at midnight, or should I expect a

18   call from you at 6:30.

19          We timelined it in the event of weather

20   delays and things out of my control as to what time I

21   would physically be able to have in my hands -- again,

22   you understand the (indiscernible) facility has a

23   thousand plus boxes at any given night.  We had ten

24   inspectors at the facility trying to find two boxes,

25   which equates to a needle in a haystack.

1              Once we found those boxes, we had to

2    bring them back to our office, at which time we had a

3    canine already there on standby, and I presented them

4    to canine Kirby.  I think the 9:30 was, in all

5    honesty, the Judge requested a timeline, and I felt

6    based on my experience, that we shouldn't have to

7    contact her or we should be contacting her prior to

8    9:30, which we did, because she approved our warrants

9    at 9:20.

10   BY MR. MILLER:

11        Q.   I understand, I understand.

12        A.   So I was pretty -- my calculation was fairly

13   accurate that we would be contacting her around the

14   9:30 area.

15              THE COURT:  All right.  Move on,

16   please.

17        Q.   Great, great, great, yes, beautiful, but now

18   your -- this statement says no earlier than 9:30.

19              MR. TULANTE:  Your Honor, objection,

20   asked and answered.

21        Q.   Right?

22              THE COURT:  Counsel, the record is

23   clear.

24              MR. MILLER:  Okay.  Okay.  Okay.

25        Q.   Now, you said something about the timeline,

1    the timeline -- the word timeline is not in here, all

2    that -- you talk -- you just testified to beautifully

3    is not --

4                    THE COURT:  Counsel, counsel, let me

5    suggest this --

6                    MR. MILLER:  Sure.

7                    THE COURT:  -- I'm not a jury.

8                    MR. MILLER:  I'll move on.

9                    THE COURT:  All right.  I'll move on.

10                    MR. MILLER:  Move on, please.

11   BY MR. MILLER:

12        Q.   Now, let me just ask you this and then we'll

13   move on, just -- I'll make it paragraphs 5 and 6, I

14   think I asked you this, though, previously.  5 and 6

15   are true and correct; am I correct?  On -- regard --

16   on page 4 of the Government's Exhibit D and also the

17   next to the last page of Government Exhibit D.

18                    MR. TULANTE:  Your Honor, we'll

19   stipulate that they are true and correct.

20                    THE COURT:  Thank you.

21                    MR. MILLER:  Okay.

22        Q.   Now --

23                    MR. MILLER:  And can I get a

24   stipulation in regards to -- well, forget, no, no, no.

25        Q.   Let me just ask it like this.  You said you

Page 87

1    had the package sometime between 6 and 9, right?

2        A.   Yes, sir.

3        Q.   Okay.  When was the package scanned in

4    Philadelphia?

5               MR. TULANTE:  Your Honor, just so the

6    record's clear, there are two packages involved

7    (indiscernible) --

8               MR. MILLER:  Okay.  I'm sorry

9    (indiscernible).

10       Q.   That'd be the package number 581, parcel

11   number 581.  When was the package scanned?

12       A.   Sir, if I can look at your addendum to

13   Defense Exhibit A, I believe you're pointing out in

14   the in route process scan that was scanned on 11/13 at

15   23:06 hours, I believe that's what you're stating to,

16   or you're asked.

17       Q.   No, I'm asking you, when was the package

18   scanned, based on your knowledge, information, and

19   belief and based on any of your records?

20       A.   Okay.  Inspector Zavorsky scanned this label

21   at 23:08 after the search warrant was executed and two

22   kilograms of cocaine were discovered inside this box.

23       Q.   Uh-huh.  Now, are you saying that the

24   container that contained this package and other

25   packages, multiple packages, all right, that were on

1    the plane, are you saying that container was not

2    scanned when it got to the airport?

3         A.   There may -- I don't believe the post office

4    has a scan at the air mail facility when the

5    containers come in off of the airplane.

6         Q.   You don't believe it you said.

7         A.   I don't believe.

8         Q.   You don't know?

9         A.   I don't believe.

10        Q.   Right, okay.  So now there's an indicator

11   that says scanner ID right here.  Are you saying that

12   was Detective Zavorsky because of the scanner ID

13   number?  Does he have a scanner ID number?

14              MR. TULANTE:  Your Honor, there are

15   multiple questions in there and I'm just --

16              MR. MILLER:  I withdraw it.

17              THE COURT:  Sustained.

18              MR. TULANTE:  I mean, I'm --

19              MR. MILLER:  I'll withdraw it, I'll

20   just ask one question.

21   BY MR. MILLER:

22        Q.   Was Detective -- you said detective I

23   believe it is or --

24        A.   Inspector.

25        Q.   Inspector Zavorsky, does he have a scanner

1   ID number?

2       A.   No, sir, he doesn't.

3       Q.   Can you see the scanner ID number here

4   that's indicated on this particular document?

5       A.   No, sir, but I know that --

6       Q.   You don't see that?

7               THE COURT:  Counsel?

8               MR. MILLER:  I'm sorry, he said no, I

9   want to make sure that -- I want to make sure that

10  he's --

11              THE COURT:  Let him finish his answer,

12  then continue with your examination.

13              MR. MILLER:  Okay.  Yes, I'm sorry, I'm

14  sorry, thank you, Your Honor.

15              THE COURT:  Do you --

16              THE WITNESS:  Sir, I directed Inspector

17  Zavorsky at approximately 10:30 to scan this parcel

18  into Philadelphia, in an effort to make the parcel

19  look like it was not intercepted by law enforcement,

20  so that we could conduct a controlled delivery the

21  following day where Stacy Epps (ph) was taken into

22  custody.

23  BY MR. MILLER:

24      Q.   Right.  Now -- and he scanned it with a --

25  and has a scanner ID number, when he scanned it, his

Page 90

1    scanner ID number would appear?

2         A.    No, sir.

3         Q.    Okay.  And do you see the scanner ID number

4    there?

5         A.    No.

6         Q.    On package number 581, do you see that?

7         A.    Yes, sir.

8         Q.    And is that information true and correct?

9         A.    It's on the -- each scanner in the post

10   office, there's probably tens of thousands of

11   scanners.  Inspector Zavorsky picked up a scanner and

12   scanned it and processed it.

13        Q.    You were there when he did this?

14        A.    No, sir.

15        Q.    Oh, so Detective -- I'm sorry, Inspector

16   Zavorsky told you all this, right?

17        A.    Yes, sir.

18        Q.    That he picked up a scanner and scanned the

19   package.

20        A.    There's numerous ways he could do it, but

21   yes, this package was scanned at a postal facility in

22   route process to Philadelphia.

23        Q.    Now, do you see right next to that, it says

24   container generated?

25        A.    Yes, sir.

1      Q.   So that would mean that that would be a

2   container.

3      A.   I have no idea what that means.

4      Q.   You deal with postal -- with the postal

5   database on a much -- on a regular basis, don't you?

6      A.   Yes, sir.

7      Q.   And you've been a postal inspector how long?

8      A.   Since April of 2012.

9      Q.   And you don't know what container generated

10   means?

11      A.   Sir, the post office has probably upwards of

12   a hundred different scans, scanners, container

13   generated means nothing to me.

14      Q.   Means nothing to you.

15      A.   No, sir.

16      Q.   Would it surprise you that it means that a

17   container was scanned.

18             MR. TULANTE:  Your Honor, I'm renewing

19   my objection, I'm sorry to be a pest to the Court, but

20   just trying to keep counsel directed.  I'm just

21   concerned that we're going far afield --

22             MR. MILLER:  Okay.

23             MR. TULANTE:  -- again so that

24   that's --

25             THE COURT:  The objection is sustained.

1   BY MR. MILLER:

2        Q.   So, sir, bottom line is that you don't even

3   know really, you weren't there, and you don't know

4   when the package was scanned; isn't that right?

5        A.   Sir, I had the package in my custody prior

6   to the search warrant, which was approved at 9:20, and

7   we executed at 9:25 and one at 9:30.  After that, we

8   went through investigative techniques that we do in

9   order to put narcotics into the individuals who were

10   shipping them to themselves.  So I was not there for

11   the scan.

12        Q.   Right.  Well, you answered one part, you

13   weren't there.  So you don't know when the package was

14   scanned.

15             MR. TULANTE:  Objection, Your Honor, he

16   did --

17             THE COURT:  Sustained.  Clearly he

18   didn't know from his personal knowledge, Counsel.

19        Q.   Now -- that's right.  Now, make sure I'm

20   correct on that, you don't know when the -- who was

21   present when the dog sniffed or the canine was exposed

22   to the package, you don't know who was there, right?

23        A.   I believe I just testified previously that I

24   was there, as well as Detective Kelliher and --

25        Q.   And other people, you don't know the names

Page 93

1    of others that were present?

2        A.    No, sir.

3        Q.    Okay.  And there were others present, right?

4        A.    I believe so.

5        Q.    Okay.  And you don't know -- let me ask you

6    the procedure that was utilized in -- when the dog was

7    brought in, or prior to the dog being brought in.

8    What procedure was used in the dog detection of the

9    package?

10               MR. TULANTE:  Your Honor, objection

11   again we're --

12               THE COURT:  Sustained.

13   BY MR. MILLER:

14       Q.    Well, aren't there procedures specifically

15   that you all go by as a postal inspector that you

16   utilize before the handler or the canine are exposed

17   to packages, that have already been identified as

18   suspect?

19               MR. TULANTE:  Your Honor, I recognize

20   the Court's emphasis on civility, but I usually don't

21   get up and object, but I really have to renew my

22   objection on the basis I articulated before.

23               THE COURT:  Counsel for the Government

24   has articulated that they presented evidence for the

25   Court to consider on the four corners of this warrant.

1   To the extent that the canine did sniff or did not

2   sniff in terms of the good faith exception issue has

3   no relevance whatsoever to this.

4                   MR. MILLER:  Well, Judge, I think that

5   it has -- it forms some of the basis of the probable

6   cause in the warrant, in fact, it's stated in the

7   warrant that the above facts are relied upon by the

8   (indiscernible) to believe that probable cause exists,

9   and that's why I'm going to the accuracy of those

10  statements, that there was procedures to be followed

11  that they followed when dogs are -- and did they

12  follow those procedures, and if not, why, in this

13  particular instance.

14                  THE COURT:  Again, to the extent that

15  the witness has testified that based upon the totality

16  of circumstances he secured a warrant, it's within the

17  four corners of the warrant that the Court must make

18  its decision.

19                  MR. MILLER:  I understand, Judge, I was

20  just going to the material statements within the

21  warrant within the four corners, that's what I was

22  trying to present.

23                  THE COURT:  Do you wish to respond to

24  that specifically?

25                  MR. TULANTE:  Yes, Your Honor, let me

1    sort of step back a little bit.  I think we

2    articulated this in our letter to the Court yesterday.

3    The process is this Court looks at the four corners,

4    and determines whether the magistrate judge had a

5    substantial basis for issuing the warrant, and failing

6    that, whether or not this agent relied in good faith.

7              So to the extent that the dog had some

8    issues with his background, or there were process and

9    procedures that were not followed, that's irrelevant,

10   so long as this affiant, Inspector McStravick was able

11   to establish in the four corners that there was

12   probable cause, and that the magistrate relied on it.

13             Now, I understand that one of the

14   reasons that we wrote the letter to the Court was

15   because we understand that there's going to be several

16   broad sides thrown at the Detective Kelliher and

17   Kirby, and again, I think as Your Honor really hit the

18   nail on the head, that that's really irrelevant for

19   purposes of this proceeding.

20             Now, for -- in order for him to try to

21   identify that there are material misstatements, he has

22   to give an offer of proof.  He has to provide some

23   reliable indication to this Court that there are

24   falsities in the affidavit.  What he simply can't do

25   is allege in summary fashion that they're falsities,

Page 96

1    and therefore, he's entitled to searching cross-
2    examination of Inspector McStravick.
3               And to be clear, we understand that
4    this Court has to rely on some record to determine
5    whether or not the warrant was properly signed,
6    because it has my name on it, you know, my signature
7    on it and the date and so forth, and that's why we
8    presented the testimony.
9               And, of course, we touch on the
10   background, but the concern I've had all along, Your
11   Honor, is as I've articulated, is that this is not the
12   vehicle for defense counsel to then start trying to
13   identify material misstatements without he moving
14   forward initially, and articulating a basis for his
15   belief that they're falsities.  He can't just say
16   they're false, the dog isn't certified, and sit down
17   and have a full blown evidentiary hearing.  That's the
18   process as we understand it, Your Honor.
19              THE COURT:  And in terms of the order
20   of things, the order of the events, at what point in
21   time did the or does the record indicate, by reason of
22   the testimony, that the dog performed any sniffing
23   activity.
24              MR. TULANTE:  And I think the testimony
25   of Inspector McStravick is around 8:30, between 8:30

1    and 9:20.

2             THE COURT:  Well, was that before the

3    warrant was secured?

4             MR. TULANTE:  Absolutely, and that's

5    what I'll clarify on redirect.

6             THE COURT:  Mr. Miller.

7             MR. MILLER:  Judge, yes, I got that

8    information simultaneously when the Court received

9    that information about 8:30, because there is no

10   documentation verifying what Mr. Tulante just said, or

11   what the postal inspector has testified to.  In fact,

12   there's documentation to the contrary to what he has

13   testified to.  And it talks about a container

14   generated scan, and it talks about that scan being

15   done in Philadelphia, okay, and it says in route

16   processed in Philadelphia at 11 o'clock at night, and

17   it's when it's scanned, when it arrives in

18   Philadelphia.

19             His testimony the whole time has been

20   oh, it got there between 6 and 9, and we have the --

21   we gave the affidavit to the magistrate and the

22   magistrate reviewed it no later than 9:20, because it

23   was at that time, while we were in the conversation

24   with the magistrate that the magistrate told us to put

25   9:20 on the document.  Okay?

1            So we know that at least by 9:20, the

2    magistrate supposedly looked at the document, fine.

3    If the magistrate looked at the document at 9:20 in

4    the evening, but the document doesn't get to

5    Philadelphia, according to their own postal tracking

6    records until 11 o'clock at night, and the affidavit

7    of probable cause says that the dog -- they're already

8    been exposed to, and had already alerted that there

9    were some controlled substances in the package, then

10   wait a minute that throws -- that's a material

11   misstatement within the affidavit itself.  That

12   (indiscernible) their own records.

13            THE COURT:  Mr. Miller, just a second.

14            MR. MILLER:  Yes, sir.  Yes, Your

15   Honor.

16            THE COURT:  Has that not been

17   demonstrated through your cross-examination up to this

18   point in time?

19            MR. MILLER:  I believe it has, Judge.

20   I have not dealt with package 581.  And I have not

21   dealt with this addendum, and this addendum we just --

22   I just presented it --

23            THE COURT:  What more did you do with

24   this.

25            MR. MILLER:  Yes, sir.  Yes, sir.  Yes,

Page 99

1    sir.

2                    Court's indulgence one moment.

3                    THE COURT:  Yes, sir, take your time.

4    I'm not rushing you.  I'm just simply trying to get

5    you to understand that you've made a record --

6                    MR. MILLER:  Oh, yes, sir.

7                    THE COURT:  -- and we need not

8    continuously go over this.

9                    MR. MILLER:  Thank you, sir.  Thank

10   you.  I appreciate that, Your Honor.

11        (Pause)

12   BY MR. MILLER:

13        Q.   Okay.  And, Mr. McStravick, I'm going to ask

14   you first about a tracking device that was placed in

15   the article with the priority mail number with 072 at

16   the end.

17             I believe it's part of what I have marked,

18   what has previously been marked as Defense Exhibit D.

19   I'm sorry, Defense Exhibit A.  There is no A.

20        A.   Excuse me, sir, I don't have that exhibit.

21        Q.   You don't have that exhibit?  Okay.  I think

22   I have an extra packet here.  Let me --

23                    MR. MILLER:  If I may approach, Your

24   Honor?

25                    THE COURT:  Yes, sir.

1                    MR. MILLER:  Thank you.  I'll give it

2     to your staff.  Thank you.

3                    THE CLERK:  Uh-huh.

4                    THE WITNESS:  Thank you, ma'am.

5                    MR. TULANTE:  What package?

6                    MR. MILLER:  A, I've only got one.

7                    MR. TULANTE:  No, I mean, what was the

8     parcel number.

9                    MR. MILLER:  Oh, 072.

10                    MR. TULANTE:  072?

11                    MR. MILLER:  Yes, sir.  May I proceed,

12    Your Honor?

13                    THE COURT:  Yes, sir.

14                    MR. TULANTE:  Your Honor, may I object.

15    The tracking device warrant is not one of the

16    affidavits that identify in his motion, and when the

17    Court asked the defendant to identify which motions he

18    was seeking to suppress, he didn't identify this

19    tracker affidavit, so I don't see the purpose of the

20    testimony related to that, you know, I have his motion

21    here, and I wrote down the different instruments he

22    was attacking, and this wasn't one of them.

23                    THE COURT:  Mr. Miller?

24                    MR. MILLER:  Yes, Your Honor, just one

25    moment, Your Honor.

1        (Pause)

2                MR. MILLER:  Judge, regarding the -- I

3    did mention that the initial warrant were to search

4    and seize package that ended in 072.  I spoke about

5    that specifically, but I specifically indicated that

6    the fruits of that package being seized, I

7    specifically made reference to that, and I don't know

8    if Mr. Tulante wrote that down, but I specifically

9    talked about the fruits of -- and that I was asking

10   that all that also be suppressed, and that was a part

11   of my motion.

12                And so the tracking device that was put

13   in there, was as a result of the actual warrant being

14   deficient as far as we're concerned.  Okay.  And so

15   I'm going -- I guess I'm starting at the -- I'm

16   backing into this, but I'm starting with the tracking

17   device and its warrant, and how it was improper, and

18   then I intend to go into the actual warrant itself was

19   72 or 072 to show how it was improper.  But I'm

20   dealing with the fruits of, and what's going on, maybe

21   that's causing the confusion, I apologize.

22                MR. TULANTE:  Your Honor, I'm not

23   confused.  It's a -- I understand he's trying to

24   suppress all the fruits of it, but it doesn't mean

25   that he gets to identify every single warrant, or

1    every single seizure as -- you know, he attacks the

2    initial affidavit, which he does in his papers, and

3    that one, Your Honor, there's no dispute, there's

4    clearly a four corners analysis, because he's not

5    alleging that there was any -- that the judge,

6    magistrate judge didn't sign it, or there were any

7    improprieties in the way it was obtained.

8                   So it would be no evidence relevant to

9    that should be admitted, because the Judge -- Your

10   Honor looks at the four corners, determines after that

11   if there's no probable cause, whether he relied on

12   good faith.

13                  So to the extent he's looking at

14   fruits, he doesn't then elicit testimony from the

15   agent regarding every single step that was taken

16   afterwards, because the legality is determined by Your

17   Honor's initial assessment on the first affidavit.

18                  THE COURT:  The objection is sustained.

19                  MR. MILLER:  Yes, sir.  Okay.  And,

20   Judge, I wasn't sure that you'd already previously

21   ruled on this particular warrant or its affidavit --

22                  THE COURT:  I haven't ruled on

23   anything.

24                  MR. MILLER:  Right, okay, that's why I

25   was -- but I understand, okay.

1          THE COURT:  Let me point out that

2   you've made a record and so much of this is asked and

3   answered.

4          MR. MILLER:  Okay.  Well, I'm going to

5   go to a different package altogether, that would be

6   the first one.

7          THE COURT:  As long as it's within the

8   ambit of what you've announced as what you are seeking

9   to suppress.

10          MR. MILLER:  Yes.

11          THE COURT:  And what you've put the

12   Government on notice of producing in their case in

13   chief.

14          MR. MILLER:  Yes, sir.  And it was the

15   initial warrant, as well as the fruits thereof, and

16   that were obtained as a result of the initial warrant

17   being executed.

18          THE COURT:  All right.

19          MR. MILLER:  And that's the only reason

20   why I went to the tracking device, Judge.

21          THE COURT:  All right.

22          MR. MILLER:  And I didn't mean to --

23   like I said, originally cause any confusion, but I

24   just saw that as a logical progression.

25          THE COURT:  Mr. Tulante said he was not

1    confused.  You may move on.

2                    MR. MILLER:  Thank you.

3    BY MR. MILLER:

4        Q.   Now, with regards to package number 70 --

5    072, the one that ends in package 072, that search

6    warrant, let me see, let me see if I have that number

7    here.  Hold on.  I believe it's a part of Government's

8    package, if I'm not mistaken, yes, it is, it's

9    actually Exhibit A.  That would be Case No. 13-1285-M,

10   it's the second page of the Government's Exhibit A.

11                   MR. TULANTE:  Your Honor, I do sound

12   like a broken record now, but this is a -- again

13   Exhibit A, that's the 072 package, that's a four

14   corners analysis.

15                   THE COURT:  Sustained.

16                   MR. TULANTE:  In his motion, he -- I

17   mean, he identifies that there was no probable cause

18   and it was unconstitutional and so forth, and there's

19   no evidence -- it's a matter of law this Court

20   could --

21                   THE COURT:  Sustained.

22                   MR. MILLER:  Judge, without you making

23   a ruling, am I not allowed to ask -- cross-examine on

24   because he was on direct, asked about Exhibit A, and

25   this particular package, and that's all I'm just

1  asking about it.  I mean, I --

2              THE COURT:  It is a four corners

3  decision, correct?

4              MR. MILLER:  I understand, Judge.

5              THE COURT:  You have the right, sir, to

6  attack what has been characterized in the case law as

7  knowing and intentional false statements with reckless

8  disregard for the truth.

9              MR. MILLER:  Exactly.

10             THE COURT:  Is that what you're trying

11 to prove by this cross-examination?

12             MR. MILLER:  Well, yes, I want to show

13 some things, I want to -- I'm hoping that I'm able to

14 show that, Judge.  I've been able to show -- I believe

15 I've been able to show that already in regards to some

16 of the other packages, and I'm attempting to start and

17 it won't be long, it won't be long --

18             THE COURT:  Go ahead.

19             MR. MILLER:  -- but start that with --

20             THE COURT:  Go ahead.

21             MR. MILLER:  -- the package that was

22 testified to on direct.

23             MR. TULANTE:  Your Honor, may I seek an

24 offer of proof just because I don't -- my concern is

25 that he -- any defense counsel can always allege that

 1    are falsities, and therefore, put the affiant on the

 2    stand and then try to, you know, create some record.

 3    He has to come forward with something more than his --

 4                  MR. MILLER:  Well, well --

 5                  MR. TULANTE:  -- assertions that

 6    there's been -- they're material misstatements.

 7                  THE COURT:  Well, it's Mr. Miller's

 8    position that the times that were demonstrated through

 9    the examination, cross-examination were not

10    necessarily consistent with the content of the

11    warrant, and also the direct examination times,

12    correct, Mr. Miller?

13                  MR. MILLER:  That's correct, Judge.

14                  THE COURT:  Now, I will allow the

15    continued cross-examination in that line of

16    questioning, but that's it.  Because it's still in the

17    end the four corners that I'm dealing with here.

18                  MR. MILLER:  I understand, Your Honor,

19    I understand.

20                  THE COURT:  All right.

21                  MR. MILLER:  And thank you, Your Honor.

22                  And, Judge, I did allege in my --

23                  THE COURT:  Go ahead, I'm telling you

24    to go ahead.

25                  MR. MILLER:  Yes, sir, but in regards

1    to your ruling just now, I did allege things about the

2    State of California coming from California, that that

3    was one of the things that allowed him to suspect that

4    the package was suspicious.

5                    THE COURT:  Well, again, Counsel, in

6    terms of good faith reliance on a warrant that was

7    issued by a magistrate, that's what we're really tied

8    here with, that's what we're dealing with here.

9                    MR. MILLER:  I understand, but I'm

10   saying there are material misstatements in the

11   warrant, that because it comes from Pennsylvania, or

12   California or Alaska or even the country of Columbia,

13   that doesn't --

14                   THE COURT:  Well now, he's testified to

15   what he's testified to under oath and that's that.

16                   MR. MILLER:  Yes, sir.  Thank you.

17                   THE COURT:  All right.

18   BY MR. MILLER:

19        Q.   In essence (indiscernible), that's a good

20   way to do it, let me just ask one question, give me a

21   time -- not give me, would you please give me some

22   type of timeline in regards to what happened with

23   package that ended in 072 from the point that it was

24   received here in Philadelphia to a point that it was

25   indicated as being suspicious, and sort of point that

1    you received it, to the point that -- that you

2    received it physically, to the point that the time

3    that the dog was exposed to the package, those type of

4    things, if you could just give me a timeline, some

5    kind of a timeline on this --

6                    THE COURT:  Now, I'm not clear.  I'm

7    not clear.

8                    MR. MILLER:  Sorry.

9                    THE COURT:  I'm not clear with that

10   question.

11                   MR. MILLER:  Okay.  Let me -- I can

12   start from the beginning then.  I'm just asking for a

13   timeline.

14   BY MR. MILLER:

15       Q.   Let me ask it like this.  When did package

16   number 072, ending in package number 072 get to

17   Philadelphia?

18       A.   I believe that it arrived in Philadelphia on

19   -- may I reference this, please?

20            I believe it would have arrived in

21   Philadelphia on November 11th or very early in the

22   morning on November 12th without having the record in

23   front of me, I'm only giving an assumption.

24       Q.   Okay.  Now -- and then the package, when it

25   arrived, I imagine it arrived at the international

1    airport; am I correct?

2         A.   Yes.

3         Q.   On a FedEx plane; am I correct?

4         A.   Again, I believe so.

5         Q.   And then after it arrived on the FedEx

6    plane, the package was scanned at the airport in a

7    container or not?

8         A.   Again, sir, no one from the post office --

9    the easiest way to summarize the air mail facility,

10   it's contractors, no one from -- there's one person

11   from the actual post office who oversees the

12   contracting firm at the air mail facility.

13            When mail comes into the air mail

14   facilities, it's enclosed in a sack.  Those sacks have

15   numerous parcels, letters, mail inside of them.  Those

16   sacks are then just quickly disbursed by zip code and

17   sent to an actual post office facility for sorting,

18   which is the first scan that will ever hit when it

19   hits the post office sorting facility.

20        Q.   You say which is -- I mean, that first scan

21   is at the local post office, one of the local post

22   offices?

23        A.   No, sir, one of its -- one of the induction

24   sites I had testified to earlier, Lindberg Boulevard,

25   there's a facility up in the northeast, facilities in

1   Chester County, it honestly depends on where the

2   parcel is going.

3            I guess the easiest way in summation, the

4   post office, nothing's routine about the post office,

5   mail moves, we move numerous packages, envelopes, so

6   once it comes into Philadelphia, it's just divvied up

7   by zip code and then inducted into the system, where

8   postal employees will put a scan at a postal facility.

9            It may be easier if I just summarize the box

10  that you were talking about earlier, we intercepted

11  before anyone from the United States Post Office

12  touched it, and was able to put a scan on it.  That

13  may make things clearer.

14                  THE COURT:  It does, all right.

15  BY MR. MILLER:

16       Q.   So you said that you intercepted it, okay.

17  And when you -- and when was it intercepted, I'm

18  talking about a priority mail package that ends in

19  072.

20       A.   Sir, I intercepted that -- that box was

21  intercepted on November 12th as my warrant affidavit

22  states.

23       Q.   On the 12th.

24       A.   Yes, sir.

25       Q.   Okay.  And it was intercepted and from where

1    -- that was at the airport, that's where it was

2    intercepted, or was it at one of these locations in --

3    where was it in the --

4         A.   Sir, again without the actual tracking

5    record, I believe this parcel was intercepted at the

6    actual delivery station.  You realize we'd been doing

7    surveillance on this case for a long period of time,

8    and identified where mailings were going.

9              So we were already on the lookout for

10   identified addresses that we suspected Mr. Simmons was

11   mailing illegal narcotics to.  This wasn't the first

12   package.  This wasn't the first box we had ever seen

13   during this investigation.

14        Q.   So you intercept that (indiscernible) and

15   you were the one that intercepted it, right?

16        A.   Inspector Richard Link (ph) intercepted this

17   parcel.

18        Q.   Okay.  And do you have any ideas what time

19   that was?

20        A.   Some time before 9 a.m. approximately.

21        Q.   On November 12th.

22        A.   Yes, sir.

23        Q.   Now, after it was intercepted, then what

24   happened to the package by Inspector Link?

25        A.   The package was brought to our office.

Page 112

1     Q.    By who, by Inspector Link or who?

2     A.    Inspector Link, sir.

3     Q.    And he got to your office at what time?

4     A.    We'll say an hour after he intercepted it.

5  I don't know, sir.

6     Q.    So there's no log kept on when packages are

7  coming to the office, is that what you're saying?

8     A.    Yes, sir, there's no log.

9     Q.    When drugs are -- when there's suspected

10 that drugs are being brought to your office?

11              MR. TULANTE:  Your Honor, he's

12 already --

13              THE COURT:  Sustained.

14 BY MR. MILLER:

15    Q    And -- okay.  After it was brought to your

16 office by Inspector Link (ph.) and is given -- what's

17 done with it?  Is it given to you or is it given to

18 somebody else or what?

19    A    The parcel is given to me where then I begin

20 to prepare my search warrant affidavit.

21    Q    You said it was given to you?

22    A    Yes, sir.

23    Q    Was it given to anyone else before you?

24    A    Just me, sir.

25    Q    And how do you know that?

1              THE COURT:  Sustained.

2              MR. MILLER:  Okay.

3   BY MR. MILLER:

4        Q    Now, in essence, with the package, after

5   it's given to you, what do you do with the package, if

6   anything?

7        A    Nothing.  We copy -- as Inspector Link

8   intercepts the parcel, he drives to our office.  I

9   contact Detective Kelliher and advise we have a

10  suspicious parcel on the way to the office.  When she

11  arrives with K9 Kirby --

12       Q    What time did you contact Detective

13  Kelliher?

14       A    Sir, I'm not sure.  At some point in time

15  after Inspector Link intercepted the parcel prior to

16  the parcel being brought to my office.

17       Q    And you don't know what time the parcel got

18  to your office?

19       A    No, sir.

20       Q    Okay.  And you don't know what time you

21  contacted Detective Kelliher.  And what time did

22  Detective Kelliher get there, do you know?

23       A    I don't know, sir.

24       Q    Okay.  And with -- after Detective Kelliher

25  got there, how long after Detective Kelliher got there

Page 114

1    was the dog exposed to the package?

2         A    My assumption is a few minutes.

3         Q    Your assumption.  Did you say that?

4         A    Yes, sir.

5         Q    Okay.  Well, you know, we don't want

6    assumptions.  But anyway, anyway -- all right.  And

7    was any preparation done prior to Detective Kelliher

8    getting there with the package?

9         A    No.

10        Q    Was the package the only -- was the package,

11   072, was that the only package that was presented to

12   the dog?

13              MR. TULANTE:  Objection, Your Honor.  I

14   think we're getting a little beyond timing.

15              MR. MILLER:  I didn't hear the Court's

16   ruling.  I'm sorry.

17              THE COURT:  Sustained.

18              MR. MILLER:  Thank you, Your Honor.

19   BY MR. MILLER:

20        Q    Okay.  And let me just ask the general

21   question.  The dog giving the alert -- from the time

22   that the dog was exposed to the time the dog gave an

23   alert, were postal policies and procedures followed?

24              MR. TULANTE:  Your Honor, objection --

25              THE COURT:  Sustained.

1    BY MR. MILLER:

2        Q    And then after the dog -- the dog -- did the

3    dog give an alert?

4        A    Detective Kelliher advised me that K9 Kirby

5    alerted to the positive -- alerted positively to the

6    odor of a controlled substance within that parcel.

7        Q    Okay.  And did you make a notation of that

8    as to what time that happened?

9        A    No, sir.

10       Q    Okay.  And then after the dog was -- after

11   that happened, after the dog gave the alert, then

12   after that happened, then what did you do?  After the

13   dog gave the alert.

14       A    I finished my warrant -- warrant application

15   -- application and affidavit for a search warrant.  I

16   sent it over to Assistant United States Attorney

17   Tulante.

18       Q    That's when you finished it, after the dog

19   gave the alert, right?

20       A    Absolutely.

21       Q    You didn't pre-prepare it.

22       A    No, sir.

23       Q    And then after you forwarded the affidavit

24   of probable cause and the warrant, after you did that,

25   what did you do after that?

 1      A    I waited to hear from the U.S. Attorney's

 2 Office here in the Eastern District of Pennsylvania to

 3 advise me if the warrant had been approved by the

 4 staff at the U.S. Attorney's Office and when the U.S.

 5 magistrate judge would be available to see me to swear

 6 to my affidavit.

 7      Q    Okay.  And what -- well, did somebody from

 8 the U.S. Attorney's Office contact you?

 9      A    They did.  I believe AUSA Copeland contacted

10 me, advised me that, as indicated on the cover sheet,

11 Supervisor Purton (ph.) approved the warrant and we

12 were to see the

13 judge -- we would have been there sometime around

14 prior to 11:45 when I swore my warrant out in front of

15 Judge Caracappa.  She signed and dated it.

16      Q    And then after that, then -- then at that

17 point, what did you do with the package?

18      A    The search warrant was executed.

19      Q    Okay.  Let me just be clear, though, that,

20 basically, you don't have any records or you have no

21 idea as to the hours that -- when I say the hours, I'm

22 talking about a 9 o'clock hour, a 10 o'clock hour, an

23 11 o'clock hour, specifically, when numerous things

24 occurred with this package.  Am I correct?  For

25 instance --

1                    MR. TULANTE:  Here -- here again --

2                    THE COURT:  Sustained.

3                    MR. MILLER:  Okay.

4    BY MR. MILLER:

5        Q    And you have no documentation to indicate

6    that what you're -- what you have testified here to

7    today is correct, am I correct?

8                    MR. TULANTE:  Objection.

9                    MR. MILLER:  Go ahead.  I'm sorry.

10                   MR. TULANTE:  I'm just objecting.

11                   THE COURT:  You have no documentation -

12   -

13                   MR. MILLER:  No notes.  No notes.  No

14   notes to tell us when -- what time the pack -- what

15   time he -- the package was brought into his office,

16   what time that --

17                   THE COURT:  Counsel, asked and

18   answered.  You've already covered all that.

19                   MR. MILLER:  Okay.  Okay.

20       (Whispered conversation)

21   BY MR. MILLER:

22       Q    Yeah.  You don't have any physical evidence

23   about -- to make sure I'm clear, it's your testimony,

24   you don't have any physical evidence about that the

25   dog ever sniffed these packages.  You took no

1  photographs, nothing like that, right?  All the

2  packages and the dog being exposed to packages, right?

3       A    No.

4       Q    Okay.

5            MR. MILLER:  Okay.  No further

6  questions, Judge, at this time.

7            THE COURT:  Mr. Tulante, it's your

8  redirect examination?

9            MR. TULANTE:  Yeah.  I promise to be

10  brief.

11            THE COURT:  Take your time.

12  REDIRECT EXAMINATION

13  BY MR. TULANTE:

14       Q    Inspector McStravick, were records to

15  Exhibits B and C -- those are the search warrant

16  paperwork for the packages ending in 391 and 581.  Do

17  you see those?

18       A    Yes, sir.

19       Q    As of 9:20 p.m., where were those two

20  parcels?  9:20 p.m. on November 13, 2013.  Where were

21  those parcels?

22       A    Those parcels were located in my office

23  which is within the Eastern District of Pennsylvania.

24       Q    As of the same time, same date, had the drug

25  detection dog been exposed to them?  Had they been

1    exposed to the dog?

2        A    Correct.  Prior to this date and time, the

3    drug detection dog was exposed.

4        Q    And roughly, when was that?

5        A    It may be --

6                MR. MILLER:  Objection.

7        A    -- fifteen, twenty minutes.

8                MR. MILLER:  This is speculation,

9    Judge.

10               THE COURT:  Sustained.

11               MR. TULANTE:  Your Honor, no further

12   questions.

13               THE COURT:  All right.

14   RECROSS-EXAMINATION

15   BY MR. MILLER:

16       Q    And, sir, you are giving that time of 9:20

17   of the packages being in your office, you're doing

18   that based upon, in part, the postal data records.  Am

19   I correct?

20       A    I'm giving that testimony based on me being

21   in my office, personally looking at the parcels, two

22   parcels, in my office prior to 9:20 p.m. on 11/13.

23       Q    And so, it's based on your word alone.  You

24   have no notes.  You have no pictures.  You have

25   nothing.  Am I correct?

1                    THE COURT:  Sustained, counsel.

2                    MR. TULANTE:  Objection.

3                    MR. MILLER:  All right.  No further

4    questions.

5                    THE COURT:  You may step down.

6                    THE WITNESS:  Thank you, Your Honor.

7                    MR. TULANTE:  Your Honor, the

8    government rests for purposes of this hearing.

9                    THE COURT:  All right.  Mr. Miller?

10                   MR. MILLER:  Yes, Your Honor.  If I

11   may, Your Honor, I would call the witness that had --

12   we subpoenaed.  That would be Officer -- I believe

13   Detective Kelliher.  I believe that's her name.  She's

14   from the Bensalem -- she's actually the dog handler.

15                   MR. TULANTE:  Your Honor, we object for

16   the reasons we've articulated.

17                   THE COURT:  Now, Mr. Miller, do you

18   have a copy of the communication that was sent to this

19   Court dated September 8th, 2014?

20                   MR. MILLER:  On yesterday?  No, I don't

21   have a copy of that.  No, sir.

22                   THE COURT:  It appears that it cc'd

23   Robert Miller, Esquire.

24                   MR. MILLER:  I see.

25                   THE COURT:  This communication

1   regarding the government opposition to the

2   introduction of this witness.

3              MR. MILLER:  I don't have a copy of it,

4   Judge.  I didn't get a copy of it.  Since yesterday --

5   I didn't -- I mean, it was e-mailed to me or

6   something?

7              THE COURT:  I don't know.

8              MR. MILLER:  I don't -- it says "cc".

9   I don't know -- maybe it was mailed to me and I

10  wouldn't have gotten it -- if it went through the U.S.

11  mail.  But maybe if it was e-mailed to me, then I

12  haven't checked my e-mail, Judge.  I've been reviewing

13  the documents in this case, looking at timelines and

14  things like that and preparing for today.

15             THE COURT:  Mr. Tulante?

16             MR. TULANTE:  Yes, Your Honor.  I'm

17  trying to pull up a copy.  I sent a copy to counsel at

18  the same time I transmitted it to your deputy

19  indicating our objection to Detective Kelliher's

20  testimony.

21             THE COURT:  Do you have a copy of it

22  now?

23             MR. TULANTE:  I have a copy here, Your

24  Honor.  I was going to give it to defense counsel to

25  make sure he sees that I transmitted it to him.

1                    MR. MILLER:  Judge, I don't know what

2    it says but I can tell you why I subpoenaed her.  And

3    I don't know if he states in his letter why I

4    subpoenaed --

5                    THE COURT:  Just one second.  Just a

6    minute.

7         (Pause)

8                    THE COURT:  Mr. Miller?

9                    MR. MILLER:  Yes, sir?

10                    THE COURT:  Umm --

11                    MR. MILLER:  Yes, sir, Your Honor.  I'm

12    just checking my e-mail right now.

13                    MR. TULANTE:  11:04 a.m.

14                    MR. MILLER:  11:04 a.m.?

15                    MR. TULANTE:  Yeah, yesterday.

16                    MR. MILLER:  On yesterday?  In fact, I

17    was in court yesterday at that time, Judge.  Down in

18    state court.

19                    THE COURT:  But it didn't disappear

20    from your device, did it?

21                    MR. MILLER:  No.  It's here.  It is

22    here, Judge.

23                    THE COURT:  What time does it state it

24    was received on your device?

25                    MR. MILLER:  I'm going to check.  It's

Page 123

1    downloading now as an attachment.

2              THE COURT:  All right.  But the

3    original e-mail bearing the attachment has to have a

4    time and date on it.  What time is that?

5              MR. MILLER:  Oh, that's correct, Judge.

6    I was trying to look at the letter.  I'm sorry.  I

7    apologize.

8              THE COURT:  All right.  Go backwards in

9    time for the record, please.

10             MR. MILLER:  It says 11:04, September

11   8th.  Monday, September 8th at 11:04, 2014.

12             THE COURT:  All right.

13             MR. TULANTE:  And, Your Honor, just --

14             MR. MILLER:  And that was -- that says

15   -- I'm sorry.  It looks like it went to Ms. Shabazz

16   (sic).  But evidently, I must have -- I didn't see the

17   letter.

18             THE COURT:  Well, as I have indicated,

19   it says "cc".

20             MR. MILLER:  I didn't see the cc.

21             THE COURT:  You didn't get the cc?

22             MR. MILLER:  No.  I'm saying I didn't -

23   - I don't see the cc on the page that I'm on now.  I'd

24   have to see the cc once I go to the actual document.

25   And I didn't go there yet.

1                      MR. TULANTE:  But you received the

2     document.

3                      MR. MILLER:  I received it, though,

4     Judge.

5                      THE COURT:  All right.

6                      MR. MILLER:  I did receive it.

7                      MR. TULANTE:  And, Your Honor, the

8     reason I didn't object to having --

9                      THE COURT:  That's all I wanted --

10                     MR. TULANTE:  Okay.

11                     THE COURT:  -- to just simply make sure

12    that you sent it and it should have been received and

13    it was, just wasn't opened by you.

14                     MR. MILLER:  That is correct, Judge.

15                     THE COURT:  All right.  Now we're going

16    to take a recess.  I want you to look at it and be

17    prepared to deal with the argument put forth by the

18    government as soon as we come back and reconvene.  All

19    right?

20                     MR. MILLER:  Thank you, Your Honor.

21                     THE COURT:  Ten minutes.

22                     MR. MILLER:  Thank you, sir.

23                     THE COURT:  Thank you.

24          (Recessed at 3:06 p.m.; reconvened at 3:39 p.m.)

25                     THE COURT:  All right.  Are we ready to

1  proceed?

2                  MR. MILLER:  Yes, sir, Your Honor.

3                  THE COURT:  And, Mr. Miller, have you

4  had an opportunity to review the communication from

5  counsel for the government dated September 8th, 2014?

6                  MR. MILLER:  Yes, I have, Your Honor.

7  I want to thank the Court for allowing me the

8  opportunity to review this and giving me time to

9  review it with my client.

10                  THE COURT:  Surely.  And to the secured

11  party, sir, have you had an opportunity to review it?

12                  THE DEFENDANT:  Yes.

13                  THE COURT:  And did you fully discuss

14  with your counsel?

15                  THE DEFENDANT:  Yes.

16                  THE COURT:  Are you prepared to go

17  forward at this time?

18                  THE DEFENDANT:  I am, yes.

19                  THE COURT:  I'm sorry?

20                  THE DEFENDANT:  Yes.

21                  THE COURT:  All right.  Now let me hear

22  your motion -- actually, let me hear the government's

23  motion to bar this information actually.

24                  MR. TULANTE:  Yes, Your Honor.  I think

25  we try to lay out some detail in the letter that in

1    order for the defendant to try to offer some extrinsic

2    evidence to challenge the voracity of the statements

3    in the affidavit, he has to provide some -- either an

4    offer of proof or some indicia, some reliable

5    indication, that the material that's in the affidavit

6    was incorrect, was false and materially false at that.

7    And the issue here is that Detective Kelliher -- she's

8    -- all she's going to be able to say is that I have a

9    dog, the dog is certified.  And what she'll testify to

10   -- and again, unless the offer of proof suggests

11   otherwise, is simply that the information that's in

12   the affidavit was accurate and correct.  And so, we

13   don't see -- since this is a four corners analysis,

14   unless this is one of the exceptions in Leon that

15   there's some information in there that's a reckless

16   disregard for truth, that he doesn't get the

17   opportunity to call witnesses to challenge voracity of

18   the statements in the affidavit unless he, in the

19   first instance, gives the Court some indication of

20   what it is this witness will say and why that is

21   contradict -- contradicts the statements in the

22   affidavit.  So that's why we object.

23              I mean, just to be sure, Your Honor,

24   she's here.  She's available.  But we don't -- we

25   think her testimony should be barred.

1              THE COURT:  And her name is?

2              MR. TULANTE:  It's Detective Christine

3    Kelliher, K-E-L-L-E-H-E-R (sic) -- I-H-E-R.  I'm

4    sorry.

5              THE COURT:  All right.  Mr. Miller?

6              MR. MILLER:  Yes.

7              THE COURT:  I'll hear from you --

8              MR. MILLER:  Thank you.

9              THE COURT:  -- in terms of -- well, to

10   the extent that counsel for the government has

11   submitted to the Court actually a written letter in

12   opposition, the one that I've referenced dated

13   September 8th, 2014, which I will make a part of this

14   record and we'll refer to it as Defense

15   Exhibit --

16             MR. TULANTE:  Government's Exhibit --

17             THE COURT:  No, I'm sorry.

18   Government's Exhibit --

19             MR. TULANTE:  Gov -- E.

20             THE COURT:  E?

21             MR. TULANTE:  Yes.

22             THE COURT:  Very well.  Within the

23   letter, inter alia, and in pertinent part, counsel for

24   the government cites the Franks v. Delaware decision

25   regarding this process.  And in addition thereto,

1    several cases that stand for the proposition that

2    counsel has to make a showing here.  And I read from

3    the written communication, in pertinent part, as

4    follows -- and this is from page 1:

5                    MR. MILLER:  Yes, sir.

6                    THE COURT:  "To obtain an evidentiary

7    hearing or a Franks hearing, the Defendant must make

8    'a substantial preliminary showing that a false

9    statement knowingly and intentionally or with reckless

10   disregard for the truth was included by the Affiant in

11   the warrant affidavit' citing the United States v.

12   Brown, 3 F.3d 673 676 (3rd Cir. 1993), quoting Franks,

13   438 U.S. at 155-56."

14                   Now based upon that case law, Mr.

15   Miller, what is it that you wish to present that would

16   fit within the parameters of this decision?

17                   MR. MILLER:  Well, Judge, thank you for

18   asking that question.  The bottom line is, is that the

19   testimony of the government's witness, Mr. McStravick

20   -- his testimony, basically, flies directly in the

21   face of the government's own documentation that they

22   submitted to the defense -- excuse

23   me -- that they submitted to the defense.  And the

24   bottom line is -- and that is, I'm talking about the

25   postal data records.  And it flies directly in the

1    face.

2                    I think that the Court or anybody would

3    agree that a dog sniff is an essential element in

4    regards to establishing probable cause.  And just as

5    we have originally stated that it would be impossible

6    for the dog to have sniffed the package at 9 o'clock

7    or thereabouts or even before that, okay, if the

8    package didn't get here until 11 o'clock at night.

9    And -- or until 11 o'clock.  11:06 to be exact.  And

10   that's specifically regarding package number 581.

11                   And so, that, in and of itself, would

12   be -- I would think lay the basis because I think that

13   his testimony flies in the face of the documentation.

14   He doesn't -- he's not -- in fact --

15                   THE COURT:  All right.  You've made

16   your point.  Let me --

17                   MR. MILLER:  Well, I want to go a

18   little further, Judge.

19                   THE COURT:  Go ahead.

20                   MR. MILLER:  In fact, after reading the

21   letter, I -- we have a witness who can testify about -

22   - of course, yes -- can testify about some of the

23   things that are contained in the postal data records

24   that the postal inspector knows nothing about.

25   Someone who's been a postal inspector for over

1   eighteen years.  And he's here.  And he's been waiting

2   all day to testify.  We'd like to call him.  And that

3   will show that things specifically in regards to

4   container generated that appears on the postal data

5   records, what that actually means.  And his

6   explanation will fly in the face of what was testified

7   to here today by the postal inspector.  And, Judge,

8   and that is -- that is -- I believe that will be at

9   least a preliminary showing, as it stated here, that a

10  false statement knowingly and intentionally or with

11  reckless disregard for the truth was included.  That,

12  in other words, that this package didn't get there.

13  Item number 581 didn't get to Philadelphia until 11

14  o'clock.  And it would be impossible for the dog to

15  have sniffed it.

16          And that's why I want to call this

17  witness, because, Judge, I filed a motion to compel.

18  I asked for discovery.  I have nothing but the

19  conclusory facts that are contained within the

20  affidavit of probable cause.  But I'm making the

21  allegation that there are material misstatements of

22  fact based on at least nothing more than the

23  documentation that I got from the assistant district -

24  - assistant U.S. attorney.

25          THE COURT:  All right.

```
 1                  MR. MILLER:  Okay?  And the testimony
 2     of the -- Inspector --
 3                  THE COURT:  All right.
 4                  MR. MILLER:  -- the postal inspector.
 5                  THE COURT:  All right.  Mr. Tulante?
 6                  MR. TULANTE:  Your Honor, I sat here
 7     and listened to Inspector McStravick's testimony and I
 8     really
 9     find -- I don't know what counsel is talking about in
10     terms of any consistency between his addendum to
11     Defense Exhibit A and what the testimony was by
12     Inspector McStravick.
13                  In the first instance, he says that
14     this -- the 1103 scan was scanned by Inspector
15     Vuzavorski (ph.) at his direction after the dog was
16     placed -- the box was exposed to the dog and the dog
17     and the dog gave a positive indication.  So to the
18     extent that he's citing some inconsistency, I
19     don't -- there's none that exists.
20                  Secondly, the --
21                  THE COURT:  Well, let me just stop you
22     right there for purposes of a very clear record.
23                  MR. TULANTE:  Exactly.
24                  THE COURT:  Now, Mr. Miller, that's
25     what I heard as well as in terms of the testimony
```

1    regarding the scan time and the order of things, in

2    terms of the sniffing by the dog and the 11:30

3    reference.  Did you not hear that?

4                    MR. MILLER:  I heard also that he

5    didn't know about the container generated issue on

6    this.  And --

7                    THE COURT:  That's -- no, wait.  Wait.

8    Let's not mix apples and oranges.  Let's just take one

9    thing at a time here.

10                   MR. MILLER:  Sure.

11                   THE COURT:  It's a fact.

12                   MR. MILLER:  Okay, yes, sir.

13                   THE COURT:  Now it is uncontroverted at

14   this point in time regarding the times that he's

15   articulating

16   vis-a-vis the time when the dog made the sniffing

17   process and the 11:30 reference, correct?

18                   MR. MILLER:  I would say that it flies

19   -- it is contro -- it is contradicted based on the

20   physical documents that we have in the case.  I say

21   that the container was scanned.  Not a particular item

22   singled out from that container.  The document says

23   container generated.  It is their document.  And so,

24   therefore, we're going to have someone -- we have

25   someone that we can put on the stand to further show,

1    make a preliminary showing, that the statements were

2    false because if the container was generated and not a

3    individual do -- individual piece of mail, that, in

4    and of itself, and that the container was scanned.

5    Not the mail.  Not the doc -- not -- what was it --

6    package 581, if the container was scanned.  That flies

7    in the face of what he's saying.

8                    THE COURT:  Mr. Tulante, do you

9    understand the argument?

10                   MR. TULANTE:  I don't understand that

11   argument, Your Honor.

12                   MR. MILLER:  Also, Judge --

13                   MR. TULANTE:  This is --

14                   MR. MILLER:  Also, Judge --

15                   THE COURT:  Mr. Miller --

16                   MR. MILLER:  -- there's a stream --

17                   THE COURT:  Mr. Miller -- Mr. Miller,

18   just one second.  I'll also give you time.

19                   MR. TULANTE:  Your Honor, I just want

20   to take this one at a time because we first started

21   talking about Detective Kelliher and then we moved on

22   to, I believe, former Inspector Kellerman?

23                   MR. MILLER:  Katerman.

24                   MR. TULANTE:  Katerman.  With respect

25   to Detective Kelliher, the testimony she'll offer not

1    only will it not contradict what Inspector McStravick

2    testified; it will merely corroborate it.  And, you

3    know, we're proceeding -- obviously, evidence has been

4    heard.  But it doesn't satisfy what the Franks

5    procedure is for.  It's for -- you identify falsity.

6    You offer it to the Court that if this witness

7    came -- were to testify, they would contradict.  And

8    that falsehood would be material and knowingly and

9    intentionally made.

10                   THE COURT:  If you say that -- I

11   understand that you're saying that.  And I could

12   accept that as an offer by government's counsel.

13                   Mr. Miller is saying, no, she's not

14   going to say that.

15                   MR. TULANTE:  Well, he --

16                   THE COURT:  She's my witness and I'm

17   offering something else.  And when two counsel offer

18   opposing -- I mean, opposite proffers, the Court is

19   fact finder, has to hear it and make a decision.

20   Don't you think?

21                   MR. TULANTE:  Your Honor, it's his

22   burden.  He has to offer that proof.  He has to --

23                   THE COURT:  Well, he's made the offer.

24                   MR. TULANTE:  -- be able to withstand

25   this --

1                    THE COURT:  And you've made the

2   counteroffer.  And he's simply saying, Judge, let me

3   show you.

4                    MR. TULANTE:  I don't think he's made

5   that offer with respect to -- respectfully, Your

6   Honor, with respect to Detective Kelliher.

7                    THE COURT:  Did you, Mr. Miller?

8                    MR. MILLER:  Well, Judge, yes.  And I -

9   - what I'm saying is also we have an inspector or

10  prior inspect -- he used to be an inspector for over

11  eighteen years.  And if Mr. Katerman can come in here,

12  then there's no question about the objection that's in

13  this letter that I just read.

14                   THE COURT:  Well, again --

15                   MR. MILLER:  There's no question --

16                   THE COURT:  -- according to the case

17  law, we're talking about --

18                   MR. MILLER:  I want to present that to

19  --

20                   THE COURT:  -- making a -- the Court

21  must then exercise -- excuse me.  Let me do it this

22  way.  I'm reading from the case law.  "An offer of

23  proof contradicting the affidavit, including materials

24  such as sworn affidavits or otherwise reliable

25  statements from witnesses."  Now to the extent that

1   you're offering a reliable statement from a witness,

2   one witness would be the officer in charge of the dog.

3   Is that correct?

4                   MR. MILLER:  Well, first --

5                   THE COURT:  I'll get to the other one.

6   Just let -- one at a time.

7                   MR. MILLER:  Yes, sir, Your Honor.

8   Yes, sir, Your Honor.

9                   THE COURT:  Is that one that you're

10  proffering is going to contradict the testimony of the

11  inspector here?

12                  MR. MILLER:  Yes, Your Honor,

13  especially in light of the testimony that Mr. Katerman

14  is going to testify to.

15                  THE COURT:  Mr. Katerman is an

16  individual who you're going to -- or you're submitting

17  or proffering as someone who can testify to custom?

18                  MR. MILLER:  Yes, in regards to

19  experience and knowledge about the postal data system

20  and how this is accurate.  And they are alleging that

21  it's not accurate.  They're alleging that it didn't

22  get to Philadelphia at 11 o'clock.  They're alleging

23  that it got to Philadelphia before 11 o'clock, before

24  9 o'clock.  That's what they're alleging.

25                  THE COURT:  All right.

1          MR. MILLER:  He's going to testify that

2    it

3    is -- it is as it appears on this document.

4          THE COURT:  All right.  I've heard

5    enough.

6          MR. TULANTE:  Your Honor, can I --

7          THE COURT:  Now, Mr. Tulante -- yes,

8    sir.

9          MR. TULANTE:  One final point.  The

10   Franks process allows the defense to challenge the

11   voracity of the statements that are in the affidavit

12   which were presented to the magistrate judge.  Now

13   what counsel is doing is he's identified an exhibit.

14   And he just, frankly, just does not agree with the

15   testimony he's heard from Mr. McStravick.  And now he

16   seeks to introduce extrinsic evidence to challenge the

17   voracity of what's in this extrinsic document without

18   speaking to the four corners of the affidavit.  That's

19   what I think Your Honor just read.  You know, it has

20   to be challenging what's in the affidavit because it's

21   the affidavit that was presented to the magistrate.

22   It's the affidavit that this Court has to evaluate

23   whether or not --

24          THE COURT:  All right.

25          MR. TULANTE:  -- it was false.

1                    THE COURT:  Given that Mr. Miller's

2     argument is that the affidavit is undermined by

3     evidence he can produce such that it would be

4     tantamount to the false or reckless representation.

5     Is that correct, Mr. Miller.

6                    MR. MILLER:  That is absolutely

7     correct.

8                    THE COURT:  All right.  You cannot

9     unring a bell.  If I said to the defendant at this

10    point in time, you can't present it and we go forward

11    with this hearing and ultimately it's reviewed, the

12    suggestion could be, Judge, all you had to do was just

13    hear it and then make a decision as to whether or not

14    it was admissible or relevant.  You could always

15    strike it because this is a suppression motion.  This

16    isn't in front of a jury.  I'm going to therefore

17    allow it subject to it being stricken.  All right?

18                    MR. TULANTE:  All right.  It's their

19    witness.

20                    THE COURT:  Exactly.  Go forward.

21                    MR. MILLER:  Thank you, Your Honor.  I

22    call Mr. Katerman.

23                    THE COURT:  All right.

24                    MR. TULANTE:  You want to take

25    Detective Kelliher first?

```
1                    THE COURT:  I thought you --

2                    MR. MILLER:  No.  I -- no.  I'm calling

3    Mr. Katerman to --

4                    THE COURT:  All right.  It's not my --

5    it's --

6                    MR. MILLER:  Yes.

7                    MR. TULANTE:  Okay.  All right.

8                    THE COURT:  You put people on in the

9    orders you wish to do it.  You're defense counsel.

10                   MR. MILLER:  Your Honor, may I go out -

11   -

12                   THE COURT:  Sure.

13                   MR. MILLER:  Thank you.

14                   THE COURT:  Is there any need to

15   sequester the inspector or not?

16                   MR. MILLER:  I believe that he may be

17   called on rebuttal and, yes, sir, Your Honor, yes, I

18   would ask that he be sequestered.

19                   THE COURT:  All right.  Thank you.

20                   MR. MILLER:  Thank you.

21        (Pause)

22                   MR. MILLER:  Your Honor, is it okay if

23   the witness approach the --

24                   THE COURT:  Yes, sir.

25                   MR. MILLER:  -- the witness stand?
```

Page 140

```
 1                   THE COURT:  Go right ahead.
 2                   MR. MILLER:  Thank you.
 3                   THE CLERK:  Good afternoon, sir.
 4                   THE WITNESS:  Good afternoon.
 5                   THE CLERK:  May I ask you to provide
 6   your full name and spell it for the record?
 7                   THE WITNESS:  Sure.  Andrew, A-N-D-R-E-
 8   W, Charles, C-H-A-R-L-E-S, Katerman, K-A-T-E-R-M-A-N.
 9                   THE CLERK:  Please raise your right
10   hand.
11           ANDREW KATERMAN, WITNESS, SWORN
12                   THE CLERK:  Thank you, sir.  You may be
13   seated.
14                   THE COURT:  You may proceed.
15                   MR. MILLER:  And, Your Honor, before I
16   proceed, I know that two witnesses are out in the
17   hallway.  And I don't know whether or not -- I'm sure
18   that Inspector is familiar with sequestration rules
19   but I would ask that it be emphasized that he not
20   speak with --
21                   THE COURT:  Mr. Tulante, if you wish to
22   have them brought in to the front door, I'll certainly
23   admonish them not to have any discussions about their
24   testimony.
25                   MR. TULANTE:  I can admonish them, Your
```

1    Honor.

2                    THE COURT:  I think it's probably best

3    --

4                    MR. TULANTE:  If -- yes, Your Honor.

5                    THE COURT:  -- that I do it on the

6    record --

7                    MR. TULANTE:  I will do so.

8                    THE COURT:  -- on myself.  Thank you.

9                    MR. MILLER:  Thank you, Your Honor.

10        (Pause)

11                    THE COURT:  Good afternoon again.  As

12   two prospective witnesses in this case, it is

13   incumbent upon me to advise you not to discuss your

14   testimony while you're out in the hallway.  All right?

15                    MS. KELLIHER:  I understand.

16                    THE COURT:  And you may be accepted to

17   being called later on in the case.  We would not want

18   to have any issues of anything like that at all.  All

19   right?

20                    MS. KELLIHER:  Okay.

21                    THE COURT:  Thank you very much.

22                    MR. MCSTRAVICK:  Yes, Your Honor.

23                    MR. MILLER:  Thank you, Your Honor.

24   May I proceed?

25                    THE COURT:  Yes, sir.  You may proceed.

1                    DIRECT EXAMINATION

2    BY MR. MILLER:

3        Q    Sir, would you at least identify yourself at

4    this time?

5        A    My name is Andrew Katerman.

6        Q    And, Mr. Katerman, are you currently

7    employed or how are you currently employed?

8        A    I'm employed as a private investigator for

9    an investigation firm out of Harrisburg, Pennsylvania.

10       Q    Okay.  And prior to that, how were you

11   employed, sir?

12       A    I was a postal inspector and a special agent

13   for postal OIG for twenty-four years or something

14   like, twenty-five years.

15       Q    When you say OIG, what is OIG?

16       A    Office of the Inspector General.

17       Q    I see.  Okay.  And you say you were postal

18   inspector for how long?

19       A    Eighteen, nineteen years, something like

20   that.

21       Q    And you were with the Office of the

22   Inspector General for how long?

23       A    Five years.

24       Q    I see.  And during your time of service as a

25   postal worker, did your duties ever carry you here to

1    the Eastern District of Pennsylvania?

2        A    Yes.

3        Q    I see.  And what did those duties basically

4    consist of?

5        A    I did both mail theft and narcotics

6    investigations in the Eastern District of

7    Pennsylvania.

8        Q    And that was as a postal inspector.

9        A    As a postal inspector, that's correct.

10       Q    I see.  Okay.  Now, sir, are you familiar or

11   as a result of your experience as a postal inspector

12   and with the Office of the Inspector General's office,

13   are you familiar with postal data records -- are you

14   familiar with postal data records?

15       A    Somewhat, yes.

16       Q    Okay.  You say somewhat.

17       A    There are certainly financial records that I

18   am not familiar with.  I do not do the audits in the

19   post office and things like that.  And there are

20   inspectors that do that but I'm not familiar enough to

21   be able to answer questions on audits and finances and

22   things like that.

23       Q    I see.  But specifically, in regards to --

24   specifically, in regards to tracking records --

25       A    Yes.

1      Q     -- tracking records of various pieces of

2   various items that are in the mail stream.

3      A     Yes.  I have experience with tracking

4   records, yes.

5      Q     Okay.  And what is the nature of that

6   experience.

7      A     Like I said, I was a postal inspector and I

8   investigated narcotics in the Eastern District of

9   Pennsylvania and in the Middle District.  And we would

10   watch parcels.  We'd have target addresses that we'd

11   be looking at.  And you would take the tracking

12   information off of the postal data records and you

13   would ascertain that the suspect got more than one

14   parcel or something like that even though you only saw

15   one of them.  And you'd realize that there's a

16   continuing pattern here.  And you identify that

17   suspect as someone you wanted to look at further.

18      Q     I see.  And were you ever involved in the

19   process of identifying the suspect packages?

20      A     Absolutely.

21      Q     Okay.  And were you -- yeah, please.

22   Explain that process.  Yeah.  Thank you.

23      A     Okay.  Well, simply, express mail labels

24   come in multiple parts.  And one of the parts is left

25   with the center.  One part is kept by the post office.

1    One part is retained by the addressee.  Well, the part

2    that is kept by the post office on --

3         Q    Excuse me.  I'm sorry.  You said express

4    mail?

5         A    That was express mail, yes.

6         Q    What about priority mail?

7         A    Okay.  Priority mail labels do not come in

8    multiple parts like that.  So you're just tracking

9    data off of the website which is -- you're not able to

10   compare handwriting and things like that to say that

11   it looks similar.  You're just looking for multiple

12   parcels going to the same address.

13        Q    I see.  Are you able to see those parcels?

14   See at least the label of those parcels prior to them

15   -- while they're in the mail stream but prior to them

16   getting to their destination?

17        A    Not when I worked priority mail.  We were

18   not able to see the label, the actual handwritten

19   labels before they were --

20        Q    When did you work priority mail?

21        A    I did not work narcotics after 2000.

22        Q    2000.

23        A    Right.  So it's been fourteen years or so

24   since I --

25        Q    Fourteen years.  Okay.

1          A      -- since I worked narcotics for the mail --

2          Q      Okay.

3          A      -- correct.

4          Q      So now you were unable to -- unable to see,

5     as far as your experience, the actual label.

6          A      Correct.

7          Q      But in regards to if you were able to see

8     that label, you would be able to determine, before the

9     package actually arrives at its destination, you would

10    be able to determine whether or not that package -- or

11    what would you be able to determine about that

12    package?

13         A      Well, I'm assuming we're talking about

14    multiple packages going to the same address.

15         Q      That's correct.

16         A      That's why we're looking at these packages.

17         Q      Or different addresses.

18         A      Okay.  Well then I'm not sure how I linked

19    it to the second address other than perhaps

20    handwriting that looked similar or they're from the

21    same return address or something like that.  I'm not

22    sure how you're linking the multiple priority packages

23    together.

24         Q      Okay.  Okay.

25         A      Do you have the same -- do you actually know

1    that they're mailed within minutes of each other at

2    the same post office in California or some place?

3         Q    Okay.  Now let me ask you this.  Let me ask

4    you this.  If the postal data records -- if you were

5    presented with the postal data records --

6         A    Uh-huh.

7         Q    -- what would that tell you about the

8    whereabouts, the location -- let me say it like that -

9    - and the time that a package would be actually

10   received at various locations.

11                  MR. TULANTE:  Objection, Your Honor,

12   only because postal data records can refer to one of

13   hundreds or thousands.

14                  THE COURT:  Sustained.

15   BY MR. MILLER:

16        Q    In regards to the postal product tracking

17   system, are you familiar with that?

18        A    Yes.

19        Q    Okay.  What does that system -- what could

20   that system tell you?  Or what did that system tell

21   you?

22        A    Well, it could tell you who actually

23   operated the scanner.  They scan the package as

24   incoming and it would tell you what time the package

25   was scanned.  So you could identify multiple packages

1    mailed at the same clerk within, we'll say, seconds of

2    each other or perhaps minutes of each other.  So if

3    the packages were mailed, we'll say, at 2:01, 2:02,

4    2:03, 2:04 in the afternoon, it would be a reasonable

5    guess to say that they're mailed by the same person.

6    Then if you look at the handwriting on the labels and

7    the handwriting appears similar on all four of those

8    package, that would take you further down the path

9    that it seems reasonable that the same person mailed

10   those four packages even though you don't even have a

11   picture of this person yet.  It would be a reasonable

12   suspicion.

13              And then there are video cameras in

14   many of the larger facilities in the metropolitan hubs

15   in California.  And that's mostly for robbery

16   prevention.  But we are able to take images off of

17   those videos to see who mailers are on particular

18   packages because now you know which clerk accepted it.

19   You know which window that clerk worked at, so you can

20   say it's the person that's at the window all the way

21   to the left.  And you can see that the same person

22   stands there and mails multiple packages and that's

23   how you would be able to link those multiple packages

24   together.

25         Q    I see.  But from the postal data records,

1    would you be able to tell the time that a package was

2    mailed?

3                    MR. TULANTE:  Your Honor, just the same

4    objection with respect to postal data records.

5                    THE COURT:  Sustained.

6                    MR. MILLER:  Well, I'm sorry.

7    BY MR. MILLER:

8        Q     Postal -- the product tracking system --

9        A     Yes.

10       Q     -- utilized by postal inspectors.

11       A     Yes.

12       Q     Would you be able to tell -- would you be

13   able to trace a package, first of all?

14       A     Well, you can tell the time the package is

15   mailed.  And you can see all the scans that it goes

16   through in round.  And you can see that packages are

17   mailed -- where they're mailed and what time they're

18   mailed or actually, you're seeing what time they're

19   scanned which is supposed to be the same thing but it

20   sometimes isn't exactly the same thing.

21       Q     Okay.  Now let me ask you this.  Let me ask

22   you this.  Are you familiar with the scanner ID?

23       A     Yes.

24       Q     Okay.  What is that?

25       A     That identifies which gun the guy is

1   pointing at the package in order to get the scanner --

2   the bar code information off of it.  And that will

3   then work backwards and tell you which post office it

4   was mailed -- was scanned at.  And then will tell you

5   further which clerk actually held the scanner in his

6   hand in order to scan that package.

7        Q    Not tell me just exactly, how would that

8   number tell you what employee or whatever was the one

9   that actually scanned the package?

10       A    I would have to call the post office.  If I

11  call the post office and say this is the inspector

12  from the east coast and I want to know who operated

13  scanner 123 on Tuesday, July 1st, they'll tell me.

14       Q    So if a person just laid the scanner down,

15  somebody else, another employee, could pick it up and

16  scan it?

17       A    Conceivably.  But in general, they're

18  assigned to a person.  Or, they're actually assigned

19  to a job.  And there's one person assigned to that

20  job.

21       Q    Okay.  And do postal inspectors --

22            THE COURT:  Excuse me one second.

23       Q    -- man the scanners?

24            THE COURT:  Excuse me one second.  Now

25  when you make that statement, you're making that

1    statement as to what occurred fourteen years ago?

2                    THE WITNESS:  That's correct.  I have

3    not investigated this type of operation in the last

4    fourteen years.  That's correct, Your Honor.

5                    THE COURT:  All right.

6    BY MR. MILLER:

7        Q    Now when you said in the last fourteen

8    years, I have a copy of your resume.  It says postal

9    inspector, U.S. Postal Service, 1989 to 2006, am I

10   correct?

11       A    Correct.

12       Q    Okay.  So you were a postal inspector during

13   that -- up to 2006.

14       A    Up to 2006.  The last six or so years, I did

15   not work narcotics through the mail.

16       Q    You didn't work narcotics.

17       A    That's correct.

18       Q    But you were still familiar with --

19       A    I was still --

20       Q    -- the product tracking system.

21       A    Absolutely.

22       Q    Okay.

23       A    That's correct.

24       Q    So your statements about the product

25   tracking system are -- is accurate up to at least

1    2006, am I correct?

2         A    I'll even go through my retirement from the

3    Office of the Inspector General, yes, because I

4    continually had data that I researched through the

5    tracking system.

6         Q    So as a result of you being involved in the

7    -- you were in the Office of -- the Inspector

8    General's office up till 2011, am I correct?

9         A    That's correct.

10        Q    And so, during that time, up till 2011, you

11   still -- or did you -- did you still --

12        A    Yes.

13        Q    -- use the postal --

14        A    Yes.

15        Q    -- product tracking system?

16        A    Yes.

17        Q    You did?  Okay.  So let me just ask you

18   this.  When it talks about the method of input on a

19   product tracking system record, what does that mean?

20        A    Normally, they're scanned.  But you can

21   input a manually -- if there's a problem with the

22   scanner or something like that.

23        Q    Okay.  And when it talks about event time,

24   what does that usually mean?

25                  MR. TULANTE:  Your Honor, may I

1  interject?  I think it'd make things easier if we're

2  talking from the same document.  I know that counsel

3  is reading from a document.  I don't know if his

4  intention is to offer it for the witness.

5                  MR. MILLER:  Oh, I do absolutely but

6  I'm --

7                  MR. TULANTE:  Okay.

8                  MR. MILLER:  But I'm just going over

9  categories that are on this document, Your Honor.

10                  THE COURT:  For now, objection's

11  overruled.

12  BY MR. MILLER:

13      Q    When it talks about the event time, are you

14  familiar with that aspect of the product tracking

15  systems?

16      A    Yes, I am.  That would be -- if you're

17  scanning it and you're seeing it arrive in

18  Philadelphia, the event time would be the time of the

19  arrival in Philadelphia.

20      Q    I see.  And when you say the time of the

21  arrival, would that be, oh, after it gets to the

22  airport and then maybe an hour or two later?  Or would

23  that be when it gets -- if it's priority mail, would

24  that be when it gets to the airport or at some other

25  remote location?

1        A      It would probably be the time the container

2    holding the packages is rolled off the airplane.

3        Q      And why do you say probably?

4        A      My experience is that that's how it would

5    be.

6    The -- it could conceivably be something else if

7    someone forgot to scan something or someone didn't do

8    something in accordance with procedures.  But the

9    procedures would be that it would be the time that the

10   container transfers from the airport employee to the

11   postal employee who now has the mail in his control

12   again.

13       Q      Okay.  So --

14                  MR. MILLER:  If I may approach, Your

15   Honor, and at least let him --

16                  THE COURT:  Yes, sir.

17                  MR. MILLER:  Let me see -- yeah.  I

18   think they are.

19                  THE WITNESS:  There's a stack of

20   documents up here.

21                  MR. MILLER:  Okay.  If I may approach,

22   Judge --

23                  THE COURT:  Yes.  Go right ahead.

24                  MR. MILLER:  -- I believe that would be

25   the addendum --

1             THE COURT:  Go right ahead.

2             MR. MILLER:  I'm just looking -- yes.

3    BY MR. MILLER:

4        Q    I would like to --

5             MR. MILLER:  If I may, Your Honor.

6    BY MR. MILLER:

7        Q    I'd like to direct your attention to what's

8    been marked for identification purposes as the

9    addendum of Defense Exhibit B -- I'm sorry -- Defense

10   Exhibit A.

11       A    Okay.  Of D-A, got it.  Okay.

12       Q    Okay.  Okay.  Do you recognize that document

13   in any kind of way, shape or form?

14       A    Yeah.  It's a typical tracking sheet from a

15   parcel for -- from the tracking confirm system of the

16   postal service.  I see it's marked U.S.A. Simmons

17   0857.  So I'm going to guess it's the same one that we

18   had viewed earlier.

19       Q    Okay.  Let me ask you this.  Do you see the

20   column where it says "Input Method"?  That would be --

21   I believe that's on page 1 of that document.  Yes.

22       A    Yes.

23       Q    And then I would like to direct your

24   attention to the date of November the 13th, 2013, the

25   event time, 23:06.  I believe that's --

1       A       Um-hmm.

2       Q       Okay.  What does that mean to you?

3       A       What does "Input Method" mean then?

4       Q       No.  What does the event time mean to you?

5       A       23:06 is 11:06 p.m.

6       Q       I see.  And where it says "Input Method" --

7       A       It says "Container Generated".

8       Q       What does that mean to you?

9       A       That means, like I was talking about, when

10      the container rolled off the airplane and it was full

11      of, we'll say, fifty parcels, they scanned the outside

12      of the container and that scan then instantly appears

13      on all fifty of those parcels as having arrived in

14      Philadelphia all at the -- all at one time from one

15      scan.

16      Q       And this was your experience not just as a

17      postal inspector but also as a member of the office of

18      Inspector General up to 2011?

19      A       That's correct.

20      Q       With regard to -- you made a statement and I

21      want to make sure that I'm clear on this, that this

22      information would be something that would be inputted,

23      for lack of a better term, by a postal employee.  Am I

24      correct?

25      A       Yes.

1        Q    Okay.  Is it your experience that -- or was

2   it your experience that these doc -- that these

3   containers would be removed from an airplane or

4   received here in Philadelphia at the airport by people

5   that are other than postal employees?

6        A    No.  They'd be rolled off the airplane by

7   the airline employees because --

8        Q    Okay.

9        A    -- the postal employees weren't allowed in

10  the airlines.  It's one of those union things.  And

11  then once they actually got into -- onto the tarmac

12  and close to the building, the postal employee would

13  take control of them.  But there was a point where

14  they were under the control of an airline employee

15  before they actually came into the control of the

16  postal employee.

17       Q    Now as a postal inspector, is it -- has it

18  been your experience that a package would be taken

19  from the airport and driven to a remote location, a

20  distribution point, other than at the -- other than at

21  the airport that would -- and then it be scanned there

22  hours later?

23       A    Taken out of that container?  Is that what

24  you're saying?

25       Q    Taken out of that container and taken to a

Page 158

1    remote location and scanned hours after it leaves the

2    airport.

3         A    No.  Why would you do that?

4         Q    Well --

5         A    I'm sorry.  It's not my -- I'm not supposed

6    to be asking questions.

7         Q    Okay.

8                   THE COURT:  Thank you very much.

9                   THE WITNESS:  I apologize.

10                  MR. MILLER:  Okay.  Okay.  Okay.  Okay.

11   Okay.

12                  THE WITNESS:  Sorry, Your Honor.

13   BY MR. MILLER:

14        Q    Okay.  Let me ask you this.  In regards to

15   the time, you're saying why would you do that.  But if

16   a package was received here -- okay.  Let me make sure

17   -- if a package was received here in Philadelphia at

18   11 o'clock in the evening, is it conceivable that that

19   package -- or scanned in on the product tracking

20   system at 11:00 p.m., is it conceivable that that

21   package actually arrived at 6:00, 7:00 or 8:00 -- 6 or

22   7 or 8:00 that same evening?

23        A    Well, it could --

24                  MR. TULANTE:  Your Honor, I don't --

25   object -- I don't know what the question is.

1          MR. MILLER:  Okay.  Let me ask it like

2     this.

3          THE COURT:  Sustained.

4     BY MR. MILLER:

5          Q    Okay.  Let me ask you this.  In regards to -

6     - I believe it's pack -- I would like to direct your

7     attention.  I believe this is Government -- the packet

8     that's marked Government Exhibit B.  Let me double

9     check here.  Excuse me.  Let me double check.

10         A    It's a priority mail parcel that ends in

11    391?

12         Q    That's correct.

13         A    Okay.

14         Q    Okay.  Okay.  Do you have that product

15    tracking record?

16         A    I have -- I have Government Exhibit B.  Yes.

17         Q    Okay.  Okay.  Do you see -- do you see a

18    product tracking system record for a package that ends

19    in 391?

20         A    No.  I have three -- four applications --

21    three applications for search warrants -- four

22    applications for search warrants --

23         Q    Let me say it like this.

24         A    -- a stack of e-mails.

25         Q    Let me direct your attention to Defense

1   Exhibit A.

2        A    Oh.  Yes.

3        Q    Okay.  And then in that package, do you see

4   anything that pertains to the product tracking system

5   for Exhibit (sic) 391.  It would be the last three --

6        A    The tracking number on Defense A is 581.

7   The last three is 581.

8        Q    Okay.  Do you see -- that's the addendum.

9   And the package that has other documents that are

10  collectively marked as Defense Exhibit A --

11                  MR. MILLER:  May I approach, Judge?

12                  THE COURT:  Yes, sir.

13                  MR. MILLER:  Thank you.

14                  THE WITNESS:  I have a couple that

15  aren't marked.  And I have Government's Exhibit --

16                  MR. MILLER:  That's the government's.

17                  THE WITNESS:  Okay.  These are all

18  government's and there's this one.

19                  MR. MILLER:  I don't know -- yes.  This

20  is it.

21                  THE WITNESS:  Okay.  It's not marked.

22                  MR. MILLER:  It's not marked.  I

23  apologize.  And it would be -- I want to direct your

24  attention to it for one more second.  Put that here.

25  Exhibit 2.  391.  There we go.  I'm sorry.

Page 161

```
 1                  THE WITNESS:  Okay.

 2                  MR. MILLER:  It's the third page of

 3   that packet.

 4                  THE WITNESS:  391.

 5                  MR. MILLER:  Yes, sir.

 6                  THE WITNESS:  Yes.  Got it.

 7                  MR. MILLER:  Okay.

 8   BY MR. MILLER:

 9        Q    Now the -- I want to go to -- it's going to

10   be 1, 2, 3, 4, 5.  That would be five from the bottom

11   -- five from the bottom where it talks about in-log

12   processing and it gives a time of 23:10 on November

13   the 13th, 2013.  Do you see that?

14        A    I see the date and it could be 23:18 or

15   23:10.  It's a little tough to read on my copy.

16        Q    It is.  It is.

17        A    Okay.

18        Q    And do you see that it was -- the location

19   of where that was scanned?

20        A    It was scanned in Belmar, New Jersey.

21        Q    I see.  And do you see the input method?

22        A    It says "Scanned" and then it gives the

23   scanner ID.

24        Q    Okay.  And do the postal inspectors have

25   scanner ID numbers?
```

1       A     Not to the best of my knowledge.

2       Q     Did you ever have a scanner ID?

3       A     I never had a scanner ID.

4       Q     Did any of your colleagues have scanner ID

5    numbers?

6       A     No.

7       Q     Okay.  If the -- would it -- is it -- let me

8    ask you like this.  Is it possible that a package

9    would come from California to New Jersey directly --

10   to Belmar, New Jersey directly?

11      A     No.

12                 MR. TULANTE:  Your Honor, objection.  I

13   mean, he's asking -- he's asking him to sort of

14   speculate.

15                 MR. MILLER:  Well --

16                 MR. TULANTE:  This is a witness.

17                 MR. MILLER:  Well, well, well --

18                 THE COURT:  Counsel --

19                 MR. TULANTE:  And I've reserved it --

20                 THE COURT:  Counsel, rephrase the

21   question.  Sustained.

22                 MR. MILLER:  All right.  Yes.

23   BY MR. MILLER:

24      Q     Well, when somebody in Philadelphia scanned

25   the package in Belmar, New Jersey, somebody in

1    Philadelphia scanned a package in Belmar -- Belmar,

2    New Jersey.

3                    MR. TULANTE:  Objection, Your Honor.

4                    THE COURT:  Sustained.

5                    THE WITNESS:  And --

6                    THE COURT:  Sustained.

7    BY MR. MILLER:

8        Q    Is that possible?

9                    MR. TULANTE:  Your Honor, same

10   objection?

11                   THE COURT:  Sustained.

12   BY MR. MILLER:

13       Q    Now --

14                   THE COURT:  Counsel, let me just, for

15   the record, first of all, the witness is not

16   testifying from his own personal knowledge about

17   anything involved in this, correct?

18                   MR. MILLER:  No.  That is correct,

19   Judge, about personal knowledge, about any -- but he

20   is -- let me take that back.  He's testifying about

21   personal knowledge that he has of the product tracking

22   system as of -- as late as 2011.

23                   THE COURT:  No.  I understand that.

24                   MR. MILLER:  Yes, sir.  Yes, sir.

25                   THE COURT:  And that's a different

```
 1   issue in terms of expert witness versus whatever you

 2   can offer for him, what capacity.  My question simply

 3   is, is that you're asking him question about

 4   possibilities on the date of November 13th of 2013

 5   where he cannot testify and observing anything from

 6   his personal knowledge.

 7                 MR. MILLER:  That is correct, Judge,

 8   based on his own personal knowledge of being present

 9   at the time that this was scanned.

10                 THE COURT:  All right.

11                 MR. MILLER:  But from his own personal

12   knowledge in regards to how things are done in the

13   postal system --

14                 THE COURT:  How things were done when

15   he was last there.

16                 MR. MILLER:  In 2011 even as an

17   inspector general.

18                 THE COURT:  All right.  No.  The

19   question about it is it possible for something to go

20   from Santa Clara, California to Belmar, New Jersey --

21   I'm sure you're talking about by airplane.  There's no

22   airport like Philadelphia International Airport --

23   International Airport.

24                 MR. MILLER:  Well, let me -- if I may

25   rephrase the question.
```

 1                    THE COURT:  Go ahead.

 2                    MR. MILLER:  Okay.

 3     BY MR. MILLER:

 4          Q    With regards to this particular -- well,

 5     this particular line item, if you want to call it

 6     that, it indicates that this package was scanned --

 7     the location was Belmar, New Jersey.  Do you see that?

 8          A    We're back at 23:10, five lines up from the

 9     bottom.

10          Q    That's correct.  Yes, sir.

11          A    Yes.

12          Q    Okay.  You see that?  Now the line just

13     below that says Santa Clara, California.  Do you see

14     that, "En Route Processing"?

15          A    Yes.

16          Q    All right.  Do you see that?

17          A    Yes.

18          Q    Okay?  Okay.  There's nothing in here that

19     indicates that that product was scanned in

20     Philadelphia.  Am I correct?

21          A    That's correct.

22          Q    Nothing on this postal tracking system that

23     indicates that article was scanned ever in

24     Philadelphia, right?

25          A    Assuming that's the whole tracking, yes, I

1    agree.

2         Q    And by 11:10 on the 13th, based on your

3    knowledge of the postal tracking system and what this

4    document indicates, where is the package at 11:10 p.m.

5    on the 13th of November 2013?

6         A    It's in Belmar, New Jersey right next to

7    scanner, whatever that says, APPS 201.

8         Q    Okay.

9         A    901?  I don't know what it says.

10        Q    Now, sir, let me just ask you this question.

11   I want to try to change gears from the tracking

12   system.  In regards to -- were you present regarding

13   any of the exposure of K9 to items that were in the

14   U.S. mail system?

15                  MR. TULANTE:  Your Honor, objection --

16                  THE COURT:  Sustained.

17                  MR. TULANTE:  -- to relevance.

18                  THE COURT:  Sustained.

19   BY MR. MILLER:

20        Q    Well, can you tell us about the policies and

21   procedures that were utilized while you were there and

22   the postal inspector's office and in the inspector --

23   Office of the Inspector General in regards to suspect

24   packages?

25                  MR. TULANTE:  Your Honor, objection.

1            THE COURT:  Sustained.

2            MR. TULANTE:  Same grounds.

3            MR. MILLER:  Well, Judge, I would like

4    to offer him as an expert.  I have given the assistant

5    U.S. attorney a copy of my client's -- I'm sorry --

6    not of my client but of my witness' curriculum vitae.

7    And I don't know if the Court would like to have a

8    copy.  But I would like to offer him as an expert and

9    offer him to be even cross-examined in regards to his

10   expertise if necessary, if the U.S. attorney wants to,

11   to cross-examine him in regards to his expertise as an

12   expert of eighteen years --

13            THE COURT:  The Court is ruling that it

14   is irrelevant.  You have an exception?

15            MR. MILLER:  Thank you.

16   BY MR. MILLER:

17       Q    So --

18            MR. MILLER:  Court's indulgence.  One

19   moment.

20            THE COURT:  Surely.

21            MR. MILLER:  Just very briefly, Judge.

22            THE COURT:  Take your time.

23       (Pause)

24   BY MR. MILLER:

25       Q    Let me just make sure I'm clear in regards

Page 168

1    to just two points.  Looking at the postal tracking

2    system for postal track -- product tracking system

3    records for the package or the parcel ending in 581.

4    Do you see that?

5                    THE COURT:  Counsel, what are you

6    referring to?

7                    THE WITNESS:  Addendum --

8                    MR. MILLER:  The postal tracking system

9    in -- that would be in -- that would be in the

10   addendum, Judge, the addendum that --

11                   THE COURT:  All right.  Just a second,

12   please.

13                   MR. MILLER:  Yes, sir.  And it's the

14   first page on the addendum.  I apologize.

15                   THE COURT:  All right.

16   BY MR. MILLER:

17        Q    Do --

18        A    I got it, yes.

19        Q    You have it.  Okay.  Great.  All right.  Let

20   me make sure I'm clear.  The container -- the portion

21   that says "Input", it says "Container Generated" and

22   you said that means that it was scanned in a

23   container.  Am I correct?

24                   MR. TULANTE:  Your Honor, objection.

25   Asked and answered.

1                    THE COURT:  Sustained.

2    BY MR. MILLER:

3         Q    And it also -- the time or the 11:23, what

4    does that mean to you?

5                    MR. TULANTE:  Your Honor, same

6    objection.

7                    THE COURT:  Wait a minute.  11:23?

8                    MR. MILLER:  I'm sorry.  11:06.  23:06.

9                    THE COURT:  All right.  For "Container

10   Generated", it says 23:06.

11                   MR. MILLER:  Yes.

12                   THE COURT:  But that's not --

13                   MR. MILLER:  I changed that -- I should

14   say 11:06 or --

15                   THE COURT:  All right.

16                   MR. MILLER:  -- 11:06 p.m. or 23:06.

17                   THE COURT:  But in terms of the

18   underlying what does that mean, that is asked and

19   answered by reason of the previous question.  So the

20   objection is sustained.

21                   MR. MILLER:  I just want to make sure

22   I'm understanding this correct, Judge.  But, yes, and

23   I apologize.

24   BY MR. MILLER:

25        Q    Bottom line, these records -- that

1    particular record, does it mean that this package was

2    in a container in Philadelphia and was scanned at

3    11:06 p.m.?

4                    MR. TULANTE:  Objection, Your Honor.

5                    THE COURT:  Overruled.  You can answer

6    the question if you know.

7                    THE WITNESS:  The document indicates

8    that the package was, in fact, in a container and the

9    container was at the Philadelphia airport on 23:06 on

10   November 13.

11                   MR. MILLER:  I have no further

12   questions, Your Honor.

13                   THE COURT:  All right.

14                   MR. TULANTE:  Judge, may I?

15                   THE COURT:  Counsel?

16                   CROSS-EXAMINATION

17   BY MR. TULANTE:

18        Q    Good afternoon, Inspector.

19        A    Good afternoon.

20        Q    I don't know if you still get called

21   "inspector" but --

22        A    It's all right.

23        Q    -- how ever you want to be addressed.

24        It's fair to say that you -- it's been fourteen

25   years since you participated in narcotics with the

Page 171

1    inspection service, is that right?

2        A    That is correct.

3        Q    And as they say in drug investigations,

4    that's a lifetime, isn't it?

5        A    Absolutely.

6        Q    Things change, investigator type things

7    change?

8        A    Absolutely.

9        Q    And one of the things it sounds like changed

10   since you last did that was when you were

11   investigating drug crimes, you weren't able to get the

12   images from priority mailboxes, is that right?

13       A    That is correct.

14       Q    In fact, you typically, the way you

15   investigated these boxes, these priority mailboxes,

16   you had a target address that you were looking for, is

17   that right?

18       A    That is correct.

19       Q    While you're looking for -- when people mail

20   multiple boxes from the same post office.

21       A    Or target mail, that's correct.

22       Q    And you understand that's not the technique

23   involved in this case, is that right?

24       A    That is correct.

25       Q    And, in fact, when you were --

1                    MR. MILLER:  Judge, I'm going to object

2    in regards to that's not the technique of target

3    mailing.  I'm going to object to that.  I think it's -

4    -

5                    THE COURT:  Overruled.  The witness can

6    answer the question.

7                    MR. MILLER:  Okay.

8    BY MR. TULANTE:

9         Q    Well, let me ask this way.  Are you familiar

10   with how the postal inspectors in this case were able

11   to target this priority mailboxes?

12        A    I am not.

13        Q    And you weren't aware that -- of any search

14   by credit cards, anything like that?

15        A    Nope.

16        Q    No?  And when you were actually an

17   investigator, it's -- and tell me if I'm wrong.  I

18   often am wrong.  When you were an investigator, it's

19   fair to say that you spent a lot of your time in the

20   Middle District, in Harrisburg, right?

21        A    Correct.

22        Q    As opposed to Philadelphia and Philadelphia

23   International Airport.

24        A    I covered all of the Middle District of

25   Pennsylvania.  And I did not do Philadelphia or the

1    five surrounding counties.  So I did the Allentown

2    area and the Reading area which was still Eastern

3    District.

4         Q    It's still a lot of work as far as that.

5         A    Yes.

6         Q    And when you discuss what would happen when

7    containers -- packages come to Philadelphia, that's

8    based on your knowledge as of 2000, is that right,

9    what happens in the Philadelphia International

10   Airport?

11        A    Yes, what happens in the airport, yes.

12        Q    So you have nothing -- you have no specific

13   knowledge about what happens now, is that right?

14        A    Not as of today, no.  I have done cases that

15   involve mail theft, that involve employees on

16   airplanes and the handling between the tarmac and the

17   building since then.  But nothing obviously in the

18   last three years.

19        Q    And so, you don't know -- you can't tell the

20   Court whether, as of November 13, 2013, how packages

21   were received at the airport.

22        A    That's correct.

23        Q    And your -- just so we're clear, your

24   testimony regarding the product tracking systems for

25   these two boxes, the 391 and 581 --

1      A      Right.

2      Q      And that's -- again, that's based on what

3    your knowledge of this from years ago, is that right?

4      A      The form looks essentially the same.   I

5    would say that they -- it probably means the same

6    thing.

7      Q      And just to be clear, you don't know

8    Inspector McStravick, is that right?

9      A      I do not.

10     Q      And you have --

11     A      I was retired before he was hired.

12     Q      And you have no personal knowledge about

13   this investigation, is that correct?

14     A      Not before I met Mr. Miller.

15                MR. TULANTE:  Okay.  Your Honor, I have

16   no further questions.

17                THE COURT:  Thank you very much.

18   Anything further?

19                MR. MILLER:  Just very -- one or two,

20   that's it.

21                REDIRECT EXAMINATION

22   BY MR. MILLER:

23     Q      Is there anything about the postal tracking

24   record -- postal tracking system documentation that's

25   before you that you're unfamiliar with?

1      A    No.

2      Q    Is there anything about the product tracking

3  system documentation that's before you that you had no

4  experience with as a result of your employment as a

5  postal inspector and as an employee with the Office of

6  Inspector General?

7      A    No.  It appears the same.  There's nothing

8  on there I would say I don't know what it is.

9      Q    Are you -- were you ever familiar with that

10  term "Container General" -- I'm sorry -- "Container

11  Generated"?  Were you ever -- are you familiar with

12  that term?

13                  MR. TULANTE:  Your Honor, that's --

14                  THE COURT:  Sustained.

15                  MR. MILLER:  All right.  No further

16  questions.

17                  THE COURT:  You may step down.  Watch

18  your step, please.

19                  THE WITNESS:  Sure.

20                  THE COURT:  Mr. Miller?

21                  MR. MILLER:  Judge, I would like to

22  call Detective Kelliher.

23                  THE COURT:  You may proceed.

24                  MR. MILLER:  Thank you.  May I, Judge?

25                  THE COURT:  Yes, sir.

Page 176

1                    MR. MILLER:  Thank you.

2          (Pause)

3                    MR. MILLER:  Your Honor, with the

4     Court's permission, may the witness --

5                    THE COURT:  Certainly.

6                    MR. MILLER:  Thank you.

7                    THE COURT:  Please.

8                    THE CLERK:  May I ask you to please to

9     provide the spelling your last name for the record?

10                   THE WITNESS:  Detective Christine, C-H-

11    R-I-S-T-I-N-E, last name Kelliher, K-E-L-L-I-H-E-R.

12                   THE CLERK:  Would you raise your right

13    hand, please?

14    DETECTIVE KELLIHER, WITNESS, SWORN

15                   THE CLERK:  Detective Kelliher, do you

16    have a badge number?

17                   THE WITNESS:  22207.

18                   THE CLERK:  Thank you.  You may be

19    seated.

20                   THE COURT:  You may proceed.

21                   MR. MILLER:  Thank you, Your Honor.

22                    DIRECT EXAMINATION

23    BY MR. MILLER:

24        Q    Detective Kelliher, I have referred to you

25    as Detective but you're detective with what political

1   -- what township?

2        A    Bensalem Township.

3        Q    Bens -- okay.

4        A    Yes.

5        Q    And what are your duties and

6   responsibilities there as a detective?

7        A    I'm assigned to the K9 unit and assigned to

8   the DEA HIDTA Task Force Group 31.

9        Q    Okay.

10                 MR. TULANTE:  And, Your Honor, just so

11  that -- she used an acronym.  I know Your Honor wants

12  to have that unpacked.

13                 MR. MILLER:  I was about to --

14                 THE COURT:  Yes.

15                 MR. MILLER:  I was about to ask her --

16                 THE WITNESS:  I'm sorry.

17                 THE COURT:  Please.  Thank you.

18                 THE WITNESS:  HIDTA is High Intensity

19  Drug Trafficking Area.

20                 THE COURT:  Thank you.

21  BY MR. MILLER:

22        Q    And let me ask you this.  You were involved

23  in the investigation in regards to this matter

24  involving Mr. Simmons, am I correct?

25        A    Yes.

1        Q    Okay.  Or the secured party, Mr. Simmons, am

2   I correct?

3        A    Yes.

4        Q    Okay.  Could you tell us what your

5   involvement consisted of?

6        A    My involvement consisted of some

7   surveillance but, in the beginning, my drug detective

8   dog was used to detect the odor of narcotics coming

9   from several parcels.

10       Q    Okay.  You say your dog was utilized to

11  detect?

12       A    Yes.

13       Q    Okay.  Could you tell us what happened?

14  What -- how did -- tell us what happened when your dog

15  was utilized?

16       A    My dog was presented three separate parcels

17  all on separate occasions.  When I cued her to search

18  for drugs, she gave me some -- several indicators that

19  she smelled the odor of narcotics.  And upon putting

20  her nose right on the box and sniffing the box, she

21  gave me a final response that that is where the odor

22  of the narcotics was coming from.

23       Q    I see.  Now you said there were three

24  separate parcels that the dog gave that alert on?

25       A    Yes.

1     Q    Okay.  Were there any other parcels present

2  at the time that the dog --

3     A    Yes.

4     Q    -- gave the alert?

5     A    Yes.

6     Q    And where were they?

7              MR. TULANTE:  Judge, I just want to

8  clarify on which occasion.

9              THE COURT:  Thank you.

10 BY MR. MILLER:

11    Q    Okay.  Well, let's start --

12             MR. TULANTE:  Counsel's talking

13 generally.

14             THE COURT:  Thank you.

15 BY MR. MILLER:

16    Q    When was the first -- let's start with, I

17 believe it would be, parcel number ending in 072.  Are

18 you familiar with that particular parcel?  Are you

19 familiar with that parcel, first of all?

20    A    Yes.  I'm familiar with three parcels with

21 this investigation --

22    Q    Okay.

23    A    -- that my dog ran.  I don't specifically

24 which

25 time --

1        Q    Okay.

2        A    -- I ran what box, what number.

3        Q    Okay.  Okay.  What about the first -- what

4   was the first parcel?  Do you recall that parcel,

5   anything about that parcel?

6        A    No, other than Inspector McStravick asked me

7   to conduct a canine sniff of the parcel.

8        Q    I see.  And were there -- you said there

9   were other parcels present.  How many?

10       A    Approximately five or six.

11       Q    Five or six.  And were you aware of the

12   target parcel prior to the dog being exposed to the

13   parcel?

14       A    I was aware it existed.

15       Q    Okay.

16       A    I did not know where it was in the room, no.

17       Q    Okay.  Okay.  And there were certain

18   policies and procedures that you followed, am I

19   correct?

20       A    Nothing written, policies and procedures.

21   There's a certain way I do things but there's no

22   written policy or procedure.

23       Q    All right.  Okay.  Okay.  And so, you

24   received certain training in regards to handling a --

25   your dog, the canine.  I believe his name was Kirby,

Page 181

1    am I correct, or is Kirby?

2         A    Yes.

3         Q    Okay.  And you received certain training.

4    And that training, did it consist of -- or what did it

5    consist of at this point?

6         A    Our initial training consisted of in

7    training her with several odors that I wanted her to

8    find.  One being marijuana, cocaine -- first one being

9    marijuana.  Then cocaine, crack cocaine, heroin and

10   methamphetamines.

11        Q    Did it have anything to do with the actual

12   method of exposing the dog to maybe a target parcel?

13        A    I'm sorry.  Did I have anything to do?

14        Q    Did any of the training consist of --

15        A    No.

16        Q    -- the method --

17        A    We did not specifically target any parcels

18   at the time I was not involved with the postal

19   inspectors or the task force -- I'm sorry -- with

20   Kirby -- yes.  I was already on the task force with

21   Kirby at the time but I was not -- I was not running

22   parcels.  I just -- I make my -- I train my dog to be

23   obedient to odor of drugs regardless of where it is.

24   And I don't -- I don't specifically, like, target one

25   area.  They may have been in a box at some time during

1    her initial training, the narcotics, but I just -- I

2    don't, you know, recall specifically.

3         Q    Yeah.  Well, were you trained in regards to

4    the procedure to be utilized when your dog would be

5    exposed to a target parcel?

6         A    Well, there is no specific procedure.

7    There's several ways I do it because I'm a full-time

8    canine handler and I do things a certain way because I

9    want a very proficient dog with very, you know, high

10   percentage rate.

11        Q    Okay.  And so you said the dog was exposed

12   to about five packages or so at the time that it

13   alerted --

14        A    At the time this target pa -- at the time

15   the target package was there, yes.

16        Q    Okay.  Let me ask you --

17                  THE COURT:  Counsel, can you give me

18   just one second, please?

19                  MR. MILLER:  Sure.  Sure.  Sure.

20        (Pause)

21                  THE COURT:  Thank you.

22                  MR. MILLER:  May I proceed?

23                  THE COURT:  You may continue.

24                  MR. MILLER:  Thank you.

25   BY MR. MILLER:

1          Q      Detective, when was the first time that, in

2     this particular, that -- I believe that Inspector

3     McStravick contacted you in regards to this particular

4     matter?

5          A      This particular --

6          Q      This particular case.

7          A      This particular case?  He had advised me at

8     some point in the beginning of November that he had an

9     investigation and would like to use Kirby should he

10    have any parcels that he needed sniffed.  And I told

11    him just to call me whenever he needed her.

12         Q      Did he later call you?

13         A      Yes, he did.

14         Q      And when was that?

15         A      The first package was -- I -- I don't recall

16    if it was November 11th was the first package and then

17    the 12th with two more or the 12th was the first

18    package and the 13th was two more.  I don't --

19         Q      So it was either the --

20         A      11th and 12th or the 12th and the 13th, yes.

21         Q      Okay.  And you say he contacted you?

22         A      Yes.

23         Q      Was this -- when was this?  Day or night?

24    What time?

25         A      I believe it was during the day.

1          Q     And when did -- did you go --

2          A     Yes.

3          Q     -- as a result of him contacting you?

4          A     Yes.

5          Q     Okay.  And where did you go?

6          A     I went to their office in the Bala Plaza off

7     of -- in Bala Cynwyd off of City Line Avenue.

8          Q     Okay.  And do you know what time you got

9     there?

10         A     I do not.

11         Q     Do you know if it was day or night?

12               MR. TULANTE:  Your Honor, I'm going to

13     object to the detailed nature of the time.

14               THE COURT:  Sustained.  Sustained.

15     BY MR. MILLER:

16         Q     Well, did you make a report?

17         A     No.  There was no written report.

18         Q     Okay.  And let me ask you this.  In regards

19     to -- let me see which one is this.

20               MR. MILLER:  Let me just find this,

21     Judge.

22               THE COURT:  Yes, sir.

23               MR. MILLER:  Thank you, Your Honor.

24         (Pause)

25     BY MR. MILLER:

 1        Q    Okay.

 2              MR. MILLER:  Your Honor, if the witness

 3   can be directed to view the Defense Exhibit A.

 4              THE COURT:  Do you have it, ma'am?

 5              MR. TULANTE:  Is it marked?  Any mark

 6   on it?

 7              MR. MILLER:  I don't know if he marked

 8   it, Your Honor.  I don't think it was marked.

 9              THE WITNESS:  I have B, C and D which

10   I'm --

11              MR. MILLER:  May I mark it in red pen,

12   Judge?

13              THE COURT:  Yes.

14              MR. MILLER:  Thank you.

15              THE WITNESS:  Oh, here.  I'm sorry.

16   Yes.  This is -- is that A?

17              MR. MILLER:  Yes, it is.

18              THE WITNESS:  Oh.  I'm sorry.  Okay.

19              MR. MILLER:  Okay.  And may I direct

20   her attention to a particular page, Judge?

21              THE COURT:  Yes, sir.

22              MR. MILLER:  Thank you.  Excuse me,

23   Judge Jones.  Judge Jones, can I ask -- tell the

24   lawyer something?

25              THE COURT:  Go ahead.

1            MR. MILLER:  Thanks.

2       (Pause)

3  BY MR. MILLER:

4       Q    Let me just ask you this.

5            MR. MILLER:  If I may, Your Honor, I'm

6  just going to approach with --

7  BY MR. MILLER:

8       Q    Were you familiar with a package that was

9  addressed to Maximilian Stone?

10      A    I don't know who any of the packages were

11  addressed to or what wording was on it.  I did not pay

12  attention to that.

13      Q    Okay.  Do you know what time, in any

14  instance, what time your -- you were with your canine

15  and your canine gave an alert in regards to any of the

16  packages?  Do you know any time?

17      A    No, I don't know the exact time, no.

18      Q    Okay.  On no occasion with any of the

19  packages?

20      A    That's correct.

21      Q    And you have no documentation or nothing --

22  no evidence on your part that you have independently

23  that would indicate time that -- or the date that

24  specifically that your canine was utilized in this

25  case?

```
 1        A    I have a -- I do a monthly log that has --
 2   that says, you know, like if she gets called out,
 3   like, where she went, the date where she went or where
 4   the job was conducted at.  And then, you know, just a
 5   brief description of what was found, if anything.  And
 6   then, you know, a little notation on the right so I
 7   could remember what job it was or what postal
 8   inspector or DE agent, whatever kind of job it was who
 9   asked me to come out for it.
10        Q    And there's no time specifically on there,
11   right?
12        A    No.
13        Q    And you submitted that documentation -- do
14   you have that documentation with you today?
15        A    No, I do not.
16        Q    And so did you give that documentation to
17   anybody?  Specifically Mr. McStravick?
18        A    Yes.  Yes, I did.
19        Q    You did?  I see.  And did you review that
20   documentation prior to testifying here today?
21        A    No.
22        Q    When did you give that documentation to Mr.
23   McStravick?
24                  MR. TULANTE:  Your Honor, objection.
25                  THE COURT:  Sustained.
```

1                    MR. MILLER:  No further questions.

2                    THE COURT:  Any questions?

3                    MR. TULANTE:  Your Honor, I have no

4      questions.

5                    THE COURT:  Thank you.  You may step

6      down.  Watch your step, please.

7                    THE WITNESS:  Yes.  Thank you.

8           (Witness excused)

9                    MR. MILLER:  Judge, I have no other

10     witnesses at this time.  I don't mean to interrupt

11     you.  Sorry.

12                   THE COURT:  All right.  Do you rest?

13                   MR. MILLER:  One second.  No, Your

14     Honor.  I have no other witnesses and, yes, I rest at

15     this time.

16                   THE COURT:  All right.  Is there any

17     rebuttal by the government?

18                   MR. TULANTE:  No, Your Honor.  I do ask

19     permission to get the inspector back in here.

20                   THE COURT:  Sure.

21                   MR. MILLER:  And may I have my witness

22     --

23                   THE COURT:  Sure.

24                   MR. MILLER:  -- come in -- or

25     witnesses.

1                    THE COURT:  Sure.

2                    MR. MILLER:  The inspector as well as

3     the detective.

4                    THE COURT:  Yes, sir.

5                    MR. MILLER:  Thank you, Your Honor.

6          (Pause)

7                    THE COURT:  All right.  You may

8     continue -- or proceed, actually.

9          (Pause)

10                    THE COURT:  Counsel, you may proceed.

11                    MR. MILLER:  Thank you, Your Honor.

12                    Your Honor, the -- first of all, we

13     talk about, on its face, the warrants themselves and

14     does the defense have any objection to the warrants on

15     their face.  Well, I'm going to go specifically to the

16     warrant that ends in 391 -- or package that deals with

17     -- the warrant that deals with the package that ends

18     in 391.  That's the warrant that's not signed.

19                    The long and the short is that, Judge,

20     on its face, if we look at -- if we're making four

21     corners arguments, and that is definitely our argument

22     on this one, then on its face, Judge, this warrant is

23     deficient.  It's not signed.  It's not signed by a

24     proper issuing authority.  That's number one.

25                    Number two, in regards to 391, we also

```
 1   have that the parcel is never indicated by any of the
 2   documentation that's a part of Defense Exhibit A or
 3   the addendum to Defense Exhibit A that the parcel ever
 4   was in Philadelphia.  There's nothing on the product
 5   tracking system that indicates that the parcel was in
 6   Philadelphia.  So that flies in the face --
 7                  THE COURT:  Excuse me.  Excuse me.
 8                  MR. MILLER:  Sure.
 9                  THE COURT:  Mr. Secured Party --
10                  THE DEFENDANT:  Yes.
11                  THE COURT:  I know that you need to
12   speak with him but you're interrupting him and he's
13   being distracted by that.  Let him do what he's got to
14   do.  He knows what he's doing.
15                  THE DEFENDANT:  No disrespect, though.
16   I
17   just --
18                  THE COURT:  No.  Don't talk to me.
19   That's between you and him.  If there's something that
20   you need to say to him, give him time to finish his
21   thought or what he's saying, then ask for some time to
22   speak with him.  Then you can resume.
23                  MR. MILLER:  That's exactly --
24                  THE COURT:  Just being polite and
25   courteous.  But don't distract your attorney.
```

1                    THE DEFENDANT:  Okay.

2                    THE COURT:  All right.

3                    MR. MILLER:  And what I was saying

4       simply, Judge, is that in regards to that article

5       that's listed as the marking drug, I think 391, that,

6       bottom line, on its face, it's not signed.  Number

7       two, on its face, in regards to the documents that

8       were submitted to the Court as our exhibit, as Exhibit

9       A as well as their addendum, the package was never in

10      -- actually, let me see to make sure.  The package was

11      never even in the state of Pennsylvania.

12                   And that all flies in the face of the

13      four corners of the warrant.  And if we're making four

14      corners arguments then that would be outlined right

15      there.  And -- one second, Judge.

16      (Pause)

17                   MR. MILLER:  And, Judge, I just want to

18      point out, too, that the affidavit says that the

19      article that ends in 391 was in Philadelphia, was at

20      the postal inspector's office, that that article was

21      sniffed.  That's not contained in the postal tracking

22      records.  That flies in the face of the postal

23      tracking records.  Because of that, we say that that -

24      - that the article ever came to Pennsylvania or was

25      ever in the state of Pennsylvania, that's a material

1    mistake.  If it was not in Pennsylvania, if it was --

2    then there would be no opportunity for an inspector to

3    go ahead and do any type of examination.  We don't

4    have testimony from any witness that specifically --

5    that article ending in 391 was ever exposed to Kirby,

6    the dog.  The handler was here.  Specifically and --

7    on the witness stand and said there were three

8    packages but she couldn't identify those packages.

9    She didn't know when.  She knew where but she couldn't

10   say that -- when she did this and where she did this

11   was, in essence, conforming to the -- consistent with

12   what's in this affidavit of probable cause, that a

13   package specifically, with certain numbers on it,

14   were -- was here in Pennsylvania and that Kirby, or

15   the dog, and the handler were both there and were

16   allowed to -- allow that particular package to be

17   inspected by the canine.  And that the canine gave an

18   alert.  Now, of course -- that's with 391.  That's

19   also true with the package that ends in 581.  That's

20   also true with regards to the package that ends in

21   072.

22              Not only that, also we have testimony

23   directly from the inspector himself saying that he's

24   unfamiliar with some of the information that's

25   contained in the product tracking system, specifically

1   in regards to a container generated or scanned.

2   According to him, according to the testimony, we have

3   that the inspector picks up a scanner and scans

4   something.  Or scans one of these packages.  That was

5   his testimony.  I'm not -- I mean, I'm not -- okay?

6   But that flies right in the face of the documentation.

7   It says it was not a particular package but a whole

8   container.

9              And, of course, when I say it wasn't

10  even here in Pennsylvania on 391, that one was scanned

11  in New Jersey.  Did the officer go to New Jersey and

12  scan it?  I mean, we don't have that.

13             I think I talked about 581.  If I did -

14  - let me see -- well, then not only that but with

15  regards to 581, we have something that flies right in

16  the face of that.  We have the time.  If we're looking

17  at the four corners of the document then the document

18  was signed at 9:20.  But that flies directly in the

19  face of the product tracking system documentation that

20  -- all these documents are documents that are -- we

21  received from the government.  This is not something

22  that we produced.  This is their documentation that

23  says that that particular article which ends in 581

24  was -- the warrant was signed at 9:20 but the parcel

25  doesn't come to Philadelphia until 11 o'clock at

1    night.  If we're talking about Mathilda (ph.)

2    statements within the actual warrant itself, on its

3    face, I think that we have shown that there is

4    definitely evidence that flies in the face of what's

5    on or within the four corners of the document.  No

6    question.  And that -- and the documentation that we

7    have shown or utilizing to show that there is some

8    contradiction between what the warrant says itself and

9    the documentation that we get from the government

10   itself conflicts with what's within the four corners

11   of the affidavit or within the search warrant.

12   Material misstatements of fact.

13            In regards to Article 7(2), there's no

14   testimony that can even, as I said already, that can

15   even link the dog Kirby with this particular item.  We

16   have the handler herself.  She has no knowledge of

17   when, what time and what packages.  None.  And we

18   suspected that.  That was the reason there is no

19   documentation because if there was documentation then

20   it would be additional documentation to fly in the

21   face of what we've already presented.  And, yes,

22   there's going to be an explanation of theirs that, no,

23   this item was taken particularly out of the stream and

24   out of the container and it was actually scanned by

25   one of our offices or one of our inspectors.  Sure,

1   that clears everything up.  I would say to a jury, use

2   your common sense and your everyday experiences and

3   that he picks up a scanner and scans it.  I would say

4   no, Judge.  That's not how it happened.  At least

5   that's not what the documentation says.

6                THE COURT:  So how did it happen?

7                MR. MILLER:  The documentation says --

8                THE COURT:  No, no.

9                MR. MILLER:  -- that it's a container -

10  -

11               THE COURT:  How did it happen?

12               MR. MILLER:  Well, I can only go on

13  what they gave me, Judge.  All I can say is, is that

14  it was in a container and it was scanned and not one

15  particular document, not one particular item.

16               THE COURT:  All right.

17               MR. MILLER:  And that flies -- and it

18  was scanned at 11 o'clock.

19               THE COURT:  All right.

20               MR. MILLER:  And based on what our

21  witness says, Mr. Katerman, that it would be scanned

22  here in Philadelphia, not taken to -- at the airport,

23  not at some remote location.  Okay.  He hasn't been

24  involved since 2011 with narcotics.

25               THE COURT:  Okay.  You made those

1   points.  Now move on.

2              MR. MILLER:  But he's familiar with the

3   tracking system.  And I think that's going to be a big

4   issue that he's not familiar with narcotics here in

5   the Philadelphia area.  He talked about Reading,

6   Pennsylvania, and Harrisburg and all those places that

7   he hasn't been involved in narcotics in fifteen,

8   twenty-five, thirty years.  But he's familiar with the

9   postal product tracking system documentation.  He said

10  specifically there's basically nothing new under the

11  sun in this document that he's unfamiliar with.  And

12  he knows about the product tracking system.

13             THE COURT:  All right.  Wrap it up,

14  please.

15             MR. MILLER:  Okay, Judge.  Yes, sir.

16  Yes, sir.  Yes, sir.  So those are our points.  That's

17  the reason why we say there are material misstatements

18  of fact.  We have evidence of it.  And the evidence

19  comes from their own documentation.  And we ask the

20  Court to recognize that and to strike these warrants

21  and the fruits of these warrants.  Thank you, Judge.

22             THE COURT:  Thank you.

23             MR. TULANTE:  Your Honor, I admire Mr.

24  Miller's energy a little bit after 5.

25             I think when counsel first filed the

1    motion, they -- on the basis for a suppression was

2    lack of probable cause.  I don't hear that and so I

3    won't address that.  There was a dog hit -- as we cite

4    to the Court, in the Third Circuit, a dog hit without

5    more is probable cause.  So I want to move right to

6    the Leon good faith analysis.

7                    As Your Honor pointed out, that he has

8    -- he has a heavy burden where an agent relies on --

9    and a warrant that's issued by a neutral magistrate, a

10   warrant, by the way, which is approved by our office.

11   There has to be a -- pretty bad things to happen

12   before that's suppressed.  And we keep -- and one of

13   the things that has sort of gone askew here is that

14   Mr. Miller sort of very deftly identifies the four

15   corners of the product tracking system, the four

16   corners of some other document.  It is the four

17   corners of the affidavit, whether there are material

18   misstatements there.  And he hasn't identified any.

19   He quibbles and nitpicks with timing and so forth, but

20   if you go through paragraph by paragraph, he hasn't

21   identified (a) -- (1) that they're misstatements; and

22   (2) that they're material; or (3) that there's a

23   mental state of recklessness or falsity that requires

24   a suppression.

25                    So the issue with 391 and 581, those

1    two packages which, on November 13, Judge Caracappa

2    directed our office to sign, there's no question that,

3    as I elicited in my redirect from Inspector

4    McStravick, that as of 9:20 p.m. that the parcel was

5    in the Eastern District and that there was a dog hit

6    on it.  And that was the time when the magistrate

7    actually authorized the inspector to search it.

8                    Now, under Rule 4.1, Your Honor, that

9    would have been enough.  You know, there's a duplicate

10   warrant that could have been filed.  But in this case,

11   the government went a step further which is to go back

12   to the magistrate the next day and have her

13   essentially confirm what had happened and that the

14   affidavit -- and re-swore the inspector.  And so, Your

15   Honor, there's not even a semblance of bad faith here.

16   And Rule 4.1 itself, in addition to Leon, says that in

17   order for suppression to be found, there really has to

18   be bad faith.  This is for -- under limited

19   circumstances.  And, Your Honor, you have an inspector

20   who relies on the magistrate who says I authorize

21   this, relies on her office.  And there's been nothing

22   shown, Your Honor, that there's any falsity in the

23   four corners of the affidavit.

24                    And let me talk a little bit about what

25   Inspector -- former Inspector Katerman elicited.  All

1    he -- you heard from him that he's not from -- he's

2    been out for fourteen years which, in narcotics, is

3    essentially a lifetime.  And he can't testify as to

4    what happens at Philadelphia Airport.  Inspector

5    McStravick can.  And he testified, I think without

6    contradiction -- and Mr. Miller and I are almost,

7    like, we're two ships passing in the night because I

8    hear his testimony that was presented, hear the

9    testimony, and the testimony that I hear, frankly, is

10   that the parcel came in.  It was taken to Bala Cynwyd

11   at which point it was presented to the dog.  And then

12   he participated in a telephone conference at 9:20.

13   And then he opened both packages afterwards.  And

14   after Inspector McStravick left, he directed another

15   inspector, Vuzavorski, to scan it.  And so, we keep

16   going back to this

17   11:06 -- 11:06 time.  It's irrelevant, Your Honor, for

18   purposes of this proceeding because it's

19   uncontradicted that by that time there had been a

20   search done, there had been a search warrant issued by

21   the magistrate judge.  And again, I don't know where

22   Mr. Miller is getting the notion that 11:06 is when it

23   came in Philadelphia because, as Inspector McStravick

24   said, that's just not the case, Your Honor.

25                    So I step back.  I feel like --

1              THE COURT:  What is your argument

2    regarding the Belmar, New Jersey?

3              MR. TULANTE:  There's no evidence

4    presented with respect to that.  In other words,

5    Inspector McStravick testified that there -- both

6    packages were in Philadelphia at the time that he

7    received authorization and the time that he searched

8    that.  I think he gave one at 9:25 and 9:30.  I don't

9    believe there was any testimony -- he wasn't asked

10   about -- I think what happened, Mr. Miller showed that

11   document to Inspector -- former Inspector Katerman but

12   didn't show it to Inspector McStravick.  So we have

13   testimony as to one, I believe, 581, but not 391.  So

14   I don't have an argument because there was no -- that

15   was not presented that conflict to Inspector

16   McStravick.  But I think the uncontradicted testimony

17   is that he had two boxes.  And when he left the office

18   that they'd been searched and the kilograms of cocaine

19   seized.

20             THE COURT:  All right.  Thank you very

21   much.  Both --

22             MR. MILLER:  Judge, may I just point

23   out one thing?  That's about his letter -- not his

24   letter but this particular document -- his e-mail --

25             MR. TULANTE:  You're referring to

Page 201

1    Exhibit D, I believe?

2                MR. MILLER:  That's correct.  And that

3    would be the e-mail that Mr. Tulante penned.

4                THE COURT:  I'll hear.

5                MR. MILLER:  His own words.

6                THE COURT:  I'll hear.

7                MR. MILLER:  If I may read his own

8    words, and he says there's no evidence --

9                THE COURT:  Go ahead.  Go ahead.  Read

10   it, please.

11               MR. MILLER:  Okay.  And this is -- next

12   to the last line in that e-mail.  "The package is all

13   on planes."  This is at 5:30 p.m.  "The package is all

14   on planes en route to Philadelphia International

15   Airport and are not expected" -- this is e-mail to the

16   judge --

17               THE COURT:  Counsel, just tell me what

18   you --

19               MR. MILLER:  -- "are not expected to be

20   presented to drug detection dog" -- "to the drug

21   detection dog until 9:30 p.m. tonight at the

22   earliest."  He's saying that there's nothing that

23   flies in the face and that flies in the face.

24               THE COURT:  So the conspiracy --

25               MR. MILLER:  Right.

1                    THE COURT:  The conspiracy is the

2     inspector, the K9 officer, Mr. Tulante and,

3     presumably, the dog --

4                    MR. MILLER:  Well, the conspiracy is

5     that, bottom line, that the package wasn't in

6     Philadelphia until later on, until after 9:30, based

7     on his own words.  It was not even expected to be in

8     Philadelphia until --

9                    THE COURT:  But --

10                   MR. MILLER:  -- after 9:30 --

11                   THE COURT:  But if you're saying --

12                   MR. MILLER:  -- at the latest (sic).

13                   THE COURT:  If you're taking that

14    position, my question still is, is that if Mr. Tulante

15    participated in approving the warrant then he's a part

16    of the conspiracy in your argument.

17                   MR. MILLER:  Well, I'm not going to go

18    that far, Judge.  All I'll say is, is that there are

19    material misstatements of fact in the warrant.  I'm

20    not going to go that far to say that he knowingly and

21    intentionally or none of that type.  I'm not doing

22    that.  I would not do that.  I'm not going to do that.

23    I'm just saying that, you know, the facts stand on

24    their own.  The facts stand on their own.  This

25    statement stands on its own.

1          THE COURT:  Right.

2          MR. MILLER:  The documentation in

3   regards to the product tracking system stands on its

4   own.

5          THE COURT:  Okay.

6          MR. MILLER:  And we could say that

7   there's nothing --

8          THE COURT:  All right.

9          MR. MILLER:  I don't know but I don't

10  know how they can say that -- yes, sir.

11          THE COURT:  All right.  The Court

12  orders that the record of this hearing be transcribed.

13  The Court further orders that each side prepare

14  proposed findings of fact and conclusions of law.  How

15  much time, Madame Deputy Clerk, will it take to get a

16  transcript?

17          THE CLERK:  I can have the transcript

18  (indiscernible) Tuesday?

19          THE COURT:  Yes.

20          THE CLERK:  (Indiscernible) by Friday.

21  We could probably even have it --

22          THE COURT:  By Friday?

23          THE CLERK:  -- before that but --

24          THE COURT:  All right.  Counsel, how

25  much time do you need to prepare the proposed findings

Page 204

1    of fact and conclusions of law from Friday, September

2    12th?  Mr. Miller?

3              MR. MILLER:  Judge, I would probably

4    need at least a week, at least a week or maybe even

5    more depending upon your ruling on the motion for

6    continuance because if we go to trial on the 23rd then

7    I have to do some preparation for that.  And I'm -- as

8    I stated in my motion, approximately -- since the last

9    three and a half weeks, approximately 300 pages.  And

10   I want to be ready and I'll do everything I can to be

11   ready within a week's time after September the 12th.

12   I'll do all that I can.

13             THE COURT:  I guess I'm not

14   understanding you.  Are you asking for a continuance -

15   -

16             MR. MILLER:  I did file --

17             THE COURT:  -- on the trial date?

18             MR. MILLER:  I did file one, Judge.

19             THE COURT:  I understand you filed one.

20   My question is are you asking the Court for a

21   continuance of the trial date.

22             MR. MILLER:  One second, Judge.

23        (Pause)

24             MR. MILLER:  Well, Judge, yes.  I am

25   asking the Court for a continuance in this matter in

1    light of the fact that we're already -- today is the

2    9th.  We're about two weeks out, approximately out.

3    I'm not good at math but about two weeks out from the

4    trial.  And I am getting -- I haven't finished my

5    investigation.  And in order to even submit -- to do

6    the groundwork so that certain points of the charge

7    that I submitted to the Court -- and the way I

8    submitted them, Judge, was not a verbatim but it came

9    out of the model of points of charge for the Third

10   Circuit but it was 2012, if I'm not mistaken.  But one

11   of them dealt with whether or not some of the

12   government's witnesses were drug abusers.  I just got

13   the main and I don't even have a date -- I don't have

14   a lot of information.  I have to continue my

15   investigation.  I'm still in the investigative stage,

16   Judge.  I'm just getting material from the assistant

17   DA -- assistant U.S. attorney.  And so, yes, that's

18   why I would ask for a continuance especially in light

19   of the fact that you're asking for the findings of --

20   proposed findings of fact and conclusions of law in

21   this matter, Judge.  And I could be ready within a

22   week after receiving them, if given the opportunity.

23              THE COURT:  So that --

24              MR. MILLER:  Or I could be ready with

25   the findings of fact and conclusions of law within a

1    week's time after receiving the notes of testimony

2    which, of course, I know might be a greater hardship

3    even on my client, or my client's family, financially

4    with the number of pages that I would imagine are --

5    would be involved in today's hearing.  They may even

6    need time to get that money together, Judge.

7                   THE COURT:  Well, I don't even want to

8    go there.  I have nothing to do with that whatsoever.

9                   MR. MILLER:  I'm saying that.

10                   THE COURT:  All right.  Please don't

11   raise that.

12                   MR. MILLER:  Yes, sir.

13                   THE COURT:  Now, Mr. Secured Party, do

14   you understand what your counsel is asking?

15                   THE DEFENDANT:  I do.  He's asking for

16   a continuance of the trial date.

17                   THE COURT:  And currently, the trial is

18   set for September 23rd.

19                   MR. MILLER:  Selection on the 22nd,

20   Judge.

21                   THE COURT:  All right.  So if the case

22   is continued, this case would be continued really into

23   October, just a few weeks later.

24                   THE DEFENDANT:  I don't have a problem

25   with a few weeks later.

Page 207

1              THE COURT:  So October the 8th?

2              THE DEFENDANT:  That's fine.

3              THE COURT:  Is that a good time for

4    everybody?

5              MR. TULANTE:  No, you're not -- no,

6    it's not, unfortunately, Your Honor.  The case agent

7    in this case, Inspector McStravick actually just

8    learned today that Judge Dalzell, on the same date,

9    set for trial another case.  He's working with my

10   colleague, Katayoun Copland, that's going to go to

11   trial for sure.  And so, he's an essential witness for

12   the government for obvious reasons and he would be the

13   government's key witness at trial to testify.  And we

14   can file a motion after that date is set along those

15   lines if the Court wants to set that date.  But it

16   wouldn't work for us.

17             THE COURT:  Is there an anticipated

18   finality to this trial in terms of your necessity of

19   being in each case?

20             MR. MCSTRAVICK:  Your Honor, I believe

21   until the 14th when it would close.

22             THE COURT:  October 14th?

23             MR. MCSTRAVICK:  Yes, sir.

24        (Pause)

25             MR. MILLER:  Would work, Judge.  The

1   15th is a good date for me.

2                  THE COURT:  October 15th?

3                  MR. MILLER:  Yes.  Not the 14th but the

4   15th.  I have something but I can work around it.

5        (Pause)

6                  THE COURT:  Counsel, I am inclined to

7   direct the production of the transcript and forego the

8   submission of proposed findings of fact and

9   conclusions of law.  Do it myself -- without being --

10  but since I have the transcript and certainly that

11  encompasses the arguments of counsel and all the

12  evidence that was presented today and go forward with

13  this case as a trial as scheduled on September 23rd.

14  Okay.  Can we do that?

15                 MR. MILLER:  Judge, I would appreciate

16  an opportunity to handle the new material, the

17  hundreds of pages of new material that I received

18  within the last couple weeks.  I would appreciate at

19  least a brief -- a couple of weeks to be able to do

20  that.

21                 THE COURT:  Well, it's going to be a

22  couple weeks.  It's going to be between now and the

23  23rd of September.  That's two weeks.

24                 MR. MILLER:  I understand.  I

25  understand.

1    But --

2                THE COURT:  You're talking about a

3    couple weeks beyond the 23rd?

4                MR. MILLER:  Just a couple of weeks,

5    Judge.  Maybe a week or two.  Maybe at least two

6    weeks.

7                THE COURT:  The problem is that would

8    take us to the 7th.  Witness has indicated that he's

9    unavailable as of the 8th.

10               MR. MILLER:  Yes, sir.

11               THE COURT:  And he won't be available

12   again until the 14th or the 15th of October.  I am

13   sitting on that entire week -- well, first of all, the

14   13th is Columbus Day.  It's a legal holiday.  The

15   14th, he's unavailable.  The 15th, presumably we're

16   all available.  That would be a jury selection date.

17   The 16th could be a trial date.  And unavailable the

18   17th, which is Friday.  Then while I am available and

19   presumably we're all available the following entire

20   week from the 20th of October through the 24th, I am

21   unavailable again the 27th, 28th and 29th.  The

22   problem is, is that if we proceed with a jury, I don't

23   want to interrupt a jury trial particularly toward the

24   end of the case for that projected length of time.

25   And clearly, Mr. -- the secured party is chomping at

1  the bit to go forward with this case on the 23rd.  And

2  it's his case.

3           MR. MILLER:  That's correct, Judge.

4  And I don't want to do anybody a disservice at the

5  same time.  But like you said, it is his case, Judge.

6  It is his life.

7           THE COURT:  And my concern is if he

8  request or if there's a continuance request, if he's

9  not going to buy into it, then there's going to be

10  problems because I insist that he give a colloquy

11  that's waiving the rule, the speedy trial rule.  And

12  if he's not going to do that then it's not the

13  government's fault and certainly not the Court's

14  fault.

15           MR. MILLER:  No.  I understand, Judge.

16  I understand, Judge.  I understand.  Understand.  And

17  when you mention the speedy trial issue, Judge, I did

18  -- something was pointed out to me in regards to your

19  ruling in regards to that when we got your order.  It

20  was docketed as a civil matter as opposed to a

21  criminal matter.  Really -- I mean, I -- you know, and

22  -- I don't -- you know, there really, at this

23  point -- really, technically, hasn't been a --

24           THE COURT:  Well, I think we all know

25  it's not a civil matter.  So I don't --

 1                    MR. MILLER:  Well, I know.  I know.

 2    But I'm just saying --

 3                    THE COURT:  I don't know how it

 4    happened but --

 5                    MR. MILLER:  Yes, it is.

 6                    THE COURT:  -- clearly, that's not even

 7    an issue.

 8                    MR. MILLER:  Right.  Yes, sir.

 9                    THE COURT:  So unless Mr. Secured Party

10    is going to say I'm going to waive the speedy trial

11    rule, it's going to have to be the 23rd.  Mr. Tulante?

12                    MR. TULANTE:  Your Honor, I was waiting

13    to -- for the Court's ruling on the defense motion

14    because I just learned last night that the government

15    may have a basis for a motion for continuance

16    ourselves.  And the basis is this.  I learned last

17    night that one of the cooperating witnesses had a

18    pretty major accident where he broke his hip and he

19    broke his shoulder.  Defense counsel told me this.

20    He's in the hospital today.

21                    MR. MILLER:  Not me.

22                    MR. TULANTE:  Excuse me?

23                    MR. MILLER:  You said defense counsel.

24                    MR. TULANTE:  No, no, no, no.  No, no.

25    I'm sorry.

Page 212

1                    MR. MILLER:  Oh, about the city.

2                    MR. TULANTE:  I apologize.

3                    MR. MILLER:  On the state.

4                    MR. TULANTE:  I apologize.

5                    MR. MILLER:  I don't believe --

6                    MR. TULANTE:  Counsel for that witness

7    has informed me that he's having pins placed in his

8    hip.  And, Your Honor, he's an essential witness.

9    He's the witness

10   who -- he's someone who we presented at grand jury.

11   He provided part of the basis for superseding the

12   indictment on August 27th.  And I haven't -- I tried

13   to get in touch with Mr. Azurano (ph.) -- Jeff

14   Azurano, his attorney, to learn his fate.  But he's

15   someone who -- he's not -- his testimony is not

16   cumulative or duplicative of other witnesses.  And I

17   was -- in light of defense's motion, I was awaiting --

18   I anticipated that was going to occur.  But in light

19   of the Court's ruling, the government -- we would seek

20   a motion on that basis.  And until at least I can

21   learn from him what his mental -- what his state will

22   be, physical state --

23                    THE COURT:  Can you apprise the Court

24   within the next twenty-four hours?

25                    MR. TULANTE:  Absolutely.  Absolutely.

1                THE COURT:  Before I make a ruling on –

2   –

3                MR. TULANTE:  Absolutely.

4                THE COURT:  –– granting the government

5   the continuance request?

6                MR. TULANTE:  Absolutely.  I will –– I

7   tried to get in touch with Mr. Azurano during breaks

8   and I wasn't able to.  And I'll attempt again.

9                THE COURT:  All right.  At this point,

10  I'm going to defer ruling on everything for twenty-

11  four hours.  Mr. Secured Party, is that acceptable to

12  you, sir?

13               THE DEFENDANT:  Based on ––

14               THE COURT:  Based on this recent

15  revelation

16  of –– this revelation just now regarding the

17  government's witness.

18               THE DEFENDANT:  No.

19               THE COURT:  Because I'm asking him, or

20  actually directing him to inform the Court within the

21  next twenty-four hours ––

22               THE DEFENDANT:  Well ––

23               THE COURT:  –– what the status of that

24  witness is.

25               THE DEFENDANT:  Okay.  But with no

1    disrespect, how Mr. Miller had made a point about my

2    family finances or whatever and you were saying that

3    it was, like, really irrelevant to --

4                 THE COURT:  No.  I said that because

5    judges do not get ever involved in money.

6                 THE DEFENDANT:  Okay.

7                 THE COURT:  All right?

8                 THE DEFENDANT:  So --

9                 THE COURT:  I am not -- that's why I

10   said that.  And I don't, never have, never will.

11                THE DEFENDANT:  Okay.  Well --

12                THE COURT:  This is different.  This is

13   simply the availability of a witness.  You've not said

14   and Mr. Miller didn't say that a witness wasn't

15   available for you.

16                THE DEFENDANT:  Okay.

17                THE COURT:  All right?

18                THE DEFENDANT:  Okay.  Now then is

19   though the government has the burden of proof to prove

20   their -- these allegations.  I don't agree to any type

21   of continuance on their behalf.  That their witness is

22   not available, that's really not my problem or my

23   issue.  So I do not agree.

24                THE COURT:  All right.  So tomorrow --

25   ultimately, the buck stops here.  I need to make the

Page 215

1   decision.  You understand that?

2                   THE DEFENDANT:  Yes, sir.

3                   THE COURT:  All right.  Now, Ms. El-

4   Shabazz, we're in here tomorrow anyway, right?

5                   THE CLERK:  (Inaudible).

6                   THE COURT:  All right.  Where?

7                   THE CLERK:  (Inaudible).

8                   THE COURT:  Okay, because I'm not

9   certain which courtroom physically I'll be in.  Can

10  you call tomorrow morning and we'll let you know?

11                  MR. TULANTE:  Absolutely.

12                  THE COURT:  But I can certainly set it

13  for a time certain.

14                  MR. MILLER:  Your Honor, did you want

15  to do any type of conference call or anything like

16  that?  Or --

17                  MR. TULANTE:  He has to be available.

18                  THE COURT:  No, because I want Mr.

19  Secured Party to be present.

20                  MR. TULANTE:  Available.

21                  THE COURT:  And he can't do that -- he

22  can't be present if we do a conference call.  I want

23  him to be in the courtroom.

24      (Whispered conversation off the record)

25                  THE COURT:  2 o'clock tomorrow

1    afternoon?

2                    MR. TULANTE:  2 o'clock?  Okay.

3                    MR. MILLER:  Yes, sir, Your Honor.

4                    THE COURT:  All right.  Mr. Secured

5    Party, 2 o'clock?

6                    THE DEFENDANT:  2 o'clock.

7                    THE COURT:  All right.  Again, I'm not

8    certain which room.  And to those of you in the

9    audience, family members, that listing tomorrow at 2

10   o'clock is really just for me to make a determination

11   based on what I'm told from the government regarding

12   the availability of a witness.  Witness case is going

13   to go for trial.  All right?  So nothing other than

14   that is going to happen.

15                   UNIDENTIFIED SPEAKER:  So we're not

16   allowed to be here?

17                   THE COURT:  No.  You have a right to be

18   here if you want to be here.  I'm just simply letting

19   you know that this could take all of five or ten

20   minutes.  That's courtesy to you.  Okay?

21                   UNIDENTIFIED SPEAKER:  Thank you.

22                   THE COURT:  All right.  So tomorrow at

23   2 o'clock.  And again, if you contact Mr. Miller,

24   he'll let you know what room we're going to be in

25   tomorrow if you want to come down.  All right?

1                    MR. TULANTE:  Yes.  Thank you.

2                    THE COURT:  Thank you very much.  Let

3      us adjourn for the day.

4                    MR. MILLER:  Excuse me, Your Honor.

5      Will you be ruling in regards to our motion that I

6      filed, motion to compel discovery?

7                    THE COURT:  If that needs to be ruled

8      upon, I'll certainly rule upon it.  I think you

9      generally can work that out, can't you?

10                    MR. TULANTE:  Well, he can provide -- I

11      think the only things remaining are Jenks.  And we set

12      a time to provide that.  I mean, we responded

13      identifying the categories.

14                    MR. MILLER:  I really don't know what

15      is -- what -- I know that I don't have certain things.

16      And but I don't know what all it consists of, Judge,

17      because I don't have -- I can't talk --

18                    THE COURT:  All right.  You gentlemen

19      need to meet and work that out.

20                    MR. MILLER:  Okay.

21                    THE COURT:  And what you can't work

22      out, let me have it.

23      (Proceedings concluded at 5:34 p.m.)

24                        *  *  *  *  *

25

1                            CERTIFICATION
2
3               I, Sheila G. Orms, certify that the
4       foregoing is a correct transcript from the official
5       electronic sound recording of the proceedings in the
6       above-entitled matter.
7
        Dated:  September 11, 2014
8
9
10
11
         Signature of Approved Transcriber
12
13
14
15
16      _____
        LISA BECK(CET**D-486)
17
        AAERT Certified Electronic Transcriber
18
19
20
21
22
23
24
25

**A**

**AAERT** 218:17
**able** 5:5,9 53:24
  61:7 64:20 66:19
  66:22 68:17 84:21
  95:10 105:13,14
  105:15 110:12
  126:8 134:24
  143:21 145:9,13
  145:18 146:7,8,10
  146:11 148:16,23
  149:1,12,13
  171:11 172:10
  208:19 213:8
**above-entitled**
  218:6
**absolutely** 75:4
  78:18 80:18 97:4
  115:20 138:6
  144:20 151:21
  153:5 171:5,8
  212:25,25 213:3,6
  215:11
**abusers** 205:12
**accept** 134:12
**acceptable** 213:11
**accepted** 56:17
  141:16 148:18
**accident** 211:18
**accompanying**
  5:21 35:11
**accuracy** 65:2 94:9
**Accurant** 43:20
  44:24,25 45:3,7
  46:8 47:9 49:18
  66:24
**accurate** 43:6,21,22
  46:8 65:3 85:13
  126:12 136:20,21
  151:25
**acronym** 67:10
  177:11
**activity** 96:23
**actual** 15:7 30:20
  36:18 48:21 61:8
  64:4 66:3 71:19

**101:13,18** 109:11
  109:17 111:4,6
  123:24 145:18
  146:5 181:11
  194:2
**addendum** 56:1,1
  57:20 62:21 63:4
  80:23 87:12 98:21
  98:21 131:10
  154:25 155:9
  160:8 168:7,10,10
  168:14 190:3
  191:9
**addition** 127:25
  198:16
**additional** 7:6
  16:23 18:25 19:4
  19:8 65:18,22
  66:14 194:20
**address** 11:21 17:2
  17:4 20:13 43:5,8
  43:10,24 44:23
  45:1,8,24 46:1,5,9
  46:12,13 48:17
  64:12,14 66:23
  145:12 146:14,19
  146:21 171:16
  197:3
**addressed** 7:12
  24:8,10 67:2
  170:23 186:9,11
**addressee** 11:22
  145:1
**addresses** 44:4
  111:10 144:10
  146:17
**Adjacent** 72:4,5
**adjourn** 217:3
**admire** 196:23
**admissible** 22:9
  138:14
**admission** 15:24
  25:14
**admitted** 16:5
  25:17 102:9
**admonish** 140:23
  140:25

**advance** 33:20
  34:13 35:14 36:6
  38:2,5 40:1
**advise** 40:2,3 74:25
  113:9 116:3
  141:13
**advised** 17:16,23
  18:2,16 21:12
  22:3 23:4,17 24:2
  31:8 39:22 115:4
  116:10 183:7
**advising** 21:15
  23:15
**affiant** 24:20 26:1
  95:10 106:1
  128:10
**affidavit** 2:12,14,16
  5:21 10:5,19,22
  11:19,21 15:7,21
  15:22,25 17:6,14
  19:13,15 25:3,6,7
  25:22 29:6,7
  32:19,25 34:7,22
  35:11,24 36:6
  38:10 39:5 42:23
  47:11 64:6 69:3
  75:9,9,22 79:5
  95:24 97:21 98:6
  98:11 100:19
  102:2,17,21
  110:21 112:20
  115:15,23 116:6
  126:3,5,12,18,22
  128:11 130:20
  135:23 137:11,18
  137:20,21,22
  138:2 191:18
  192:12 194:11
  197:17 198:14,23
**affidavits** 6:23 7:23
  33:19 41:14 66:21
  69:5 77:17,20
  100:16 135:24
**affirmed** 11:11
**afield** 62:14 91:21
**afternoon** 28:25
  32:13 37:4 57:3,4

**69:20,21,25** 140:3
  140:4 141:11
  148:4 170:18,19
  216:1
**agent** 14:16 42:16
  49:21 52:6 67:4
  67:12 95:6 102:15
  142:12 187:8
  197:8 207:6
**ago** 151:1 174:3
**agree** 5:5,10 9:17
  30:24 35:8 76:11
  78:3 129:3 137:14
  166:1 214:20,23
**ahead** 22:25 27:1
  29:13 43:12 82:11
  105:18,20 106:23
  106:24 117:9
  129:19 140:1
  154:23 155:1
  165:1 185:25
  192:3 201:9,9
**air** 39:21 49:16
  59:25 62:5 63:18
  71:10,25 72:1
  88:4 109:9,12,13
**airline** 71:3,4,5,9
  157:7,14
**airliner** 71:7
**airlines** 157:10
**airplane** 88:5 154:2
  156:10 157:3,6
  164:21
**airplanes** 173:16
**airport** 19:10 32:6
  37:5 40:11 48:18
  49:14 59:10,11,14
  59:23,23 60:1,11
  60:11 71:24 72:3
  72:4,5 81:17
  83:23 88:2 109:1
  109:6 111:1
  153:22,24 154:10
  157:4,19,21 158:2
  164:22,22,23
  170:9 172:23
  173:10,11,21

**195:22** 199:4
  201:15
**Alaska** 107:12
**alert** 114:21,23
  115:3,11,13,19
  178:24 179:4
  186:15 192:18
**alerted** 21:11 98:8
  115:5,5 182:13
**alia** 127:23
**alike** 78:17
**allegation** 130:21
**allegations** 214:20
**allege** 95:25 105:25
  106:22 107:1
**alleging** 102:5
  136:20,21,22,24
**Allentown** 173:1
**allow** 10:9 66:1,2
  106:14 138:17
  192:16
**allowed** 104:23
  107:3 157:9
  192:16 216:16
**allowing** 125:7
**allows** 137:10
**altogether** 103:5
**ambit** 103:8
**America** 1:3,10
**amount** 70:19
**analysis** 102:4
  104:14 126:13
  197:6
**ancient** 45:6
**Andrew** 2:4 140:7
  140:11 142:5
**Angeles** 63:20 79:2
**announced** 103:8
**answer** 53:4 83:18
  89:11 143:21
  170:5 172:6
**answered** 68:18
  85:20 92:12 103:3
  117:18 168:25
  169:19
**anticipated** 207:17
  212:18

**anticipation** 36:13
   84:9
**anticipatory** 17:2
   24:15,17
**anybody** 49:3
   129:2 187:17
   210:4
**anyway** 75:14
   114:6,6 215:4
**apartment** 4:9
**apologies** 39:8
**apologize** 8:9,18
   31:7,22 33:2
   55:20,20 56:14
   58:13 77:5 82:3
   101:21 123:7
   158:9 160:23
   168:14 169:23
   212:2,4
**apology** 67:15
**appear** 90:1
**APPEARANCES**
   1:9
**appears** 120:22
   130:4 137:3 148:7
   156:12 175:7
**apples** 132:8
**application** 2:12,14
   2:16 10:3 15:6,21
   15:25 25:2,6,7,22
   29:6,7 38:4 69:3
   115:14,15
**applications** 78:9
   84:8 159:20,21,22
**applied** 17:1 24:14
**apply** 24:16
**applying** 19:19
**appreciate** 99:10
   208:15,18
**apprise** 212:23
**approach** 57:15
   76:22 77:11 99:23
   139:23 154:14,21
   160:11 186:6
**approval** 17:10
   31:11 34:8
**approvals** 15:9

17:15
**approved** 18:3,6
   19:21,22 23:17,19
   23:22,23,24 29:14
   30:10 31:9 36:6
   85:8 92:6 116:3
   116:11 197:10
   218:11
**approving** 202:15
**approximately**
   16:22 24:9,11
   36:11 47:19 89:17
   111:20 180:10
   204:8,9 205:2
**APPS** 166:7
**April** 14:13 91:8
**area** 50:7,7 85:14
   173:2,2 177:19
   181:25 196:5
**aren't** 93:14
**argues** 11:5
**argument** 124:17
   133:9,11 138:2
   189:21 200:1,14
   202:16
**arguments** 189:21
   191:14 208:11
**arraigned** 51:12
**arrest** 4:22,24 5:1
**arrival** 153:19,21
**arrive** 21:6 59:2
   74:8 153:17
**arrived** 38:10
   39:19 40:3 60:20
   62:22 63:10,12
   108:18,20,25,25
   109:5 156:13
   158:21
**arrives** 50:3 97:17
   113:11 146:9
**arriving** 21:9 62:1
   62:2,4
**article** 99:15
   165:23 191:4,19
   191:20,24 192:5
   193:23 194:13
**articulated** 93:22

93:24 95:2 96:11
   120:16
**articulating** 96:14
   132:15
**ascertain** 144:13
**asked** 29:21 30:13
   38:19 68:18 83:13
   84:5 85:20 86:14
   87:16 100:17
   103:2 104:24
   117:17 130:18
   168:25 169:18
   180:6 187:9 200:9
**askew** 197:13
**asking** 6:12 36:17
   47:9 53:2,3 62:14
   83:6 84:16 87:17
   101:9 105:1
   108:12 128:18
   158:6 162:13,13
   164:3 204:14,20
   204:25 205:19
   206:14,15 213:19
**aspect** 153:14
**assertions** 106:5
**assessment** 102:17
**assigned** 150:18,18
   150:19 177:7,7
**assistance** 76:25
**assistant** 8:7,12
   55:9,11,23 67:25
   69:17 74:18
   115:16 130:23,24
   167:4 205:16,17
**associate** 46:13
**associated** 43:7,24
   44:7,23 45:1,23
   46:5,9 66:23
**assume** 44:18
**assuming** 146:13
   165:25
**assumption** 108:23
   114:2,3
**assumptions** 114:6
**attached** 7:4,5
**attachment** 123:1,3
**attachments** 20:24

20:25
**attack** 47:11 105:6
**attacking** 100:22
**attacks** 102:1
**attempt** 213:8
**attempted** 52:15
**attempting** 105:16
**attention** 4:2 15:9
   32:18 78:24 155:7
   155:24 159:7,25
   160:24 185:20
   186:12
**attorney** 55:9,12,23
   67:25 69:17 74:18
   115:16 130:24
   167:5,10 190:25
   205:17 212:14
**Attorney's** 116:1,4
   116:8
**Attorney's** 1:10 8:7
   15:8 17:14,15,19
   17:25 19:12
**audience** 216:9
**audits** 143:18,21
**August** 212:12
**AUSA** 17:24 29:16
   31:10 34:7 39:22
   84:13 116:9
**auth** 26:10
**authority** 53:15,19
   53:25 189:24
**authorization**
   26:10 200:7
**authorize** 198:20
**authorized** 52:6
   198:7
**automatically**
   66:16
**availability** 214:13
   216:12
**available** 37:9,15
   64:12,12,13,15
   66:3 84:4 116:5
   126:24 209:11,16
   209:18,19 214:15
   214:22 215:17,20
**Avenue** 60:12

184:7
**awaiting** 212:17
**aware** 172:13
   180:11,14
**Azurano** 212:13,14
   213:7
**a-n** 13:16
**A-N-D-R-E** 140:7
**a.m** 1:5 111:20
   122:13,14

**B**

**B** 2:9,14 7:17,17
   9:9 20:7,10 24:23
   25:1,18,20 26:13
   26:15 27:1,5,12
   27:21 29:2 30:4
   30:21,22 31:1,18
   31:19 35:3 41:5
   41:16,18,25 42:1
   42:3 49:8,11
   67:21 118:15
   155:9 159:8,16
   185:9
**back** 21:23 23:6
   24:4 29:18,19,22
   29:23 30:11,13
   40:16 61:6 75:16
   76:18 77:24 85:2
   95:1 124:18
   163:20 165:8
   188:19 198:11
   199:16,25
**background** 95:8
   96:10
**backing** 101:16
**backtrack** 65:10
**backwards** 123:8
   150:3
**bad** 197:11 198:15
   198:18
**badge** 176:16
**Bala** 184:6,7
   199:10
**bar** 125:23 150:2
**barred** 126:25
**based** 3:12 11:20

34:5 38:2 43:13
43:19 62:8 65:25
66:15,23 67:5
85:6 87:18,19
94:15 119:18,20
119:23 128:14
130:22 132:19
164:8 166:2 173:8
174:2 195:20
202:6 213:13,14
216:11
**basically** 36:20
40:5,6 61:2 67:4
70:10 74:12,13
78:3,4 116:20
128:20 143:3
196:10
**basis** 3:5 5:17
10:19,25 11:18,23
22:7 47:11 91:5
93:22 94:5 95:5
96:14 129:12
197:1 211:15,16
212:11,20
**bear** 4:1
**bearing** 123:3
**beautiful** 85:17
**beautifully** 86:2
**BECK(CET**
218:16
**beeper** 17:1 24:15
**began** 19:13 66:24
69:2
**beginning** 108:12
178:7 183:8
**behalf** 54:3 214:21
**belief** 80:2 83:15
84:1 87:19 96:15
**believe** 4:12 5:6,9
5:12 11:8,15
12:11 13:4 22:4
23:18 26:10 29:11
31:17 32:16,19
33:3 36:10 39:19
47:1 50:13 51:11
54:12 55:3 56:14
56:16 57:10 58:14

61:17,19,19,21,22
61:23 63:19 64:6
64:7 71:11,15,16
73:12,14 74:6
75:18,19,21 87:13
87:15 88:3,6,7,9
88:23 92:23 93:4
94:8 98:19 99:17
104:7 105:14
108:18,20 109:4
111:5 116:9
120:12,13 130:8
133:22 139:16
154:24 155:21,25
159:6,7 179:17
180:25 183:2,25
200:9,13 201:1
207:20 212:5
**bell** 138:9
**Belmar** 161:20
162:10,25 163:1,1
164:20 165:7
166:6 200:2
**belt** 63:25 64:2
**bench** 54:7
**Bens** 177:3
**Bensalem** 120:14
177:2
**best** 53:17 83:14
141:2 162:1
**better** 80:2 156:23
**beyond** 114:14
209:3
**big** 196:3
**bit** 58:15 95:1
196:24 198:24
210:1
**blank** 34:21
**blocks** 55:14
**blown** 96:17
**Blue** 17:2,3 18:25
**book** 27:12
**bottom** 26:7,25
32:17,24 33:6
78:13,14 83:7
92:2 128:18,24
161:10,11 165:9

169:25 191:6
202:5
**Boulevard** 60:4
109:24
**box** 18:25 24:7,10
25:4,9 38:10,14
64:19,25 68:9
70:17 87:22 110:9
110:20 111:12
131:16 178:20,20
180:2 181:25
**boxes** 19:1,4,8,14
19:17 20:1 21:5,6
21:9,14,16 58:8
84:10,23,24 85:1
171:15,20 173:25
200:17
**breaks** 213:7
**bridges** 8:23
**brief** 118:10 187:5
208:19
**briefly** 16:12 17:9
167:21
**bring** 85:2
**bringing** 74:20
**brings** 71:11
**broad** 95:16
**broke** 211:18,19
**broken** 53:24
104:12
**brought** 73:13,16
74:22 93:7,7
111:25 112:10,15
113:16 117:15
140:22
**Brown** 128:12
**buck** 214:25
**building** 157:12
173:17
**burden** 134:22
197:8 214:19
**business** 43:6,23
45:8
**businesses** 44:1
**buy** 210:9

───────
C
───────

**C** 1:7 2:16 3:1 7:10
7:13 9:9 20:10
24:23 25:6,18
26:22 27:4,5,12
27:20 41:16,18
42:2,5,10,11 43:1
47:18 48:12 49:8
49:11 50:14 67:21
118:15 185:9
**calculation** 85:12
**California** 14:20
63:20 65:23,23
70:23 79:2,16
107:2,2,12 147:2
148:15 162:9
164:20 165:13
**call** 12:2 18:1,4,15
23:13 41:20 78:23
84:16,18 120:11
126:17 130:2,16
138:22 150:10,11
165:5 175:22
183:11,12 215:10
215:15,22
**called** 12:11 22:3
23:2 139:17
141:17 170:20
187:2
**calling** 36:18,23
139:2
**cameras** 148:13
**canine** 12:22 19:17
19:25 21:10,11,12
33:14 35:25 42:13
46:24 47:17 48:7
48:25 75:1 85:3,4
92:21 93:16 94:1
180:7,25 182:8
186:14,15,24
192:17,17
**can't** 46:7 95:24
96:15
**capability** 61:20
**capacity** 164:2
**capture** 61:7
**captured** 61:10
63:19

**Caracappa** 11:7,10
16:14 17:16,23
18:1 20:13,22
21:18 22:5 23:8
23:12,14,15 24:18
38:19 39:24 40:16
62:12 74:25 84:2
84:12,16 116:15
198:1
**Caracappa's** 23:7
27:7
**card** 65:20,22 66:3
66:11,12,17
**cards** 172:14
**carry** 142:25
**case** 2:12,14,17 3:3
3:18 4:6,11 12:8
14:16 16:1 25:3,8
31:2,2 40:14 42:7
49:21 103:12
104:9 105:6 111:7
121:13 128:14
132:20 135:16,22
141:12,17 171:23
172:10 183:6,7
186:25 198:10
199:24 206:21,22
207:6,7,9,19
208:13 209:24
210:1,2,5 216:12
**cases** 128:1 173:14
**categories** 153:9
217:13
**cause** 6:14 10:20,23
11:18 35:11 94:6
94:8 95:12 98:7
102:11 103:23
104:17 115:24
129:4 130:20
192:12 197:2,5
**causing** 101:21
**cc** 121:8 123:19,20
123:21,23,24
**cc'd** 120:22
**center** 59:19
144:25
**centers** 59:16,21

central 59:16
certain 34:11
  180:17,21,24
  181:3 182:8
  192:13 205:6
  215:9,13 216:8
  217:15
certainly 45:25
  77:2 140:22
  143:17 176:5
  208:10 210:13
  215:12 217:8
CERTIFICATI...
  218:1
certified 96:16
  126:9 218:17
certify 218:3
chain 74:13
challenge 126:2,17
  137:10,16
challenges 10:18
challenging 10:2
  137:20
chambers 18:16,20
  23:16 24:4 29:19
change 44:4 166:11
  171:6,7
changed 169:13
  171:9
characterized
  105:6
charge 49:20 53:12
  136:2 205:6,9
charged 52:11
charging 52:12
Charles 140:8
Chavez 54:17
check 66:23 122:25
  159:9,9
checked 121:12
checking 122:12
Chester 110:1
Chestnut 1:11
chief 103:13
chomping 209:25
Christine 2:5 127:2
  176:10

Cir 128:12
Circuit 197:4
  205:10
circumstances
  94:16 198:19
cite 197:3
cites 127:24
citing 128:11
  131:18
city 184:7 212:1
civil 210:20,25
civility 93:20
claim 53:1,5,7
claiming 53:8
Clara 164:20
  165:13
clarify 8:19 97:5
  179:8
clear 10:1 17:18
  18:7 23:9 29:10
  40:24 41:7 52:25
  85:23 87:6 96:3
  108:6,7,9 116:19
  117:23 131:22
  156:21 167:25
  168:20 173:23
  174:7
clearer 110:13
clearly 92:17 102:4
  209:25 211:6
clears 195:1
clerk 13:13,17,19
  13:21,23 14:1
  51:22,25 52:3,7
  52:10 53:3 100:3
  140:3,5,9,12
  148:1,18,19 150:5
  176:8,12,15,18
  203:15,17,20,23
  215:5,7
clerk's 28:9
client 4:24 51:11
  125:9 167:6 206:3
client's 167:5 206:3
close 6:17 28:25
  78:7 157:12
  207:21

CMRA 67:6,10
coast 150:12
cocaine 16:21,24
  16:25 24:9,11
  52:13,15 65:13
  66:13 87:22 181:8
  181:9,9 200:18
code 52:14,16,19
  52:21 109:16
  110:7 150:2
cold 58:13
colleague 207:10
colleagues 162:4
collectively 8:1
  160:10
colloquy 210:10
Columbia 107:12
Columbus 209:14
column 155:20
come 8:23 18:16
  24:3 29:21,23
  30:13 36:15 49:13
  60:8,10,11 70:1
  70:22 72:10 88:5
  106:3 124:18
  135:11 144:24
  145:7 162:9 173:7
  187:9 188:24
  193:25 216:25
comes 73:20 107:11
  109:13 110:6
  196:19
coming 50:8 107:2
  112:7 178:8,22
commercial 67:11
  71:5,7
common 9:5 195:2
communicate
  39:23
communicated
  39:7
communication
  37:14 120:18,25
  125:4 128:3
Company 1:22
compare 145:10
compared 20:25

comparing 82:10
compel 130:17
  217:6
complete 4:4,10
  54:19
compound 82:21
computer 44:9,12
conceivable 158:18
  158:20
conceivably 150:17
  154:6
concern 47:9 62:13
  96:10 105:24
  210:7
concerned 62:8
  91:21 101:14
concluded 217:23
conclusions 203:14
  204:1 205:20,25
  208:9
conclusory 130:19
conditions 72:13
conduct 89:20
  180:7
conducted 18:22
  187:4
conference 18:1,4
  23:13 199:12
  215:15,22
confirm 155:15
  198:13
conflict 200:15
conflicts 194:10
conforming 192:11
confused 12:17
  30:2 76:21 101:23
  104:1
confusion 101:21
  103:23
consider 93:25
considered 33:7
consist 143:4 181:4
  181:5,14
consisted 178:5,6
  181:6
consistency 131:10
consistent 20:17,20

106:10 192:11
consists 217:16
conspiracy 52:12
  201:24 202:1,4,16
contact 19:24 21:18
  21:24 40:2,3 85:7
  113:9,12 116:8
  216:23
contacted 19:12
  21:16,20,22,22
  22:4,13 23:4
  39:22 113:21
  116:9 183:3,21
contacting 36:12
  36:14,16 74:25
  85:7,13 184:3,6
contain 58:9,11
contained 14:19
  24:7 42:14 65:4
  65:12 66:13 87:24
  129:23 130:19
  191:21 192:25
container 87:24
  88:1 90:24 91:2,9
  91:12,17 97:13
  109:7 130:4 132:5
  132:21,22,23
  133:2,4,6 154:1
  154:10 156:7,10
  156:12 157:23,25
  168:20,21,23
  169:9 170:2,8,9
  175:10,10 193:1,8
  194:24 195:9,14
containers 58:10
  88:5 157:3 173:7
contains 79:1,15
content 106:10
context 47:5
continually 152:4
continuance 204:6
  204:14,21,25
  205:18 206:16
  210:8 211:15
  213:5 214:21
continue 6:8 43:13
  54:14 67:14 89:12

182:23 189:8
205:14
**continued** 70:13,14
106:15 206:22,22
**continuing** 144:16
**continuously** 99:8
**contracting** 109:12
**contractors** 109:10
**contradict** 126:21
134:1,7 136:10
**contradicted**
132:19
**contradicting**
135:23
**contradiction**
82:17 194:8 199:6
**contradicts** 126:21
**contrary** 97:12
**contro** 132:19
**control** 84:20
154:11 157:13,14
157:15
**controlled** 18:21
70:18 74:15 79:15
89:20 98:9 115:6
**conversation** 36:18
84:5 97:23 117:20
215:24
**convicted** 52:20
**cooperating** 211:17
**Copeland** 116:9
**copies** 6:25 7:22
57:13
**Copland** 207:10
**copy** 10:3 25:11
50:21,23 57:11,13
113:7 120:18,21
121:3,4,17,17,21
121:23 151:8
161:15 167:5,8
**copying** 50:21
**corners** 10:22
93:25 94:17,21
95:3,11 102:4,10
104:14 105:2
106:17 126:13
137:18 189:21

191:13,14 193:17
194:5,10 197:15
197:16,17 198:23
**correct** 4:8 5:13 6:2
6:3,5,15 10:13
13:2,3 17:5 18:9
21:2 22:17,18
26:14 27:15,18,22
29:8,15,16 30:6
30:12,14,16,17,18
30:22,23 31:14,15
33:19 34:13,14,20
34:23 35:6,7,18
35:23 36:3 37:10
37:11 38:7,17
39:18 40:13 41:10
42:1 43:1 44:10
44:17 46:17,20
49:12,20,24 56:25
57:1 58:4,19 59:1
59:3 60:7,9,13,13
60:21,22 61:18
65:3,4,5,7,8 68:13
69:7,8,12,14 72:7
74:4 75:10,12
80:17 81:19,22
82:1 83:14 86:15
86:15,19 90:8
92:20 105:3
106:12,13 109:1,3
116:24 117:7,7
119:2,19,25 123:5
124:14 126:12
132:17 136:3
138:5,7 143:9
146:3,6,15 151:2
151:4,10,11,17,23
152:1,8,9 156:19
156:24 159:12
163:17,18 164:7
165:10,20,21
168:23 169:22
171:2,13,18,21,24
172:21 173:22
174:13 177:24
178:2 180:19
181:1 186:20

201:2 210:3 218:4
**Correction** 45:15
**correctly** 4:21
28:23 37:2
**correspondence**
40:9
**corresponding** 9:9
**corroborate** 134:2
**couldn't** 45:4 49:5
72:9
**counsel** 3:4,6 5:4
9:18 10:9 12:6
20:6 25:11 47:2
50:25 51:6 54:10
83:18 85:22 86:4
86:4 89:7 91:20
92:18 93:23 96:12
105:25 107:5
117:17 120:1
121:17,24 125:5
125:14 127:10,23
128:2 131:9
134:12,17 137:13
139:9 153:2
162:18,20 163:14
168:5 170:15
182:17 189:10
196:25 201:17
203:24 206:14
208:6,11 211:19
211:23 212:6
**Counsel's** 179:12
**Count** 52:12,17,22
**counteroffer** 135:2
**counties** 173:1
**country** 107:12
**Counts** 52:14,19
**County** 110:1
**couple** 160:14
208:18,19,22
209:3,4
**course** 96:9 129:22
192:18 193:9
206:2
**court** 1:1,22 3:2,22
3:25 5:25 6:7,11
6:12,21,24 7:2,4,8

7:9,20 8:2,4,8,10
8:14,17,22,25 9:3
9:8,17 10:5,8,8,14
10:21,24 11:9,16
12:4,6,25 13:6,10
14:4,17,25 15:11
16:3,5 19:3,7 22:7
22:15,20,25 25:15
25:17 28:8,12,17
31:5 38:24 40:22
47:5,13 50:24
51:4,6,13,16,18
51:21 53:2,3,7,10
53:12,14,16,21
54:1,1,8,14,16,25
55:4,6,11,14,17
55:19,21 56:3,6,9
56:12,15,17,21
57:14,16,17,20,25
62:16,25 63:1,5
67:9,13 68:19,22
73:6 76:24 77:11
77:25 81:2 82:5
82:11 83:18 85:15
85:22 86:4,7,9,20
88:17 89:7,11,15
91:19,25 92:17
93:12,23,25 94:14
94:17,23 95:2,3
95:14,23 96:4,19
97:2,6,8 98:13,16
98:23 99:3,7,25
100:13,17,23
102:18,22 103:1,7
103:11,18,21,25
104:15,19,21
105:2,5,10,18,20
106:7,14,20,23
107:5,14,17 108:6
108:9 110:14
112:13 113:1
114:17,25 117:2
117:11,17 118:7
118:11 119:10,13
120:1,5,9,17,19
120:22,25 121:7
121:15,21 122:5,8

122:10,17,18,19
122:23 123:2,8,12
123:18,21 124:5,9
124:11,15,21,23
124:25 125:3,7,10
125:13,16,19,21
126:19 127:1,5,7
127:9,11,17,20,22
128:6 129:2,15,19
130:25 131:3,5,21
131:24 132:7,11
132:13 133:8,15
133:17 134:6,10
134:16,18,23
135:1,7,14,16,20
135:20 136:5,9,15
136:25 137:4,7,22
137:24 138:1,8,20
138:23 139:1,4,8
139:12,14,19,24
140:1,14,21 141:2
141:5,8,11,16,21
141:25 147:14
149:5 150:22,24
151:5 153:10
154:16,23 155:1
158:8 159:3
160:12 162:18,20
163:4,6,11,14,23
163:25 164:10,14
164:18 165:1
166:16,18 167:1,7
167:13,13,20,22
168:5,11,15 169:1
169:7,9,12,15,17
170:5,13,15 172:5
173:20 174:17
175:14,17,20,23
175:25 176:5,7,20
177:14,17,20
179:9,14 182:17
182:21,23 184:14
184:22 185:4,13
185:21,25 187:25
188:2,5,12,16,20
188:23 189:1,4,7
189:10 190:7,9,11

190:18,24 191:2,8
195:6,8,11,16,19
195:25 196:13,20
196:22 197:4
200:1,20 201:4,6
201:9,17,24 202:1
202:9,11,13 203:1
203:5,8,11,11,13
203:19,22,24
204:13,17,19,20
204:25 205:7,23
206:7,10,13,17,21
207:1,3,15,17,22
208:2,6,21 209:2
209:7,11 210:7,24
211:3,6,9 212:23
212:23 213:1,4,9
213:14,19,20,23
214:4,7,9,12,17
214:24 215:3,6,8
215:12,18,21,25
216:4,7,17,22
217:2,7,18,21
**courteous** 190:25
**courtesy** 216:20
**courtroom** 13:11
   50:21 215:9,23
**Court's** 114:15
   167:18 176:4
   210:13 211:13
   212:19
**Court's** 4:2 82:10
   93:20 99:2
**cover** 33:7 35:17,20
   40:6 116:10
**covered** 40:21
   117:18 172:24
**crack** 181:9
**create** 106:2
**credit** 65:20,21
   66:3,11,11,12,17
   172:14
**crime** 52:18
**crimes** 171:11
**criminal** 210:21
**criteria** 46:21,22
**criterias** 46:21

**cross** 2:2 8:22
   28:12 82:18 96:1
**cross-examination**
   28:19 98:17
   105:11 106:9,15
   170:16
**cross-examine**
   104:23 167:11
**cross-examined**
   167:9
**cross-examining**
   54:12
**cued** 178:17
**cumulative** 212:16
**curious** 44:1 63:9
**current** 45:10
**currently** 70:20
   142:6,7 206:17
**curriculum** 167:6
**custody** 18:23
   70:17,20 74:13,16
   89:22 92:5
**custom** 136:17
**cut** 21:25
**Cynwyd** 184:7
   199:10
**C-H** 176:10
**C-H-A-R-L-E-S**
   140:8

---

**D**

**D** 2:1 3:1 20:4,8,8
   20:12,15,24 31:18
   31:22,22 32:17,22
   32:24,24 33:5
   34:2 35:18 37:1
   40:6,19 75:23,23
   76:1,2,3,14,17,18
   76:19 77:4,16
   80:21,25 81:3,6,8
   83:10 86:16,17
   99:18 185:9 201:1
**DA** 205:17
**Dalzell** 207:8
**DARNELL** 1:7
**data** 7:24 44:9,20
   45:22 119:18

128:25 129:23
130:4 136:19
143:13,14 144:12
145:9 147:4,5,12
148:25 149:4
152:4
**database** 43:6,20
   44:16,17 45:6,18
   45:22 46:4 58:25
   61:8 91:5
**databases** 66:1,5
**date** 18:5 23:18
   27:8,13 29:17
   31:9 45:11,12,12
   96:7 118:24 119:2
   123:4 155:24
   161:14 164:4
   186:23 187:3
   204:17,21 205:13
   206:16 207:8,14
   207:15 208:1
   209:16,17
**dated** 116:15
   120:19 125:5
   127:12 218:7
**David** 20:8 31:22
   32:25
**day** 11:11 18:12,14
   18:19 24:3,4,12
   26:4 29:19 30:9
   30:12 46:11 61:11
   65:10 74:15 89:21
   130:2 183:23,25
   184:11 198:12
   209:14 217:3
**DE** 187:8
**DEA** 177:8
**deal** 31:19 91:4
   124:17
**dealing** 5:6 101:20
   106:17 107:8
**deals** 4:2 189:16,17
**dealt** 98:20,21
   205:11
**decision** 53:24
   94:18 105:3
   127:24 128:16

134:19 138:13
215:1
**defendant** 1:13 9:3
   10:18 51:24 52:2
   52:5,9,24 53:4,8
   53:11,14,18,23
   54:5 100:17
   125:12,15,18,20
   126:1 128:7 138:9
   190:10,15 191:1
   206:15,24 207:2
   213:13,18,22,25
   214:6,8,11,16,18
   215:2 216:6
**Defendant's** 2:18
**DEFENDANT'S**
   1:7
**defense** 8:1 9:1
   10:6,9 11:5 20:6
   47:2 50:14,14
   56:1 57:21 62:13
   62:21 80:21,23,25
   87:13 96:12 99:18
   99:19 105:25
   121:24 127:14
   128:22,23 131:11
   137:10 139:9
   155:9,9 159:25
   160:6,10 185:3
   189:14 190:2,3
   211:13,19,23
**defense's** 212:17
**defer** 213:10
**deficient** 101:14
   189:23
**definitely** 189:21
   194:4
**deftly** 197:14
**Delaware** 127:24
**delays** 72:12 84:20
**delivered** 14:22
   49:16 61:1
**delivery** 18:21 43:5
   43:8,24 70:19
   74:16 89:20 111:6
**Delta** 71:9
**demonstrated**

98:17 106:8
**depending** 59:4
   65:2 72:12 204:5
**depends** 50:5,6,8
   59:13,14 63:24
   64:1 110:1
**deputy** 53:2 121:18
   203:15
**described** 20:18
**description** 187:5
**desk** 68:14
**destination** 145:16
   146:9
**detail** 125:25
**detailed** 184:13
**detect** 178:8,11
**detection** 32:7
   40:12 81:18 83:24
   93:8 118:25 119:3
   201:20,21
**detective** 19:17
   21:10,11,15 33:14
   37:7 42:19,21
   48:5,10,24 49:4
   88:12,22,22
   90:15 92:24 95:16
   113:9,12,21,22,24
   113:25 114:7
   115:4 120:13
   121:19 126:7
   127:2 133:21,25
   135:6 138:25
   175:22 176:10,14
   176:15,24,25,25
   177:6 178:7 183:1
   189:3
**determination**
   216:10
**determine** 11:16
   42:13,21 45:7,23
   46:4 65:14 66:22
   96:4 146:8,10,11
**determined** 102:16
**determines** 95:4
   102:10
**determining** 46:8
**developed** 14:18

**device** 24:15 99:14
  100:15 101:12,17
  103:20 122:20,24
**didn't** 5:4 7:6
  39:17 46:19 71:11
  83:12,13 92:18
  100:18 102:6
  103:22
**difference** 27:16
**differences** 78:11
**different** 10:11,13
  49:9 59:15,16
  61:7 91:12 100:21
  103:5 146:17
  163:25 214:12
**digits** 7:19 9:13
  25:4,9 79:6,7
**dimensions** 64:13
**direct** 2:2 14:6 17:3
  104:24 105:22
  106:11 142:1
  155:7,23 159:6,25
  160:23 176:22
  185:19 208:7
**directed** 11:10 18:5
  27:8 89:16 91:20
  185:3 198:2
  199:14
**directing** 32:18
  213:20
**direction** 131:15
**directly** 62:19
  128:20,25 162:9
  162:10 192:23
  193:18
**disagree** 31:3,8
**disappear** 122:19
**disassemble** 77:4,7
**disassembled** 77:9
**disbursed** 59:15
  109:16
**disconnect** 39:25
**discovered** 16:21
  17:13 87:22
**discovery** 9:21
  130:18 217:6
**discuss** 5:4 125:13

**141**:13 173:6
**discussed** 20:21
**discussion** 36:10
**discussions** 140:23
**display** 48:23 49:1
**disposal** 66:5
**dispute** 102:3
**disregard** 105:8
  126:16 128:10
  130:11
**disrespect** 53:5
  56:20 190:15
  214:1
**disservice** 210:4
**distance** 78:12,13
**distract** 190:25
**distracted** 190:13
**distribute** 52:12
**distribution** 52:15
  157:20
**district** 1:1,1 8:12
  34:19 38:1 39:12
  55:9 84:10 116:2
  118:23 130:23
  143:1,6 144:8,9
  172:20,24 173:3
  198:5
**divvied** 110:6
**doc** 133:5 157:2
**docketed** 210:20
**document** 55:24
  65:3,3 89:4 97:25
  98:2,3,4 123:24
  124:2 132:22,23
  137:3,17 153:2,3
  153:9 155:12,21
  166:4 170:7
  193:17,17 194:5
  195:15 196:11
  197:16 200:11,24
**documentation**
  7:23 50:22 97:10
  97:12 117:5,11
  128:21 129:13
  130:23 174:24
  175:3 186:21
  187:13,14,16,20

**187**:22 190:2
  193:6,19,22 194:6
  194:9,19,19,20
  195:5,7 196:9,19
  203:2
**documents** 19:23
  24:5 28:7 29:23
  30:16 54:17 64:25
  69:10,16 121:13
  132:20 154:20
  160:9 191:7
  193:20,20
**doesn't** 40:18 62:7
  82:16 89:2 98:4
  101:24 102:14
  107:13
**dog** 11:19 19:18
  32:7 37:7 40:12
  48:24,25 81:18
  83:24 92:21 93:6
  93:7,8 95:7 96:16
  96:22 98:7 108:3
  114:4,12,21,22,22
  115:2,2,3,10,11
  115:13,18 117:25
  118:2,25 119:1,3
  120:14 126:9,9
  129:3,6 130:14
  131:15,16,16,17
  132:2,16 136:2
  178:8,10,14,16,24
  179:2,23 180:12
  180:25 181:12,22
  182:4,9,11 192:6
  192:15 194:15
  197:3,4 198:5
  199:11 201:20,21
  202:3
**doggoned** 40:10
**dogs** 94:11
**doing** 22:21 65:13
  111:6 119:17
  137:13 190:14
  202:21
**don't** 5:3,6,17 8:19
  8:20 9:19,22 13:8
  26:24 30:5 38:23

**42**:25 44:2,18,22
  47:21 49:2 50:15
  51:11 57:10 62:13
  64:7,10 69:23
  71:6,15,16 72:19
  73:2,23 75:11
  77:6 80:25 84:14
  88:3,6,7,8,9 89:6
  91:5,9 92:2,3,13
  92:20,22,25 93:5
  93:20 99:20,21
  100:19 101:7
  105:24 112:5
**door** 140:22
**double** 159:8,9
**downloading** 123:1
**downtown** 59:24
**drew** 17:13 64:6
**Drive** 67:3,3
**driven** 39:20 60:12
  60:13 157:19
**drives** 113:8
**drug** 32:7 33:14
  37:6 40:12 42:13
  52:18 81:18 83:24
  118:24 119:3
  171:3,11 177:19
  178:7 191:5
  201:20,20 205:12
**drugs** 112:9,10
  178:18 181:23
**duplicate** 198:9
**duplicates** 9:5
**duplication** 9:15
**duplicative** 212:16
**duties** 142:25 143:3
  177:5
**D-A** 155:11
**D-486** 218:16

---

**E**

**e** 1:13,14 2:1,9 3:1
  3:1 70:3,11 84:13
  127:19,20
**earlier** 18:19 20:18
  24:3 38:16 56:14
  82:22 85:18

**109**:24 110:10
  155:18
**earliest** 32:8 36:5
  37:8 39:17 81:19
  83:25 201:22
**early** 61:11 108:21
**ease** 6:20
**easier** 24:22 110:9
  153:1
**easiest** 109:9 110:3
**east** 150:12
**Eastern** 1:1 34:18
  38:1 39:12 84:10
  116:2 118:23
  143:1,6 144:8
  173:2 198:5
**edification** 62:24
**education** 63:2
**effort** 89:18
**eighteen** 130:1
  135:11 142:19
  167:12
**either** 36:22 126:3
  183:19
**El** 215:3
**Elchubach** 55:1
**electronic** 218:5,17
**electronically**
  20:22 70:5
**element** 129:3
**elicit** 102:14
**elicited** 198:3,25
**emphasis** 93:20
**emphasized** 140:19
**employed** 142:7,7,8
  142:11
**employee** 150:8,15
  154:10,11 156:23
  157:12,14,16
  175:5
**employees** 110:8
  157:5,7,9 173:15
**employment** 175:4
**en** 165:14 201:14
**enclosed** 109:14
**encompasses**
  208:11

encompassing 84:15
ended 42:11 61:17 101:4 107:23
ends 3:13,15,16 4:3 4:8,9 5:7 6:1,18 31:1 54:19 104:5 110:18 159:10,18 189:16,17 191:19 192:19,20 193:23
energy 196:24
enforcement 43:6 89:19
enter 52:24 54:2 59:13
entered 61:11 67:22
entering 84:10
entire 66:24 209:13 209:19
entirety 80:10
entitled 96:1
entity 43:15
envelopes 110:5
Epps 89:21
equates 84:25
especially 136:13 205:18
ESQ 1:10,13
Esquire 120:23
essence 36:3 46:3,7 107:19 113:4 192:11
essential 129:3 207:11 212:8
essentially 21:22 47:3 174:4 198:13 199:3
Essington 72:2
establish 62:10 95:11
established 13:5
establishing 129:4
establishments 67:7
estimate 40:15,18
evaluate 137:22

evening 18:6 74:24 75:2 98:4 158:18 158:22
event 10:24 84:19 152:23 153:13,18 155:25 156:4
events 96:20
everybody 207:4
everybody's 6:20
everyday 195:2
evidence 11:3,13 11:14 53:18 93:24 102:8 104:19 117:22,24 126:2 134:3 137:16 138:3 186:22 194:4 196:18,18 200:3 201:8 208:12
evidentiary 96:17 128:6
evidently 123:16
exact 129:9 186:17
exactly 3:5,10 51:13,16 59:22 72:19 76:11,12,12 76:19,20 78:4,5,7 78:17 80:1,6,14 105:9 131:23 138:20 149:20 150:7 190:23
examination 14:6 89:12 96:2 106:9 106:11 118:8,12 142:1 174:21 176:22 192:3
examine 28:13
exception 94:2 167:14
exceptions 126:14
excerpts 9:21
exclusion 30:17,19
excuse 26:23 50:24 99:20 128:22 135:21 145:3 150:22,24 159:9 185:22 190:7,7

211:22 217:4
excused 188:8
execute 16:16
executed 16:19 21:1 24:7 74:15 80:5 87:21 92:7 103:17 116:18
executing 16:20 17:13
execution 4:19
exercise 135:21
exhibit 7:10,13,17 7:17,19 8:1 9:1,9 10:3,9 15:11,16 15:17,18,21,24 16:6 18:11 20:4 20:12,15,24 24:23 24:23 25:1,6,20 26:13,15,21,22 27:4,5,5,12,12,12 27:20,21,23 29:2 29:3,6 30:4,21,22 31:1,18,18,21 32:17,22,23,24 33:5 37:1,22 40:6 40:19 41:3,5,18 41:18 42:3,5,10 42:11 43:1 47:18 48:12 49:11,11 50:14,14 56:1,2 57:21 62:21 75:23 75:23,25 76:1,2,3 76:14,17,18,19 77:4,16 80:21,25 81:2,6,8 83:10 86:16,17 87:13 99:18,19,20,21 104:9,10,13,24 127:15,16,18 131:11 137:13 155:9,10 159:8,16 160:1,5,10,15,25 185:3 190:2,3 191:8,8 201:1
exhibits 6:21 9:16 24:23 25:18 27:12 28:3 41:13 67:21

118:15
existed 180:14
exists 94:8 131:19
exit 12:10 13:11
expect 36:11 84:16 84:17
expected 32:7 35:21 36:4 37:6 38:16 40:11 81:17 83:17,24 201:15 201:19 202:7
expecting 36:15
experience 11:21 34:6 43:14 45:18 45:20 66:15 67:5 85:6 136:19 143:11 144:3,6 146:5 154:4 156:16 157:1,2,18 175:4
experiences 195:2
expert 164:1 167:4 167:8,12
expertise 167:10,11
explain 14:17,25 16:11 17:9 19:7 57:8 144:22
explained 84:6
explanation 130:6 194:22
exposed 33:13 36:1 36:8 47:17 48:6 92:21 93:16 98:8 108:3 114:1,22 118:2,25 119:1,3 131:16 180:12 182:5,11 192:5
exposing 181:12
exposure 166:13
express 144:23 145:3,5
extensively 40:21
extent 5:12 9:4 63:2 94:1,14 95:7 102:13 127:10 131:18 135:25
extra 57:13,13

99:22
extrinsic 126:1 137:16,17
e-mail 19:23 20:12 20:13,24 83:12 84:15 121:12 122:12 123:3 200:24 201:3,12 201:15
e-mailed 70:5,8 121:5,11
e-mails 37:14 159:24

**F**
face 38:3,4 128:21 129:1,13 130:6 133:7 189:13,15 189:20,22 190:6 191:6,7,12,22 193:6,16,19 194:3 194:4,21 201:23 201:23
facilities 109:14,25 148:14
facility 19:9 39:21 43:11,15,16 49:17 59:4,8 71:25 72:1 74:2,7,8 84:22,24 88:4 90:21 109:9 109:12,17,19,25 110:8
fact 94:6 97:11 122:16 129:14,20 130:22 132:11 134:19 170:8 171:14,25 194:12 196:18 202:19 203:14 204:1 205:1,19,20,25 208:8
factors 50:5
facts 40:14 80:17 94:7 130:19 202:23,24
failing 10:24 95:5
fair 170:24 172:19

**fairly** 85:12
**faith** 11:2 94:2 95:6
    102:12 107:6
    197:6 198:15,18
**falls** 64:2
**false** 96:16 105:7
    126:6,6 128:8
    130:10 133:2
    137:25 138:4
**falsehood** 134:8
**falsities** 95:24,25
    96:15 106:1
**falsity** 134:5 197:23
    198:22
**familiar** 49:22 57:5
    58:3 80:21 140:18
    143:10,13,14,18
    143:20 147:17
    149:22 151:18
    153:14 172:9
    175:9,11 179:18
    179:19,20 186:8
    196:2,4,8
**family** 206:3 214:2
    216:9
**far** 23:3 62:14
    91:21 101:14
    146:5 173:4
    202:18,20
**fashion** 95:25
**fate** 212:14
**fault** 210:13,14
**federal** 15:6
**FedEx** 71:11,13,14
    71:16 109:3,5
**feel** 199:25
**felon** 52:20
**felt** 85:5
**fifteen** 119:7 196:7
**fifty** 156:11,13
**file** 204:16,18
    207:14
**filed** 28:8 130:17
    196:25 198:10
    204:19 217:6
**final** 137:9 178:21
**finality** 207:18

**finally** 27:23
**finances** 143:21
    214:2
**financial** 143:17
**financially** 206:3
**find** 16:18 32:21
    64:9 66:2 74:12
    84:24 131:9 181:8
    184:20
**finder** 134:19
**finding** 16:24,25
**findings** 203:14,25
    205:19,20,25
    208:8
**fine** 40:24 98:2
    207:2
**finish** 89:11 190:20
**finished** 115:14,18
    205:4
**firearm** 52:17,20
**firm** 109:12 142:9
**first** 3:4 14:25 15:2
    15:2 25:20,21
    26:25 29:2,5
    31:20,23,24 32:2
    33:11 34:2 35:17
    39:18 66:10 68:9
    70:16,17 72:10
    78:13,15 79:20,23
    80:9,20 81:12
    82:15,16 83:9
    99:14 102:17
    103:6 109:18,20
    111:11,12 126:19
    131:13 133:20
    136:4 138:25
    149:13 163:15
    168:14 179:16,19
    180:3,4 181:8
    183:1,15,16,17
    189:12 196:25
    209:13
**fit** 128:16
**five** 79:21 142:23
    161:10,11 165:8
    173:1 180:10,11
    182:12 216:19

**flat** 64:16,18,19,25
**flies** 128:20,25
    129:13 132:18
    133:6 190:6
    191:12,22 193:6
    193:15,18 194:4
    195:17 201:23,23
**fly** 130:6 194:20
**follow** 24:2 94:12
**followed** 24:3
    62:11 94:10,11
    95:9 114:23
    180:18
**following** 24:4
    89:21 209:19
**follows** 128:4
**force** 177:8 181:19
    181:20
**forego** 208:7
**foregoing** 218:4
**forget** 86:24
**forgive** 55:13
**forgot** 154:7
**form** 6:17 155:13
    174:4
**former** 133:22
    198:25 200:11
**forms** 94:5
**forth** 11:21 96:7
    104:18 124:17
    197:19
**forward** 10:21
    11:24 54:3 70:22
    96:14 106:3
    125:17 138:10,20
    208:12 210:1
**forwarded** 32:12
    75:9 115:23
**found** 46:1 85:1
    187:5 198:17
**four** 10:22 79:6
    93:25 94:17,21
    95:3,11 102:4,10
    104:13 105:2
    106:17 126:13
    137:18 148:7,10
    159:20,21 189:20

191:13,13 193:17
    194:5,10 197:14
    197:15,16 198:23
    213:11
**fourteen** 145:23,25
    151:1,4,7 170:24
    199:2
**fourth** 76:13,14,17
    76:18
**frankly** 137:14
    199:9
**Franks** 47:3 127:24
    128:7,12 134:4
    137:10
**frequently** 44:2,5
**Friday** 203:20,22
    204:1 209:18
**front** 15:13 18:11
    20:3 29:3 34:2
    40:19 42:16 55:18
    76:18 80:24 83:6
    108:23 116:14
    138:16 140:22
**fruit** 3:12 4:23
**fruits** 3:21 4:17,17
    4:18 101:6,9,20
    101:24 102:14
    103:15 196:21
**full** 96:17 140:6
    156:10
**fully** 38:20 125:13
**full-time** 182:7
**further** 10:10 28:11
    118:5 119:11
    120:3 129:18
    132:25 144:17
    148:8 150:5
    170:11 174:16,18
    175:15 188:1
    198:11 203:13
**furtherance** 52:17
**F.3d** 128:12

————— **G** —————
**G** 3:1 218:3
**game** 19:15 20:18
**gears** 166:11

**general** 114:20
    142:16,22 150:17
    152:3 156:18
    164:17 166:23
    175:6,10
**generally** 14:17
    72:15 179:13
    217:9
**General's** 143:12
    152:8
**generated** 90:24
    91:9,13 97:14
    130:4 132:5,23
    133:2 156:7
    168:21 169:10
    175:11 193:1
**gentlemen** 217:18
**getting** 36:7 63:2
    66:20 114:8,14
    145:16 199:22
    205:4,16
**give** 6:16 37:18
    41:3 84:2 95:22
    100:1 107:20,21
    107:21 108:4
    115:3 121:24
    133:18 182:17
    187:16,22 190:20
    210:10
**given** 6:25 11:19,19
    62:9 84:23 112:16
    112:17,17,19,21
    112:23 113:5
    138:1 167:4
    205:22
**gives** 126:19 161:12
    161:22
**giving** 3:8 9:11
    108:23 114:21
    119:16,20 125:8
**go** 11:24 22:25 27:1
    29:13 35:1 39:1
    41:1 42:2,5 43:12
    47:10 54:3 70:23
    72:21 73:11 74:10
    75:16,19 77:24
    79:5 82:11 93:15

99:8 101:18 103:5
105:18,20 106:23
106:24 117:9
123:8,24,25
125:16 129:17,19
138:10,20 139:10
140:1 152:2
154:23 155:1
160:25 161:9
164:19 165:1
184:1,5 185:25
189:15 192:3
193:11 195:12
197:20 198:11
201:9,9 202:17,20
204:6 206:8
207:10 208:12
210:1 216:13
**Goborsky** 73:17
**goes** 34:7,7 149:15
**going** 7:11 8:15
10:20 19:25 31:19
36:24 47:10 50:9
50:25 51:14,16
66:16 70:24 78:6
78:20 79:10,14
80:2,20 91:21
94:9,20 95:15
99:13 101:15,20
103:4 110:2 111:8
121:24 122:25
124:15 126:8
132:24 134:14
136:10,14,16
137:1 138:16
145:12 146:14
153:8 155:17
161:9 172:1,3
184:12 186:6
189:15 194:22
196:3 199:16
202:17,20,22
207:10 208:21,22
210:9,9,12 211:10
211:10,11 212:18
213:10 216:12,14
216:24

**good** 11:1 13:13
14:8,9 28:24 29:5
57:3,4 94:2 95:6
102:12 107:6,19
140:3,4 141:11
170:18,19 197:6
205:3 207:3 208:1
**gotten** 38:6 121:10
**Gov** 127:19
**government** 8:12
9:6 10:6,15 11:10
13:1 15:16,24
30:4 31:17 41:5
41:17 42:10,11
47:6,18 48:12
50:22 62:11 75:23
81:8 86:17 93:23
103:12 120:8
121:1 124:18
125:5 127:10,24
159:7,8,16 188:17
193:21 194:9
198:11 207:12
211:14 212:19
213:4 214:19
216:11
**government's**
125:22 127:16,18
128:19,21 134:12
160:15,16,18
205:12 207:13
210:13 213:17
**government's** 2:11
9:8 15:17 16:6
25:18 29:2 30:21
41:12,18 43:1
75:22 81:2,5
83:10 86:16 104:7
104:10
**GPS** 17:1 24:15
**grams** 52:15
**grand** 53:13 212:10
**granting** 213:4
**great** 85:17,17,17
168:19
**greater** 206:2
**Griffin** 18:22 70:20

74:17
**grounds** 167:2
**groundwork** 205:6
**Group** 24:10,17
67:2 177:8
**guess** 38:20 76:13
101:15 110:3
148:5 155:17
204:13
**guesstimating**
72:11
**guilty** 52:22,23
54:2
**gun** 149:25
**guy** 149:25

———————

**H**

**H** 1:13 2:9
**hadn't** 38:6
**half** 204:9
**hallway** 140:17
141:14
**hand** 13:24 51:23
68:16 140:10
150:6 176:13
**handed** 55:1
**handle** 208:16
**handled** 41:9
**handler** 12:22
93:16 120:14
182:8 192:6,15
194:16
**handling** 70:19
173:16 180:24
**hands** 61:5 84:21
**handwriting**
145:10 146:20
148:6,7
**handwritten**
145:18
**hanging** 24:6
**happen** 173:6
195:6,11 197:11
216:14
**happened** 15:4
17:22 18:13 19:7
21:8,20 23:2,5,25

29:20 30:15
107:22 111:24
115:8,11,12
178:13,14 195:4
198:13 200:10
211:4
**happens** 50:3 173:9
173:11,13 199:4
**hard** 58:15
**hardship** 206:2
**harmed** 53:9
**Harrisburg** 142:9
172:20 196:6
**hate** 40:7
**haven't** 102:22
**haystack** 84:25
**head** 95:18
**heading** 78:12
**hear** 114:15 116:1
125:21,22 127:7
132:3 134:19
138:13 197:2
199:8,8,9 201:4,6
**heard** 131:25 132:4
134:4 137:4,15
199:1
**hearing** 1:7 40:16
47:3 58:15 96:17
120:8 128:7,7
138:11 203:12
206:5
**Hearsay** 22:8
**heavy** 197:8
**held** 150:5
**heroin** 181:9
**he'll** 216:24
**he's** 10:2 13:4 22:9
22:23 47:2,9 73:5
89:10 96:1 101:23
102:4,13 107:14
107:15 112:11
**HIDTA** 177:8,18
**high** 177:18 182:9
**hinged** 59:7
**hip** 211:18 212:8
**hired** 174:11
**hit** 19:17 21:16

36:22 61:20 95:17
109:18 197:3,4
198:5
**hits** 109:19
**hold** 23:5 38:21
76:16 104:7
**holding** 154:2
**holiday** 209:14
**honestly** 49:2,5
64:11 110:1
**honesty** 85:5
**Honor** 3:7,11 5:14
6:4,6,19 7:21 8:3
8:9,16,18 9:2,19
10:13,17 11:15,23
12:2,9,13 13:4
14:5 15:10,23
16:4 20:11 22:19
22:23 23:7 25:13
25:16 26:23 28:10
28:14,15 31:4,6,7
31:8 37:17,17
38:12,12 39:2,8,8
40:20 46:25 47:9
51:9,21 54:11,15
54:21 55:5,8 56:8
56:11 57:11,24
62:6,7 67:12 73:4
77:2,4,13,23 82:3
82:13 84:6,6
85:19 86:18 87:5
88:14 89:14 91:18
92:15 93:10,19
94:25 95:17 96:11
96:18 98:15 99:10
99:24 100:12,14
100:24,25 101:22
102:3,10 104:11
105:23 106:18,21
112:11 114:13,18
114:24 119:11
120:6,7,10,11,15
121:16,24 122:11
123:13 124:7,20
125:2,6,24 126:23
131:6 133:11,19
134:21 135:6

136:7,8,12 137:6
137:19 138:21
139:10,17,22
140:15 141:1,4,9
141:22,23 147:11
149:3 151:4
152:25 153:9
154:15 155:5
158:12,24 162:12
163:3,9 166:15,25
168:24 169:5
170:4,12 174:15
175:13 176:3,21
177:10,11 184:12
184:23 185:2,8
186:5 187:24
188:3,14,18 189:5
189:11,12 196:23
197:7 198:8,15,19
198:22 199:17,24
207:6,20 211:12
212:8 215:14
216:3 217:4
**HONORABLE** 1:7
**Honor's** 102:17
**hoping** 105:13
**hospital** 211:20
**hour** 112:4 116:22
116:22,23 153:22
**hours** 87:15 116:21
116:21 157:22
158:1 212:24
213:11,21
**hubs** 148:14
**hundred** 91:12
**hundreds** 80:5
147:13 208:17
**hung** 18:15

**I**

**ID** 88:11,12,13 89:1
89:3,25 90:1,3
149:22 161:23,25
162:2,3,4
**idea** 74:14 91:3
116:21
**ideas** 111:18

**identical** 21:3,4
**identification** 2:10
55:25 68:6 155:8
**identifications**
68:12
**identified** 7:5 15:3
15:5 19:5,8,11
43:3 61:3,3,4
65:11 67:19,23
68:9,25 69:2 84:7
93:17 111:8,10
137:13 197:18,21
**identifies** 104:17
149:25 197:14
**identify** 10:23
18:25 46:16 47:2
66:8 95:21 96:13
100:16,17,18
101:25 134:5
142:3 144:16
147:25 192:8
**identifying** 47:11
144:19 217:13
**identity** 43:17
**II** 1:7 52:14
**III** 52:14
**illegal** 111:11
**image** 61:7 63:19
66:2
**images** 61:10 66:4
148:16 171:12
**imagine** 108:25
206:4
**implication** 4:18
**impossible** 129:5
130:14
**improper** 101:17
101:19
**improprieties**
102:7
**Inaudible** 215:5,7
**inclined** 208:6
**include** 7:7
**included** 5:2 50:13
128:10 130:11
**including** 135:23
**incoming** 147:24

**inconsistency**
131:18
**incorrect** 126:6
**incumbent** 141:13
**independently**
186:22
**indicate** 19:18
23:18 29:13 60:19
96:21 117:5
186:23
**indicated** 18:4 20:1
21:12 36:22 38:3
40:9 44:12 47:17
62:20 65:7,11
75:1 84:13 89:4
101:5 107:25
116:10 123:18
190:1 209:8
**indicates** 20:20
32:19 35:5,25
62:21 64:24 83:22
165:6,19,23 166:4
170:7 190:5
**indicating** 121:19
**indication** 78:8
95:23 126:5,19
131:17
**indicator** 88:10
**indicators** 178:18
**indicia** 126:4
**indictment** 51:8
52:11 53:10
212:12
**indiscernible** 12:18
13:14,19 48:20
49:17 52:1,4,6,8
53:19,20,24 54:24
60:2 64:22 70:18
81:15 83:1 84:22
87:7,9 94:8 98:12
107:19 111:14
203:18,20
**individual** 43:17
70:16 133:3,3
136:16
**individuals** 92:9
**inducted** 50:10

110:7
**induction** 50:6
109:23
**indulgence** 99:2
167:18
**inform** 213:20
**information** 9:22
14:18 17:11 45:6
45:9 65:4,25 66:4
67:20 70:9 83:15
87:18 90:8 97:8,9
125:23 126:11,15
144:12 150:2
156:22 192:24
205:14
**informed** 212:7
**initial** 101:3 102:2
102:17 103:15,16
181:6 182:1
**initially** 60:20
63:10 96:14
**ink** 24:5
**inner** 19:9
**input** 152:18,21
155:20 156:3,6
161:21 168:21
**inputted** 156:22
**inside** 16:21 24:7,9
87:22 109:15
**insist** 210:10
**inspect** 135:10
**inspected** 192:17
**inspection** 14:11
34:18 37:25 39:12
171:1
**inspector** 11:1,14
11:20 12:3 13:18
14:8 15:13 25:21
26:2 47:4 62:9
73:12,13,15 74:19
87:20 88:24,25
89:16 90:11,15
91:7 93:15 95:10
96:2,25 97:11
111:16,24 112:1,2
112:16 113:7,15
118:14 129:24,25

130:7 131:2,4,7
131:12,14 133:22
134:1 135:9,10
136:11 139:15
140:18 142:12,16
142:18,22 143:8,9
143:11,12 144:7
150:11 151:9,12
152:3,7 156:17,18
157:17 164:17
166:22,23 170:18
170:21 174:8
175:5,6 180:6
183:2 187:8
188:19 189:2
192:2,23 193:3
198:3,7,14,19,25
198:25 199:4,14
199:15,23 200:5
200:11,11,12,15
202:2 207:7
**inspectors** 71:23
74:1,6,19 84:17
84:24 143:20
149:10 150:21
161:24 172:10
181:19 194:25
**inspector's** 166:22
191:20
**instance** 31:5 61:2
64:3 72:17 94:13
116:25 126:19
131:13 186:14
**instantly** 156:12
**instructed** 19:24
29:16 31:10
**instruction** 29:21
**instruments** 100:21
**intend** 101:18
**intends** 8:20
**Intensity** 177:18
**intention** 153:4
**intentional** 105:7
**intentionally** 128:9
130:10 134:9
202:21
**inter** 127:23

**intercept** 70:23
111:14
**intercepted** 19:9
65:21 82:23,24
89:19 110:10,16
110:17,20,21,25
111:2,5,15,16,23
112:4 113:15
**intercepts** 113:8
**interject** 153:1
**international** 19:10
32:6 37:5 40:11
59:9 81:17 83:23
108:25 164:22,23
172:23 173:9
201:14
**interrupt** 188:10
209:23
**interrupting**
190:12
**interviewing** 74:17
**introduce** 137:16
**introduction** 121:2
**invalidly** 11:6
**investigated** 144:8
151:3 171:15
**investigating**
171:11
**investigation** 14:14
14:21 49:20 66:6
70:13,15 111:13
142:9 174:13
177:23 179:21
183:9 205:5,15
**investigations**
143:6 171:3
**investigative** 16:24
61:14 65:14 66:24
92:8 205:15
**investigator** 142:8
171:6 172:17,18
**involve** 173:15,15
**involved** 12:23
14:14 48:23,25
87:6 144:18 152:6
163:17 171:23
177:22 181:18

195:24 196:7
206:5 214:5
**involvement** 23:3
178:5,6
**involving** 177:24
**in-log** 161:11
**irrelevant** 95:9,18
167:14 199:17
214:3
**isn't** 40:14 46:10
82:17,19 83:11
92:4 96:16
**issue** 10:7 11:15,25
94:2 126:7 132:5
164:1 196:4
197:25 210:17
211:7 214:23
**issued** 6:13,13 11:6
12:1 51:10 62:12
107:7 197:9
199:20
**issues** 95:8 141:18
**issuing** 95:5 189:24
**item** 130:13 132:21
165:5 194:15,23
195:15
**items** 144:2 166:13
**it'd** 153:1
**it'll** 24:22
**it's** 22:8 28:24 29:6
32:17,19 33:5,6,6
37:23,23,23 38:18
39:25 40:8 41:5
45:10,12,15 49:16
50:9,15,15 56:25
57:19 58:7,14,17
58:25 59:7 60:25
61:1,17 63:23,25
63:25 64:24 68:20
71:11,16 72:9
74:24 75:21,21,23
75:24,24 76:1,2,2
76:7 81:2 90:9
94:6,16 97:17,17
99:17 101:23
103:7 104:7,8,10
104:19 106:7,16

109:10,14 110:6
**IV** 52:17
**I-H-E-R** 127:3
**I'd** 47:19
**I'll** 33:14 62:19
81:14,14 86:8,9
86:13 88:19,19
97:5 100:1
**I'm** 3:10 4:21 5:15
7:11 8:17 9:5,11
9:11 12:15,16,17
21:24 23:11 26:14
26:16,16,22 27:1
30:2 31:19,21
32:18,21 33:4,8
33:10,10,12,25
34:4,8,10,24 35:3
36:3 37:2,19 38:8
38:9,12 39:4,5
41:4,7 43:12 44:1
44:19 47:25 48:10
48:20 49:13 50:14
51:13,16,22 53:16
57:9,12 58:14,16
62:8,22,25 63:2,9
63:9 64:8 68:17
69:24 72:11 73:21
74:12,12,17 75:11
76:21,23 77:10,19
78:6,20 79:6
80:16 81:4,8 82:9
82:25 83:5,20
86:7 87:8,17
88:15,18 89:8,13
89:13 90:15 91:18
91:19,20 92:19
94:9 99:4,4,13,19
101:15,15,15,16
101:19,22 103:4
104:8,25 105:13
105:13,16 106:17
106:23 107:9
108:6,6,9,12,23
110:17
**I've** 6:25 10:2
15:11 55:8 80:5
96:10,11 100:6

105:14,15

—————————

**J**

**Jackson** 24:10,17
67:2
**Jamahl** 1:5 14:15
**Jeff** 212:13
**Jenks** 217:11
**Jersey** 79:16
161:20 162:9,10
162:25 163:2
164:20 165:7
166:6 193:11,11
200:2
**Jiminez** 55:18
**job** 150:19,20
187:4,7,8
**Johnson** 1:14
**Jones** 1:7 185:23
185:23
**judge** 4:8,14,21,22
5:3 6:10,16 7:14
11:7,7,9 12:17
16:14 17:16,23
18:1 19:21,22
20:13,22 21:18
22:4 23:7,8,12,14
23:15 24:18 26:17
26:18 27:6 28:7
29:12,16 32:12
34:10,22 35:10,24
36:5,10 37:9,15
38:19 39:24 40:15
41:9,15 50:20,23
51:3 55:13,15,18
56:14 57:12,19
62:12,18 74:25
76:22 77:24 82:10
84:2,12,16 85:5
94:4,19 95:4 97:7
98:19 101:2 102:5
102:6,9,20 103:20
104:22 105:4,14
106:13,22 116:5
116:13,15 118:6
119:9 121:4,12
122:1,17,22 123:5

124:4,14 128:17
129:18 130:7,17
133:12,14 135:2,8
137:12 138:12
154:22 160:11
163:19 164:7
167:3,21 168:10
169:22 170:14
172:1 175:21,24
179:7 184:21
185:12,20,23,23
188:9 189:19,22
191:4,15,17 195:4
195:13 196:15,21
198:1 199:21
200:22 201:16
202:18 204:3,18
204:22,24 205:8
205:16,21 206:6
206:20 207:8,25
208:15 209:5
210:3,5,15,16,17
217:16
**judges** 214:5
**judge's** 27:16 28:2
29:19 30:5
**July** 150:13
**juncture** 8:25
**jury** 53:13 86:7
138:16 195:1
209:16,22,23
212:10

—————————

**K**

**Katayoun** 207:10
**Katerman** 2:4
12:10 133:23,24
135:11 136:13,15
138:22 139:3
140:8,11 142:5,6
195:21 198:25
200:11
**keep** 55:7 91:20
197:12 199:15
**Kellehearn** 12:19
**Kellerman** 133:22
**Kelliher** 2:5 19:17

21:10,12,15 42:17
42:19,22 46:23
47:15,16 48:5,10
49:4 74:21 92:24
95:16 113:9,13,21
113:22,24,25
114:7 115:4
120:13 126:7
127:3 133:21,25
135:6 138:25
141:15,20 175:22
176:11,14,15,24
**Kelliher's** 121:19
**Kelliher's** 48:24
**Kelly** 12:18
**Kenneth** 18:22
**kept** 48:20 112:6
144:25 145:2
**key** 207:13
**kilogram** 24:11
**kilograms** 16:21,22
24:9 52:13 65:12
66:13 87:22
200:18
**kind** 45:11 108:5
155:13 187:8
**Kirby** 21:11,11,16
33:14 35:25 36:7
48:24 75:1 85:4
95:17 113:11
115:4 180:25
181:1,20,21 183:9
192:5,14 194:15
**knew** 192:9
**know** 5:4,6 8:20
9:20 21:17 22:8
30:3 34:6 38:23
43:14 44:18,18,22
47:8,21,22,24
48:4 50:15 53:5
61:23 62:7,13
64:8,10 71:3,9,15
72:17 73:2,23
75:11,13 81:13
88:8 89:5 91:9
92:3,3,13,18,20
92:22,25 93:5

96:6 98:1 100:20
101:7 102:1 106:2
112:5,25 113:17
113:20,22,23
114:5 121:7,9
122:1,3 131:9
132:5 134:3
137:19 140:16,17
146:25 148:18,19
150:12 153:2,3
158:25 160:19
166:9 167:7 170:6
170:20 173:19
174:7 175:8
177:11 180:16
182:2,9 184:8,11
185:7 186:10,13
186:16,17 187:2,4
187:6 190:11
192:9 198:9
199:21 202:23
203:9,10 206:2
210:21,22,24
211:1,1,3 215:10
216:19,24 217:14
217:15,16
**knowing** 105:7
**knowingly** 128:9
130:10 134:8
202:20
**knowledge** 83:15
87:18 92:18
136:19 162:1
163:16,19,21
164:6,8,12 166:3
173:8,13 174:3,12
194:16
**knows** 129:24
190:14 196:12
**K-A-T-E-R-M-A...**
140:8
**K-E-L-L-E-H-E-R**
127:3
**K-E-L-L-I-H-E-R**
176:11
**K9** 113:11 115:4
166:13 177:7

202:2

_____
## L

**label** 61:8,13,16
63:22,25 64:1,4,5
64:9,23 66:3,4,20
66:20 87:20
145:14,18 146:5,8
**labeled** 4:6 8:12
**labels** 61:10 144:23
145:7,19 148:6
**lack** 10:20 11:17
156:23 197:2
**laid** 150:14
**language** 78:7
**larger** 148:14
**lashes** 50:24
**late** 36:17 163:22
**latest** 36:11,14
202:12
**law** 1:13 24:10,17
43:5 54:6 67:2
89:19 104:19
105:6 128:14
135:17,22 203:14
204:1 205:20,25
208:9
**laws** 53:25
**lawyer** 185:24
**lay** 125:25 129:12
**laying** 63:24
**lead** 14:16
**leading** 19:2
**learn** 19:20 212:14
212:21
**learned** 207:8
211:14,16
**leave** 72:21
**leaves** 158:1
**left** 72:25 73:2,11
74:10,14 144:24
148:21 199:14
200:17
**left-hand** 27:7
**legal** 209:14
**legality** 102:16
**length** 209:24

**Leon** 10:25 126:14
197:6 198:16
**letter** 78:4 95:2,14
122:3 123:6,17
125:25 127:11,23
129:21 135:13
200:23,24
**letters** 58:19
109:15
**letting** 216:18
**let's** 132:8,8 179:11
179:16
**let's** 17:18 18:12
21:5 25:20 26:6
27:11 35:1,2
38:14 39:1 54:3
78:11
**level** 34:8
**lie** 40:7,13 83:11,16
**life** 210:6
**lifetime** 171:4
199:3
**light** 136:13 205:1
205:18 212:17,18
**limited** 62:9 198:18
**Lindberg** 60:4,12
109:24
**line** 28:4 47:1 62:8
78:13,14 83:7
92:2 106:15
128:18,24 165:5
165:12 169:25
184:7 191:6
201:12 202:5
**lines** 80:11 165:8
207:15
**link** 111:16,24
112:1,2,16 113:7
113:15 148:23
194:15
**linked** 146:18
**linking** 146:22
**LISA** 218:16
**listed** 63:4 191:5
**listened** 131:7
**listing** 216:9
**litigate** 13:6

**litigating** 3:3
**little** 12:17 30:2
58:15 82:22 95:1
114:14 129:18
161:15 187:6
196:24 198:24
**LLC** 17:2,3 18:25
**local** 109:21,21
**located** 34:17 37:24
39:11 59:22,22,23
118:22
**location** 48:16 50:6
147:8 153:25
157:19 158:1
161:18 165:7
195:23
**locations** 59:3
111:2 147:10
**lodged** 53:12
**log** 48:20 112:6,8
187:1
**logical** 103:24
**long** 14:12 62:18
91:7 95:10 103:7
105:17,17 111:7
113:25 142:18,22
189:19
**look** 10:22 25:20
30:3 64:9 87:12
89:19 123:6
124:16 144:17
148:6 189:20
**looked** 34:22 61:24
61:25 64:8 67:1
98:2,3 146:20
**looking** 33:10,11
64:23 67:24 68:1
79:17 102:13
119:21 121:13
144:11 145:11
146:16 155:2
168:1 171:16,19
193:16
**lookout** 111:9
**looks** 95:3 102:10
123:15 145:11
174:4

**Los** 63:20 79:2
**losing** 58:15
**lot** 62:14 68:17
   172:19 173:4
   205:14
**lower** 25:25 27:6,7

**M**

**machine** 61:20
**Madame** 13:11
   203:15
**magistrate** 7:12,15
   11:7 16:14 17:16
   19:20,22 20:22
   21:18 23:12 95:4
   95:12 97:21,22,24
   97:24 98:2,3
   102:6 107:7 116:5
   137:12,21 197:9
   198:6,12,20
   199:21
**mail** 3:15 4:4,9,10
   6:1 7:16,18 9:12
   14:23 19:5 24:9
   39:21 50:10 58:8
   58:19 61:12 63:16
   65:23 67:4,11,22
   70:4 71:25 72:1
   79:3 84:14 88:4
   99:15 109:9,12,13
   109:13,15 110:5
   110:18 121:11
   133:3,5 143:5
   144:2,23 145:4,5
   145:6,7,15,17,20
   146:1 151:15
   153:23 154:11
   159:10 166:14
   171:19,21 173:15
**mailboxes** 171:12
   171:15 172:11
**mailed** 70:12,17
   121:9 147:1 148:1
   148:3,5,9 149:2
   149:15,17,17,18
   150:4
**mailers** 148:17

**mailing** 14:19
   43:15 111:11
   172:3
**mailings** 111:8
**mails** 148:22
**main** 205:13
**major** 211:18
**making** 104:22
   130:20 135:20
   150:25 189:20
   191:13
**man** 150:23
**manually** 152:21
**margins** 78:16,17
**marijuana** 181:8,9
**mark** 10:9 18:5
   29:17 57:18 185:5
   185:11
**marked** 7:25 8:11
   8:13,19 9:1,7 20:4
   29:7 32:17,20
   33:6 55:6 56:6
   76:2,7,14 99:17
   99:18 155:8,16
   159:8 160:10,15
   160:21,22 185:5,7
   185:8
**Market** 1:23
**marking** 55:24
   191:5
**mask** 43:16
**match** 11:22
**material** 40:13
   47:12 63:4 94:20
   95:21 96:13 98:10
   106:6 107:10
   126:5 130:21
   134:8 191:25
   194:12 196:17
   197:17,22 202:19
   205:16 208:16,17
**materially** 126:6
**materials** 135:23
**math** 205:3
**Mathilda** 194:1
**matter** 51:8 104:19
   177:23 183:4

204:25 205:21
   210:20,21,25
   218:6
**Maximilian** 186:9
**Maximillian** 3:14
   24:8,16 43:7
   44:22,25 45:7,23
   45:25 46:5,9
   66:22
**ma'am** 185:4
**ma'am** 100:4
**McStravick** 2:3
   11:14 12:3 13:15
   13:15,18,20,22,25
   15:14 26:1 28:21
   47:4 56:25 57:1,5
   58:3 62:10 95:10
   96:2,25 99:13
   118:14 128:19
   131:12 134:1
   137:15 141:22
   174:8 180:6 183:3
   187:17,23 198:4
   199:5,14,23 200:5
   200:12,16 207:7
   207:20,23
**McStravick's**
   131:7
**mean** 4:22,25 6:17
   23:21,22 37:1
   44:1,8 53:7 62:5
   63:23 64:17,18,20
   71:4 88:18 91:1
   100:7 101:24
   103:22 104:17
   105:1 109:20
   121:5 126:23
   134:18 152:19,24
   156:2,3,4,8
   162:13 169:4,18
   170:1 188:10
   193:5,12 210:21
   217:12
**means** 91:3,10,13
   91:14,16 130:5
   156:9 168:22
   174:5

**meant** 56:19
**mechanically** 58:22
**mechanized** 58:23
**medium** 64:24
**meet** 72:21 217:19
**Meeting** 79:3
**member** 156:17
**members** 216:9
**mental** 197:23
   212:21
**mention** 101:3
   210:17
**mentioned** 5:16
**merely** 29:6 36:9
   134:2
**messed** 12:18
**met** 28:6 174:14
**methamphetami...**
   181:10
**method** 58:18
   65:15 152:18
   155:20 156:3,6
   161:21 181:12,16
**metropolitan**
   148:14
**middle** 27:25 144:9
   172:20,24
**midnight** 84:17
**Mid-Atlantic** 1:23
**Miller** 1:13,13 3:4
   3:7 4:1 5:16,19,22
   6:5,9,15 7:1,11,21
   8:6,9,11,20 9:2,4
   9:10,23 10:12
   12:9,15,20 16:4
   19:2 20:7,9 22:6,8
   22:13 25:12,16
   26:13,16,23 28:14
   28:18,20 31:12
   38:25 39:2 40:23
   40:25 47:14 50:17
   50:20 51:3,9,15
   51:17,20 54:11,15
   54:22,24 55:2,5,8
   55:13,15,18,20,22
   56:5,7,10,13,19
   56:23,24 57:12,15

57:18,23 58:1,2
   62:16,18 63:7,8
   67:16 68:23,24
   73:7,9 76:22 77:6
   77:10,13,15,23
   78:1,2 81:4,7 82:7
   82:12,14 83:20
   85:10,24 86:6,8
   86:10,11,21,23
   87:8 88:16,19,21
   89:8,13,23 91:22
   92:1 93:13 94:4
   94:19 97:6,7
   98:13,14,19,25
   99:6,9,12,23
   100:1,6,9,11,23
   100:24 101:2
   102:19,24 103:4
   103:10,14,19,22
   104:2,3,22 105:4
   105:9,12,19,21
   106:4,12,13,18,21
   106:25 107:9,16
   107:18 108:8,11
   108:14 110:15
   112:14 113:2,3
   114:15,18,19
   115:1 117:3,4,9
   117:13,19,21
   118:5 119:6,8,15
   120:3,9,10,17,20
   120:23,24 121:3,8
   122:1,8,9,11,14
   122:16,21,25
   123:5,10,14,20,22
   124:3,6,14,20,22
   125:2,3,6 127:5,6
   127:8 128:5,15,17
   129:17,20 131:1,4
   131:24 132:4,10
   132:12,18 133:12
   133:14,15,16,17
   133:17,23 134:13
   135:7,8,15,18
   136:4,7,12,18
   137:1 138:5,6,21
   139:2,6,10,13,16

139:20,22,25
140:2,15 141:9,23
142:2 147:15
149:6,7 151:6
153:5,8,12 154:14
154:17,21,24
155:2,3,5,6
158:10,13 159:1,4
160:11,13,16,19
160:22 161:2,5,7
161:8 162:15,17
162:22,23 163:7
163:12,18,24
164:7,11,16,24
165:2,3 166:19
167:3,15,16,18,21
167:24 168:8,13
168:16 169:2,8,11
169:13,16,21,24
170:11 172:1,7
174:14,19,22
175:15,20,21,24
176:1,3,6,21,23
177:13,15,21
179:10,15 182:19
182:22,24,25
184:15,20,23,25
185:2,7,11,14,17
185:19,22 186:1,3
186:5,7 188:1,9
188:13,21,24
189:2,5,11 190:8
190:23 191:3,17
195:7,9,12,17,20
196:2,15 197:14
199:6,22 200:10
200:22 201:2,5,7
201:11,19,25
202:4,10,12,17
203:2,6,9 204:2,3
204:16,18,22,24
205:24 206:9,12
206:19 207:25
208:3,15,24 209:4
209:10 210:3,15
211:1,5,8,21,23
212:1,3,5 214:1

214:14 215:14
216:3,23 217:4,14
217:20
**Miller's** 138:1
196:24
**Miller's** 106:7
**Mine** 8:11
**minute** 3:23 98:10
122:6 169:7
**minutes** 114:2
119:7 124:21
147:1 148:2
216:20
**mirror** 27:5
**mismatch** 9:20
**misspeak** 42:25
**misstatement** 40:13
98:11
**misstatements**
95:21 96:13 106:6
107:10 130:21
194:12 196:17
197:18,21 202:19
**mistake** 192:1
**mistaken** 104:8
205:10
**mix** 132:8
**model** 205:9
**moment** 13:9 22:15
56:3 99:2 100:25
167:19
**Monday** 123:11
**money** 206:6 214:5
**month** 45:10,12,13
45:13,16,17
**monthly** 187:1
**morning** 13:13
14:8,9 18:17
29:24 55:16,16
108:22 215:10
**Morristown** 79:16
**motion** 1:7 3:3,5
5:15 10:18 11:17
12:6 13:1 100:16
100:20 101:11
104:16 125:22,23
130:17 138:15

197:1 204:5,8
207:14 211:13,15
212:17,20 217:5,6
**motions** 100:17
**move** 12:2 15:23
18:12 25:13 27:4
44:1 85:15 86:8,9
86:10,13 104:1
110:5 196:1 197:5
**moved** 133:21
**moves** 110:5
**moving** 96:13
**multiple** 49:13
87:25 88:15
144:24 145:8,11
146:14,22 147:25
148:22,23 171:20
**multitude** 50:5,9
**music** 58:16
**M-c-S-t-r-a-v-i-c-k**
13:16
_____
**N**
**N** 2:1 3:1
**nail** 95:18
**name** 13:14 24:5,20
29:22 30:14 43:7
43:23 46:12,12
73:19,24 96:6
120:13 127:1
140:6 142:5 176:9
176:11 180:25
**names** 92:25
**narcotics** 14:19
17:12 21:13 34:18
37:25 42:17 67:7
92:9 111:11 143:5
144:8 145:21
146:1 151:15,16
170:25 178:8,19
178:22 182:1
195:24 196:4,7
199:2
**National** 1:22
**nature** 144:5
184:13
**near** 72:3

**necessarily** 48:16
106:10
**necessary** 167:10
**necessity** 207:18
**need** 12:8 17:17
76:25 99:7 139:14
190:11,20 203:25
204:4 206:6
214:25 217:19
**needed** 183:10,11
**needle** 84:25
**needs** 11:13 55:6
217:7
**neutral** 197:9
**never** 5:10,13,13,16
162:3 190:1 191:9
191:11 214:10,10
**new** 17:13 79:16
161:20 162:9,10
162:25 163:2
164:20 165:7
166:6 193:11,11
196:10 200:2
208:16,17
**night** 84:23 97:16
98:6 129:8 183:23
184:11 194:1
199:7 211:14,17
**night's** 24:19
**nineteen** 142:19
**nitpicks** 197:19
**Nixon** 67:3,3
**nominal** 17:20
**Nope** 172:15
**normally** 45:10
152:20
**northeast** 60:5,12
109:25
**nose** 178:20
**notation** 10:10 48:5
115:7 187:6
**noted** 54:8
**notes** 37:13 47:23
117:13,13,14
119:24 206:1
**nothing's** 110:4
**notice** 103:12

**notion** 199:22
**November** 15:3,4,5
18:13 24:13,14
29:12,15 33:13
61:9 65:11,21
67:18,18,18,20,21
69:20 108:21,22
110:21 111:21
118:20 155:24
161:12 164:4
166:5 170:10
173:20 183:8,16
198:1
**number** 4:10,10
5:1,7,8 37:21,23
39:1,10 41:1,2,3
43:4 48:16 54:18
54:20,22 58:9,11
64:11 66:2 75:19
78:23,24 79:12
83:7 87:10,11
88:13,13 89:1,3
89:25 90:1,3,6
99:15 100:8 104:4
104:6 108:16,16
129:10 130:13
150:8 160:6
176:16 179:17
180:2 189:24,25
191:6 206:4
**numbers** 3:16,17
4:3,4,5 9:11,12
161:25 162:5
192:13
**numerous** 66:4,5
70:19,24 90:20
109:15 110:5
116:23
_____
**O**
**O** 3:1
**oath** 83:16 107:15
**obedient** 181:23
**object** 8:19,21 13:8
46:25 54:6 62:6
93:21 100:14
120:15 124:8

126:22 158:25
172:1,3 184:13
**objecting** 117:10
**objection** 8:2,3
16:3,4 19:2 22:6
25:15,16 38:22
40:20 73:4 85:19
91:19,25 92:15
93:10,22 102:18
114:13,24 117:8
119:6 120:2
121:19 135:12
147:11 149:4
162:12 163:3,10
166:15,25 168:24
169:6,20 170:4
187:24 189:14
**objections** 62:7
**objection's** 153:10
**objection's** 54:8
**observing** 164:5
**obtain** 16:8 17:10
66:19 128:6
**obtained** 3:19,20
4:19 5:1 16:8
47:6 102:7 103:16
**obvious** 207:12
**obviously** 11:12
45:17 63:24 68:10
134:3 173:17
**occasion** 45:20,21
179:8 186:18
**occasions** 178:17
**occur** 212:18
**occurred** 116:24
151:1
**October** 206:23
207:1,22 208:2
209:12,20
**odor** 21:13 115:6
178:8,19,21
181:23
**odors** 181:7
**offense** 55:17
**offer** 62:17 95:22
105:24 126:1,4,10
133:25 134:6,12

134:17,22,23
135:5,22 153:4
164:2 167:4,8,9
**offered** 62:10
**offering** 134:17
136:1
**office** 1:10 15:8
17:15,15,19 18:1
19:12 28:9 34:18
34:23 38:1 39:6
39:12,21 43:10,15
43:16 48:16,18,19
49:23 58:8,18
67:6 69:11 70:2
70:21 72:21,24
73:3 74:10,14,20
85:2 88:3 90:10
91:11 109:8,11,17
109:19,21 110:4,4
110:11 111:25
112:3,7,10,16
113:8,10,16,18
116:2,4,8 117:15
118:22 119:17,21
119:22 142:16,21
143:12,12,19
144:25 145:2
147:2 150:3,10,11
152:3,7,8 156:17
166:22,23 171:20
175:5 184:6
191:20 197:10
198:2,21 200:17
**officer** 46:23 47:15
47:15,16 48:9,24
120:12 136:2
193:11 202:2
**officers** 82:24
**offices** 1:13 65:22
109:22 194:25
**official** 218:4
**oh** 27:1 34:1 37:12
46:19 55:13 58:12
77:10 83:13,13
90:15 97:20 99:6
100:9 123:5 153:5
153:21 160:2

185:15,18 212:1
**OIG** 142:13,15,15
**okay** 4:13 8:2,24
13:17 18:10,12
20:10 23:8 26:12
26:19 27:1 28:15
28:24 29:5,10,10
29:18 30:8,24,24
31:16,16,16,16,18
31:25 32:11,11,15
32:15,15 33:3,8
33:18,22 34:12,15
34:15,15,15 35:1
35:4,8,14,15
36:19,25 37:12,20
37:20 38:11 39:9
39:15 40:23,23
41:12,19,19,24,24
42:5,9 43:9,19,22
44:4,7,8,8,15,21
44:21,21 45:19
46:15,15,22 48:4
48:14 49:7,10,15
49:18,22 50:12
53:11 57:8 58:1
58:10,12,17,21
59:2,6,9,10,18,21
59:21 60:6,10,17
61:3,15,25 63:21
64:3 65:1,1,1,1
66:7 67:17,25
68:4,4,4,8,11,14
68:23,23,23 69:2
69:5,9,9,13,15
70:8,25 71:7,13
71:13,14,18,18
72:5,5,24 73:10
74:14 75:5,7,13
76:10,16,21 77:16
77:19 78:22 79:8
79:17,18,22 80:13
80:16,16,19,19,19
80:19 81:9,12,25
81:25,25 82:8
83:5,5,7 85:24,24
85:24 86:21 87:3
87:8,20 88:10

89:13 90:3 91:22
93:3,5 97:15,25
99:13,21 101:14
102:19,24,25
103:4 108:11,24
110:16,25 111:18
112:15 113:2,20
113:24 114:5,20
115:7,10 116:7,19
117:3,19,19 118:4
118:5 124:10
129:7 131:1
132:12 139:7,22
141:20 142:10,17
143:10,16 144:5
144:21,23 145:7
145:25 146:2,18
146:24,24 147:3
147:19 149:21,24
150:21 151:12,22
152:17,23 153:7
154:13,21 155:11
155:11,12,12,19
156:2 157:1,8
158:7,10,10,10,10
158:11,14,16
159:1,5,13,14,14
159:17,17 160:3,8
160:17,21 161:1,7
161:17,24 162:7
165:2,12,18,18
166:8 168:19
172:7 174:15
177:3,9 178:1,4
178:10,13 179:1
179:11,22 180:1,3
180:3,15,17,17,23
180:23 181:3
182:11,16 183:21
184:5,8,18 185:1
185:18,19 186:13
186:18 191:1
193:5 195:23,25
196:15 201:11
203:5 208:14
213:25 214:6,11
214:16,18 215:8

216:2,20 217:20
**old** 45:5
**omissions** 47:12
**once** 6:11 28:6 40:2
59:13 61:5 67:4
68:15,16,25 69:2
75:8 85:1 110:6
123:24 157:11
**ones** 11:4 74:9
**one's** 72:10,11,11
**opened** 65:12
124:13 199:13
**operate** 58:6
**operated** 147:23
150:12
**operation** 151:3
**opportunity** 3:8
125:4,8,11 126:17
192:2 205:22
208:16
**opposed** 172:22
210:20
**opposing** 13:1
134:18
**opposite** 134:18
**opposition** 121:1
127:12
**oranges** 132:8
**order** 7:11 21:19
34:9 67:7 75:12
92:9 95:20 96:19
96:20 126:1 132:1
150:1,6 198:17
205:5 210:19
**orders** 139:9
203:12,13
**origin** 63:15
**original** 123:3
**originally** 103:23
129:5
**originals** 28:8
**Orms** 218:3
**outlined** 191:14
**outside** 156:11
**outstanding** 13:1
**overruled** 19:3
63:5 153:11 170:5

172:5
oversees 109:11
o'clock 116:22,22
  116:23 129:6,8,9
  130:14 136:22,23
  136:24 158:18
  193:25 195:18
  215:25 216:2,5,6
  216:10,23
o'clock 75:3,5 83:2
  97:16 98:6

**P**

P 3:1
pa 1:4,12,14,24
  182:14
pack 117:14 159:6
package 3:15,16
  4:3,4,8,9 5:10,12
  6:1 7:16 9:12
  11:22 17:3 35:20
  36:1,4,7,8 37:21
  38:6,15 39:1,4,6
  39:10,16,17,19,23
  40:7,10 42:20,20
  46:17,17,23 47:17
  48:6,11 49:7,8,10
  50:2,3,6,8,13
  54:18 59:8 60:19
  62:22 63:14,15,17
  63:17,22,24 64:2
  64:10,16 65:6,20
  66:8,8 67:19
  71:19,21,22 72:6
  73:11 75:8,15,18
  75:19 82:8,9,9,18
  82:23,25,25 83:7
  87:1,3,10,11,17
  87:24 90:6,19,21
  92:4,5,13,22 93:9
  98:9,20 100:5
  101:4,6 103:5
  104:4,5,8,13,25
  105:21 107:4,23
  108:3,15,16,24
  109:6 110:18
  111:12,24,25

113:4,5 114:1,8
114:10,10,11
116:17,24 117:15
129:6,8,10 130:12
133:6 146:9,10,12
147:9,23,24 148:8
149:1,13,14 150:1
150:6,9 157:18
158:16,17,19,21
159:18 160:3,9
162:8,25 163:1
165:6 166:4 168:3
170:1,8 182:15
183:15,16,18
186:8 189:16,17
191:9,10 192:13
192:16,19,20
193:7 201:12,13
202:5
packages 9:13 32:5
  37:3,4 48:6,23
  50:10 59:2,10
  60:6 61:2,16
  63:10,11 66:9
  68:15,15,16,25
  71:12 81:16 83:22
  87:6,25,25 93:17
  105:16 110:5
  112:6 117:25
  118:2,2,16 119:17
  144:19 146:14,16
  146:22 147:25
  148:3,10,18,22,23
  149:16 154:2
  166:24 173:7,20
  182:12 186:10,16
  186:19 192:8,8
  193:4 194:17
  198:1 199:13
  200:6
packet 5:7 7:25 8:4
  32:25 60:25 99:22
  159:7 161:3
page 2:10 6:21 10:6
  25:21,24 26:25
  27:11,23,25 29:2
  29:5 30:4,20,21

31:20,24 32:16,16
32:17,22,23,24
33:4,5,6,6,7,7,10
34:2 35:17,20
37:22,22,23 39:18
40:19 75:25 76:1
76:2,2,3,11,12,13
76:14,15,17,18,19
78:14 80:20,21
81:12 82:16 83:6
83:9,10 86:16,17
104:10 123:23
128:4 155:21
161:2 168:14
185:20
pages 78:5,11
  204:9 206:4
  208:17
paper 11:24
papers 10:21 102:2
paperwork 118:16
paragraph 32:3,20
  33:11 34:16 37:23
  76:6,7,10 77:20
  78:24 79:9,11,12
  79:21,24,24 80:9
  80:10 82:15 83:9
  197:20,20
paragraphs 79:18
  80:20 86:13
paragraph-by-pa-
  47:10
parameters 44:13
  44:15 128:16
parcel 4:5 5:7,8
  15:5 16:22 30:25
  33:13 34:17,23
  36:15,21 37:24
  39:10 40:3 41:1,2
  42:6,10,12,16
  43:3,5,18 54:18
  54:19,19 61:6,8
  64:13 65:12,15,16
  66:12,17 67:2
  73:13,16 74:11
  79:1,14 87:10
  89:17,18 100:8

110:2 111:5,17
112:19 113:8,10
113:15,16,17
115:6 144:14
155:15 159:10
168:3 179:17,18
179:19 180:4,4,5
180:7,12,13
181:12 182:5
190:1,3,5 193:24
198:4 199:10
parcels 14:19,22
  41:21 58:8,19
  61:6,17 65:18
  66:14 70:24 74:7
  74:11,20 75:1
  84:6 109:15
  118:20,21,22
  119:21,22 144:10
  145:12,13,14
  156:11,13 178:9
  178:16,24 179:1
  179:20 180:9
  181:17,22 183:10
part 4:23 14:21
  62:20 75:22 92:12
  99:17 101:10
  104:7 119:18
  127:13,23 128:3
  144:25 145:1,1
  186:22 190:2
  202:15 212:11
participated
  170:25 199:12
  202:15
particular 16:13
  17:12,24 43:3
  45:15,19,21 50:12
  72:16 73:19,22
  74:10,11,11 89:4
  94:13 102:21
  104:25 132:21
  148:17 165:4,5
  170:1 179:18
  183:2,3,5,6,7
  185:20 192:16
  193:7,23 194:15

195:15,15 200:24
particularly 194:23
  209:23
partner 48:25
parts 144:24,24
  145:8
party 52:2,3,5,7,10
  125:11 178:1
  190:9 206:13
  209:25 211:9
  213:11 215:19
  216:5
party's 54:2
passing 199:7
path 148:8
pattern 144:16
Pause 50:19 99:11
  101:1 122:7
  139:21 141:10
  167:23 176:2
  182:20 184:24
  186:2 189:6,9
  191:16 204:23
  207:24 208:5
pay 65:16 186:11
paying 65:18
payment 65:15
PEDRO 1:10
pen 185:11
penned 201:3
Pennsylvania 1:1
  34:19 38:1 39:13
  79:3 84:11 107:11
  116:2 118:23
  142:9 143:1,7
  144:9 172:25
  191:11,24,25
  192:1,14 193:10
  196:6
people 72:21 73:10
  92:25 139:8 157:4
  171:19
percentage 182:10
performed 96:22
period 111:7
permission 56:15
  176:4 188:19

permitted 77:24
person 49:19
  109:10 148:5,9,11
  148:20,21 150:14
  150:18,19
personal 92:18
  163:16,19,21
  164:6,8,11 174:12
personally 119:21
pertains 160:4
pertinent 127:23
  128:3
pest 91:19
ph 3:14 12:19
  24:10 43:20 54:18
  55:1 73:12 74:2
  89:21 111:16
  112:16 116:11
  131:15 194:1
  212:13
Philadelphia 1:4,12
  1:14,24 14:20
  19:10 21:6,9 32:6
  35:21 37:5 38:6
  38:16 40:8,10
  50:3,7,11 59:9,14
  59:17 60:8,20
  62:1,2,4,22 63:11
  63:12 64:14 65:24
  81:16 83:23 84:7
  87:4 89:18 90:22
  97:15,16,18 98:5
  107:24 108:17,18
  108:21 110:6
  130:13 136:22,23
  153:18,19 156:14
  157:4 158:17
  162:24 163:1
  164:22 165:20,24
  170:2,9 172:22,22
  172:25 173:7,9
  190:4,6 191:19
  193:25 195:22
  196:5 199:4,23
  200:6 201:14
  202:6,8
phone 22:22 23:6

23:10,11 24:6
  27:8 41:20 74:17
photo 61:20
photograph 63:12
photographs 118:1
physical 117:22,24
  132:20 212:22
physically 18:17
  68:16 70:2 71:17
  84:21 108:2 215:9
pick 150:15
picked 90:11,18
picks 193:3 195:3
picture 61:13 63:14
  63:15,17 66:19,20
  148:11
pictures 61:15,24
  61:25 119:24
piece 133:3
pieces 58:19 144:1
pins 212:7
place 147:2
placed 23:5 53:1,6
  99:14 131:16
  212:7
places 196:6
plain 57:19
plainly 37:1
plan 19:15,21,23
  20:17,19 21:18
plane 49:9 60:18
  70:22 71:1,5,17
  72:17,20,22 83:22
  88:1 109:3,6
planes 32:5 37:3,4
  49:9,13 71:6 72:9
  72:15 81:16
  201:13,14
plant 63:20,21
Plaza 184:6
plea 52:25 54:2
plead 52:22
please 3:23 13:11
  22:15 33:9 37:19
  51:23 53:15 54:6
  56:4 78:10 85:16
  86:10 107:21

108:19 123:9
  140:9 144:21
  168:12 175:18
  176:7,8,13 177:17
  182:18 188:6
  196:14 201:10
  206:10
pleases 51:21
plus 84:23
Plymouth 79:2
point 23:9,11 34:21
  38:19 51:11 61:12
  63:15,18 65:7
  66:8,10 72:6
  75:14,17 76:23,25
  78:10 79:9 96:20
  98:18 103:1
  107:23,24,25
  108:1,2 113:14
  116:17 129:16
  132:14 137:9
  138:10 157:13,20
  181:5 183:8
  191:18 199:11
  200:22 210:23
  213:9 214:1
pointed 197:7
  210:18
pointing 87:13
  150:1
points 168:1 196:1
  196:16 205:6,9
policies 114:23
  166:20 180:18,20
policy 180:22
polite 190:24
political 176:25
portion 168:20
position 106:8
  202:14
positive 36:22
  65:19 78:8 115:5
  131:17
positively 21:16
  75:1 115:5
possession 36:22
  52:17,20

possibilities 164:4
possible 162:8
  163:8 164:19
post 49:23 58:8,18
  65:22 88:3 90:9
  91:11 109:8,11,17
  109:19,21,21
  110:4,4,11 143:19
  144:25 145:2
  147:2 150:3,10,11
  171:20
postal 7:24 13:18
  14:11 26:1 34:17
  37:25 39:11 49:22
  57:6 58:4 62:19
  66:1 71:4,5 90:21
  91:4,4,7 93:15
  97:11 98:5 110:8
  110:8 114:23
  119:18 128:25
  129:23,24,25
  130:4,7 131:4
  136:19 142:12,13
  142:17,25 143:8,9
  143:11,13,14
  144:7,12 147:4,5
  147:12,16 148:25
  149:4,8,10 150:21
  151:8,9,12 152:13
  154:11 155:16
  156:17,23 157:5,9
  157:12,16,17
  161:24 164:13
  165:22 166:3,22
  168:1,2,8 172:10
  174:23,24 175:5
  181:18 187:7
  191:20,21,22
  196:9
practicing 54:6
preliminary 128:8
  130:9 133:1
preparation 114:7
  204:7
prepare 17:6 19:13
  34:6 69:10 112:20
  203:13,25

prepared 15:6,7
  19:16 33:18 34:4
  34:9 35:12 69:5
  69:15 75:8 124:17
  125:16
preparing 69:3
  70:22,25 121:14
presence 21:13
present 11:14 48:9
  48:14,22,22 49:3
  92:21 93:1,3
  94:22 128:15
  135:18 138:10
  164:8 166:12
  179:1 180:9
  215:19,22
presented 9:6
  11:18 19:16 21:10
  32:7 37:6 40:11
  41:9,14 42:12,16
  42:19,21 46:23
  48:10,11 54:17
  69:7,16 81:18
  83:24 85:3 93:24
  96:8 98:22 114:11
  137:12,21 147:5
  178:16 194:21
  199:8,11 200:4,15
  201:20 208:12
  212:10
presently 37:24
  39:11
presumably 202:3
  209:15,19
pretty 6:9 49:19
  85:12 197:11
  211:18
prevention 148:16
previous 24:19
  45:13,17 169:19
previously 15:12
  18:18 86:14 92:23
  99:18 102:20
pre-prepare 33:22
  115:21
pre-prepared
  33:19 69:6

**prior** 36:16 45:13
60:25 61:25 62:2
65:10 69:6 74:20
74:25 85:7 92:5
93:7 113:15 114:7
116:14 119:2,22
135:10 142:10
145:14,15 180:12
187:20
**priority** 3:15 4:4,9
4:10 6:1 7:16,18
9:12 25:4,9 79:3
99:15 110:18
145:6,7,17,20
146:22 153:23
159:10 171:12,15
172:11
**private** 142:8
**probable** 6:13
10:20,23 11:17
35:11 94:5,8
95:12 98:7 102:11
104:17 115:24
129:4 130:20
192:12 197:2,5
**probably** 47:20
78:6 90:10 91:11
141:2 154:1,3
174:5 203:21
204:3
**problem** 55:19
56:21 77:12
152:21 206:24
209:7,22 214:22
**problems** 210:10
**procedurally** 51:6
**procedure** 24:3
62:11 93:6,8
134:5 180:22
182:4,6
**procedures** 93:14
94:10,12 95:9
114:23 154:8,9
166:21 180:18,20
**proceed** 10:16 12:4
14:4 17:23 19:25
21:5,17,19 54:16

56:7 57:23 63:6
100:11 125:1
140:14,16 141:24
141:25 175:23
176:20 182:22
189:8,10 209:22
**proceeded** 11:9
**proceeding** 95:19
134:3 199:18
**proceedings** 217:23
218:5
**proceeds** 3:12 4:18
**process** 63:1 66:25
74:17 87:14 90:22
95:3,8 96:18
127:25 132:17
137:10 144:19,22
**processed** 90:12
97:16
**processing** 59:16
59:18,21 63:20,21
161:12 165:14
**produce** 138:3
**produced** 193:22
**producing** 103:12
**product** 57:6 58:4
147:16 149:8
151:20,24 152:15
152:19 153:14
158:19 159:14,18
160:4 163:21
165:19 168:2
173:24 175:2
190:4 192:25
193:19 196:9,12
197:15 203:3
**production** 208:7
**proffering** 136:10
136:17
**proffers** 134:18
**proficient** 182:9
**progression** 103:24
**prohibited** 42:15
**projected** 209:24
**promise** 118:9
**promptly** 51:1
**proof** 53:15 62:17

95:22 105:24
126:4,10 134:22
135:23 214:19
**proper** 189:24
**properly** 11:9 96:5
**proposed** 203:14
203:25 205:20
208:8
**proposition** 128:1
**prospective** 141:12
**prove** 105:11
214:19
**provide** 47:4 53:15
95:22 126:3 140:5
176:9 217:10,12
**provided** 10:3
15:11 212:11
**provides** 66:3
**providing** 40:15
**pull** 121:17
**purchase** 65:20
**purports** 22:20
**purpose** 9:24 62:9
100:19
**purposes** 3:2 6:10
55:25 95:19 120:8
131:22 155:8
199:18
**Purton** 116:11
**put** 5:14 6:21 7:3
11:3,12,14,21
63:16 92:9 97:24
101:12 103:11
106:1 110:8,12
124:17 132:25
139:8 160:24
**putting** 178:19
**p.m** 1:5 23:19 26:9
27:9 28:4 29:15
31:9 32:8 34:3
37:7 51:5,5 75:3
81:18 82:1 83:2
118:19,20 119:22
124:24,24 156:5
158:20 166:4
169:16 170:3
198:4 201:13,21

217:23
_____
**Q**
**question** 42:18 46:2
46:2 73:7,8,8
82:20,21 83:19
88:20 107:20
108:10 114:21
128:18 135:12,15
158:25 162:21
164:2,3,19,25
166:10 169:19
170:6 172:6 194:6
198:2 202:14
204:20
**questioning** 47:1
62:8 106:16
**questions** 28:11
62:14 63:3 88:15
118:6 119:12
120:4 143:21
158:6 170:12
174:16 175:16
188:1,2,4
**quibbles** 197:19
**quickly** 109:16
**quite** 40:21
**quoting** 128:12
_____
**R**
**R** 3:1
**raise** 13:23 51:23
140:9 176:12
206:11
**ramp** 74:2,7
**ran** 45:25 179:23
180:2
**rate** 58:17 64:25
182:10
**reached** 17:16
**read** 18:3 23:17
26:7 27:13 34:22
34:24 35:24 38:2
38:5,8,9,13 56:16
70:3 80:2 81:14
81:22 128:2
135:13 137:19

161:15 201:7,9
**reading** 37:2
129:20 135:22
153:3 173:2 196:5
**reads** 32:5 76:10,11
76:12
**ready** 39:24 124:25
204:10,11 205:21
205:24
**real** 6:17
**realize** 111:6
144:15
**realized** 66:11
**really** 5:4 6:16 45:8
46:2,8 47:10 64:8
74:13 76:21 92:3
93:21 95:17,18
107:7 131:8
198:17 206:22
210:21,22,23
214:3,22 216:10
217:14
**reask** 82:20
**reason** 12:17 67:24
68:1 73:19,22
96:21 103:19
124:8 169:19
194:18 196:17
**reasonable** 148:4,9
148:11
**reasons** 95:14
120:16 207:12
**rebuttal** 139:17
188:17
**recall** 23:15 36:18
49:2,5 61:19
64:11 69:22,23
71:16 72:19 73:15
73:22,23 74:19
180:4 182:2
183:15
**recalling** 69:24
**receive** 15:9 43:17
124:6
**received** 16:6 25:18
50:22 51:10 67:20
70:9 97:8 107:24

108:1,2 122:24
124:1,3,12 147:10
157:4 158:16,17
173:21 180:24
181:3 193:21
200:7 208:17
**receiving** 67:4,11
205:22 206:1
**recess** 50:25 124:16
**Recessed** 51:5
124:24
**reckless** 105:7
126:15 128:9
130:11 138:4
**recklessness**
197:23
**recognize** 15:18
93:19 155:12
196:20
**reconvene** 51:1
124:18
**reconvened** 51:5
124:24
**record** 3:4 7:4 10:1
15:25 20:12 23:9
25:1 54:5 62:20
67:9 85:22 96:4
96:21 99:5 103:2
104:12 106:2
108:22 111:5
123:9 127:14
131:22 140:6
141:6 152:19
159:15,18 163:15
170:1 174:24
176:9 203:12
215:24
**recording** 218:5
**records** 7:24 9:16
46:1 87:19 98:6
98:12 116:20
118:14 119:18
128:25 129:23
130:5 143:13,14
143:17,24 144:1,4
144:12 147:4,5,12
148:25 149:4

168:3 169:25
191:22,23
**record's** 87:6
**RECROSS** 2:2
**RECROSS-EXA...**
119:14
**rectangular** 64:17
64:18,18
**red** 185:11
**redacted** 20:13
**redirect** 2:2 97:5
118:8,12 174:21
198:3
**refer** 42:23 127:14
147:12
**reference** 6:20 25:8
38:19 101:7
108:19 132:3,17
**referenced** 127:12
**referencing** 77:17
**referred** 29:1 42:11
48:11 49:7 75:21
176:24
**referring** 17:20
33:12 41:13 61:9
168:6 200:25
**reflect** 6:21 41:13
**regard** 9:16 86:15
156:20
**regarding** 48:21
54:18 55:23 101:2
102:15 121:1
127:25 129:10
132:1,14 166:12
173:24 200:2
213:16 216:11
**regardless** 181:23
**regards** 30:25
31:18 37:14 41:25
45:21 46:8 50:12
63:3 82:7 86:24
104:4 105:15
106:25 107:22
129:4 130:3
136:18 143:23,24
146:7 147:16
158:14 159:5

164:12 165:4
166:12,23 167:9
167:11,25 172:2
177:23 180:24
182:3 183:3
184:18 186:15
189:25 191:4,7
192:20 193:1,15
194:13 203:3
210:18,19 217:5
**region** 1:23 14:20
**regular** 91:5
**related** 100:20
**relevance** 94:3
166:17
**relevant** 102:8
138:14
**reliable** 95:23
126:4 135:24
136:1
**reliance** 107:6
**relied** 11:1 94:7
95:6,12 102:11
103:16 143:11
152:6 175:4 184:3
**relies** 197:8 198:20
198:21
**rely** 96:4
**remaining** 217:11
**remember** 187:7
**remembered** 23:16
**remote** 153:25
157:19 158:1
195:23
**removed** 157:3
**renew** 93:21
**renewing** 91:18
**rephrase** 22:24
162:20 164:25
**report** 9:20 184:16
184:17
**Reporting** 1:22
**representation**
138:4
**represented** 49:11
**request** 29:23
210:8,8 213:5
**requested** 19:23
36:24 84:3,8,12

85:5
**required** 20:2
**requires** 197:23
**researched** 152:4
**reserved** 162:19
**respect** 10:7,20
11:13,17 23:25
25:3 62:12 133:24
135:5,6 149:4
200:4
**respectfully** 135:5
**respond** 94:23
**responded** 217:12
**response** 7:5,7,17
11:8 178:21
**responsibilities**
177:6
**rest** 11:24 188:12
188:14
**rests** 120:8
**result** 3:12,19,21
4:15,16,17,19,23
70:9 101:13
103:16 143:11
152:6 175:4 184:3
**results** 65:19
**resume** 151:8
190:22
**retained** 145:1
**retired** 174:11
**retirement** 152:2
**retrieve** 71:18
73:11
**retrieved** 71:21
72:6
**return** 64:12
146:21
**revealed** 65:19
**revelation** 213:15
213:16
**review** 39:25 65:25
125:4,8,9,11
187:19
**reviewed** 20:23
35:10 36:6 97:22
138:11
**reviewing** 44:16

121:12
**re-swore** 198:14
**Richard** 111:16
**right** 3:22,25 5:25
6:7,24 7:2 8:8,10
8:14,22 10:8,14
10:15 12:5,20,25
13:23 18:8 21:23
28:6,12,25 29:25
30:11 31:13,18,19
31:19 32:13 34:12
34:12 35:22 36:1
37:20 38:14 39:10
40:24 41:22 42:2
42:3,6,15 43:12
43:24 44:5,13,24
45:2,14 46:10
51:23 55:4,21
56:3,11 57:2,20
58:14 59:19 60:15
61:11 62:19 63:5
64:24 65:1,4,6,17
71:19 72:3,25
73:3,25 74:9 75:5
75:10,13 76:6
77:22 79:4 80:17
81:14,23 82:11
83:2 85:15,21
86:9 87:1,25
88:10,11 89:24
90:16,23 92:4,12
92:19,22 93:3
102:24 103:18,21
105:5 106:20
107:17 110:14
111:15 114:6
115:19 118:1,2
119:13 120:3,9
122:12 123:2,8,12
124:5,15,19,25
125:21 127:5
129:15 130:25
131:3,5,22 136:25
137:4,24 138:8,17
138:18,23 139:4,7
139:19 140:1,9
141:14,19 145:23

151:5 154:23
155:1 162:22
164:10,18 165:16
165:24 166:6
168:11,15,19
169:9,15 170:13
170:22 171:1,12
171:17,23 172:20
173:8,13 174:1,3
174:8 175:15
176:12 178:20
180:23 187:6,11
188:12,16 189:7
191:2,14 193:6,15
195:16,19 196:13
197:5 200:20
201:25 203:1,8,11
203:24 206:10,21
211:8 213:9 214:7
214:17,24 215:3,4
215:6 216:4,7,13
216:17,22,25
217:18
**right-hand** 25:25
27:6 28:1
**robbery** 148:15
**robe** 53:16
**Robert** 1:13,13
120:23
**rock** 58:15
**rolled** 154:2 156:10
157:6
**room** 180:16 216:8
216:24
**roughly** 119:4
**round** 149:16
**route** 32:6 37:5
81:16 83:23 84:7
87:14 90:22 97:15
165:14 201:14
**routine** 110:4
**rule** 11:8 50:20
198:8,16 210:11
210:11 211:11
217:8
**ruled** 102:21,22
217:7

**rules** 56:16 140:18
**ruling** 82:10 104:23
107:1 114:16
167:13 204:5
210:19 211:13
212:19 213:1,10
217:5
**run** 62:14
**running** 181:21
**rushing** 99:4
**R-I-S-T-I-N-E**
176:11

**S**

**S** 2:9 3:1
**sack** 109:14
**sacks** 109:14,16
**Santa** 164:20
165:13
**sat** 131:6
**satisfy** 134:4
**save** 54:22
**saw** 63:11 103:24
144:14
**saying** 36:23 40:5
41:25 49:10 60:17
61:15 63:10 87:23
88:1,11 107:10
112:7 123:22
133:7 134:11,13
135:2,9 157:24
158:15 190:21
191:3 192:23
201:22 202:11,23
206:9 211:2 214:2
**says** 26:8,9 28:4
32:24 33:12,12
34:2 35:20 37:1,2
37:8 39:9,9 81:21
81:23 83:16 85:18
88:11 90:23 97:15
98:7 121:8 122:2
123:10,14,19
131:13 132:22
151:8 155:20
156:6,7 161:22
165:13 166:7,9

168:21,21 169:10
187:2 191:18
193:7,23 194:8
195:5,7,21 198:16
198:20 201:8
**scan** 87:14 88:4
89:17 92:11 97:14
97:14 109:18,20
110:8,12 131:14
132:1 147:23
150:6,16 154:7
156:12,15 193:12
199:15
**scanned** 50:4 59:3
59:5,10,12,18
60:6,24,25 61:1
87:3,11,14,18,20
88:2 89:24,25
90:12,18,21 91:17
92:4,14 97:17
109:6 131:14
132:21 133:4,6
147:25 149:19
150:4,9 152:20
156:11 157:21
158:1,19 161:19
161:20,22 162:24
163:1 164:9 165:6
165:19,23 168:22
170:2 193:1,10
194:24 195:14,18
195:21
**scanner** 88:11,12
88:13,25 89:3,25
90:1,3,9,11,18
147:23 149:22
150:1,5,13,14
152:22 161:23,25
162:2,3,4 166:7
193:3 195:3
**scanners** 90:11
91:12 150:23
**scanning** 153:17
**scans** 91:12 149:15
193:3,4 195:3
**scheduled** 208:13
**Sean** 2:3 13:15,25

26:1
**search** 2:12,14,14
2:14,16,16 3:12
3:18 4:6,12 5:20
10:2,4,4,19,25
14:22 15:6,7,22
15:25 16:1,9,13
16:15,16,20 17:2
19:13,19 21:19
23:20,23 24:1,6
24:15,17 25:2,2,7
25:8,23 29:7 30:3
30:5,9,10,12,20
30:25 31:2,11
38:3,4 41:14,25
44:9,12,25 69:3
78:9 80:4 87:21
92:6 101:3 104:5
112:20 115:15
116:18 118:15
159:21,22 172:13
178:17 194:11
198:7 199:20,20
**searched** 5:11,13
5:17 45:2,22
46:11,13 200:7,18
**searching** 96:1
**seat** 77:24
**seated** 14:2 54:3
56:14,15,18
140:13 176:19
**second** 27:11 30:4
30:20,21 39:2
41:2 42:9 50:18
51:7 52:11 67:1
72:11 76:11 79:5
98:13 104:10
122:5 133:18
146:19 150:22,24
160:24 168:11
182:18 188:13
191:15 204:22
**Secondly** 131:20
**seconds** 148:1
**Section** 52:14,16,19
52:21
**secured** 52:2,3,5,7

52:10 54:2 94:16
97:3 125:10 178:1
190:9 206:13
209:25 211:9
213:11 215:19
216:4
**see** 18:17 20:23
25:21 26:19,24
27:16,24 30:5
32:1,3,8,20 33:16
34:19 35:15,17
39:13,15 50:15,18
64:3,16 66:1
69:19 76:4,6,7,13
77:21 81:15,15
89:3,6 90:3,6,23
100:19 104:6,6
116:5,12 118:17
120:24 123:16,20
123:23,24 126:13
142:17,24 143:3
143:10,23 144:18
145:13,13,14,18
146:4,7 148:17,21
148:25 149:15,16
153:20 154:17
155:16,19 156:6
159:17,17 160:3,8
161:13,14,18,21
161:21 165:7,12
165:13,16 168:4
178:23 180:8
184:19 187:19
191:10 193:14
**seeing** 64:21 149:18
153:17
**seek** 105:23 212:19
**seeking** 3:6,10
100:18 103:8
**seeks** 137:16
**seen** 20:15 111:12
**sees** 121:25
**seize** 14:21 101:4
**seized** 4:15,16 5:10
5:13,16 65:12
101:6 200:19
**seizure** 102:1

**selection** 206:19
  209:16
**semblance** 198:15
**send** 84:9,12
**sense** 195:2
**sent** 15:8 17:14
  79:15 109:17
  115:16 120:18
  121:17 124:12
**sentence** 32:2 33:9
  33:11,12,16 37:24
  40:6 79:20,23,23
  80:9,11 81:13
  82:16 83:9,10,16
  83:21 84:15
**separate** 178:16,17
  178:24
**September** 1:3
  120:19 123:10,11
  125:5 127:13
  204:1,11 206:18
  208:13,23 218:7
**sequester** 139:15
**sequestered** 12:8
  12:23 139:18
**sequestration** 12:7
  13:9 140:18
**service** 14:11 34:18
  37:25 39:12
  142:24 151:9
  155:16 171:1
**set** 206:18 207:9,14
  207:15 215:12
  217:11
**setting** 48:23 49:1
**Settlement** 3:14
  43:7
**Settlements** 24:8
  24:16 46:1 66:22
**Seven** 79:13
**Shabazz** 123:15
  215:4
**shape** 155:13
**sheet** 116:10
  155:14
**Sheila** 218:3
**she'll** 126:9 133:25

**she's** 84:4
**ship** 65:23
**shipping** 92:10
**ships** 199:7
**short** 62:19 189:19
**shoulder** 211:19
**shouldn't** 85:6
**show** 20:3 24:23
  101:19 105:12,14
  105:14,15 130:3
  132:25 135:3
  194:7 200:12
**showed** 43:6
  200:10
**showing** 65:19
  128:2,8 130:9
  133:1
**shown** 194:3,7
  198:22
**sic** 62:23 123:16
  127:3 160:5
  202:12
**side** 26:1 27:6,7
  28:1 71:17 203:13
**sides** 95:16
**sign** 11:10 24:19
  26:3,17 29:22
  30:13,20 31:13
  102:6 198:2
**signature** 25:24,25
  26:7,11,19,24
  27:6,7,14,17,19
  27:20,24 28:2,3
  30:5 42:1 96:6
  218:11
**signed** 6:18 11:6
  18:21 24:18,20,20
  24:21 26:4,6,18
  29:14,14 30:9,12
  30:16,25 35:9,9
  47:7 96:5 116:15
  189:18,23,23
  191:6 193:18,24
**similar** 145:11
  146:20 148:7
**Simmons** 1:5 14:15
  14:18 111:10

155:16 177:24
  178:1
**simpler** 82:22
**simply** 9:25 11:24
  95:24 99:4 124:11
  126:11 135:2
  144:23 164:2
  191:4 214:13
  216:18
**simultaneously**
  97:8
**single** 101:25 102:1
  102:15
**singled** 132:22
**sir** 3:7,24 17:21
  20:5,16 24:25
  27:15 28:22 29:1
  29:4,9 30:1,7,18
  31:23 32:10,14
  33:17,21 34:20
  35:7,23 36:2
  37:20 38:17 39:7
  39:14,19 41:3,6
  41:23 42:8 43:2
  43:21,25 44:11
  45:4 46:7 47:22
  47:24 48:19 49:21
  49:25 51:15,17,20
  53:22 55:2,5 56:5
  56:9,10,13,19,20
  56:23,25 57:1,4,7
  57:17,25 58:5,20
  59:1,11 63:9,13
  69:8 70:7 72:4
  74:24 75:6 76:24
  77:22,25 78:18,24
  79:12 80:4,12,18
  81:1,11,22,24
  82:12 83:12,21
  87:2,12 89:2,5,16
  90:2,7,14,17,25
  91:6,11,15 92:2,5
  93:2 98:14,25,25
  99:1,3,6,9,20,25
  100:11,13 102:19
  103:14 105:5
  106:25 107:16

109:8,23 110:20
  110:24 111:4,22
  112:2,5,8,22,24
  113:14,19,23
  114:4 115:9,22
  118:18 119:16
  120:21 122:9,11
  124:22 125:2,11
  128:5 132:12
  136:7,8 137:8
  139:17,24 140:3
  140:12 141:25
  142:3,11 143:10
  154:16 160:12
  161:5 163:24,24
  165:10 166:10
  168:13 175:25
  184:22 185:21
  189:4 196:15,16
  196:16 203:10
  206:12 207:23
  209:10 211:8
  213:12 215:2
  216:3
**sit** 56:11 96:16
**sites** 109:24
**sitting** 53:16,19
  209:13
**six** 151:14 180:10
  180:11
**smelled** 178:19
**sniff** 94:1,2 129:3
  180:7
**sniffed** 92:21
  117:25 129:6
  130:15 183:10
  191:21
**sniffing** 96:22
  132:2,16 178:20
**solely** 11:15 47:4
**somebody** 70:10
  112:18 116:7
  150:15 162:24,25
**somewhat** 10:11,12
  143:15,16
**soon** 124:18
**sorry** 8:17 9:5

12:15 21:24 26:14
  26:16,16,22 27:1
  31:21 39:4,5 41:4
  43:12 47:25 48:10
  50:14 51:22 57:9
  57:12 58:13,16
  73:21 77:10 79:6
  81:4,8 83:20 87:8
  89:8,13,14 90:15
  91:19 99:19 108:8
  114:16 117:9
  123:6,15 125:19
  127:4,17 145:3
  149:6 155:9 158:5
  158:12 160:25
  167:5 169:8
  175:10 177:16
  181:13,19 185:15
  185:18 188:11
  211:25
**sort** 43:15 95:1
  107:25 162:13
  197:13,14
**sorting** 109:17,19
**sound** 104:11 218:5
**sounds** 171:9
**Sozi** 1:10 23:12
  27:9 28:5 69:18
**speak** 3:8 140:20
  190:12,22
**SPEAKER** 216:15
  216:21
**speaking** 9:11 33:9
  43:1 62:7 75:18
  137:18
**special** 142:12
**specific** 173:12
  182:6
**specifically** 3:16
  4:22,25 11:4 46:3
  71:4 75:19 79:20
  83:6 93:14 94:24
  101:5,5,7,8
  116:23 129:10
  130:3 143:23,24
  179:23 181:17,24
  182:2 186:24

187:10,17 189:15
192:4,6,13,25
196:10
**speculate** 162:14
**speculation** 119:8
**speedy** 210:11,17
211:10
**spell** 13:14 140:6
**spelling** 176:9
**spent** 172:19
**spoke** 21:23 55:22
101:4
**spoken** 55:9
**stack** 154:19
159:24
**Stacy** 89:21
**staff** 54:17 57:16
100:2 116:4
**stage** 205:15
**stale** 45:5
**stand** 28:15 51:22
106:2 128:1
132:25 139:25
192:7 202:23,24
**standard** 80:4
**standards** 58:23,25
**standby** 19:16 22:4
85:3
**stands** 148:22
202:25 203:3
**start** 35:2 61:13
96:12 105:16,19
108:12 179:11,16
**started** 133:20
**starting** 76:17
101:15,16
**state** 3:4 37:21
107:2 122:18,23
191:11,25 197:23
212:3,21,22
**stated** 30:8 33:18
94:6 129:5 130:9
204:8
**statement** 85:18
128:9 130:10
136:1 150:25
151:1 156:20

202:25
**statements** 94:10
94:20 105:7 126:2
126:18,21 133:1
135:25 137:11
151:24 194:2
**states** 1:1,3,10
10:25 14:11 34:16
34:17 37:25 39:11
52:14,16,19,21
55:11 58:7 69:17
74:18 110:11,22
115:16 122:3
128:11
**stating** 87:15
**station** 60:3 111:6
**status** 213:23
**staying** 35:3
**step** 95:1 102:15
120:5 175:17,18
188:5,6 198:11
199:25
**steps** 16:24 17:9
65:14
**stipulate** 5:12
54:21 86:19
**stipulation** 86:24
**Stone** 186:9
**stop** 33:14 131:21
**stops** 214:25
**store** 67:4,6
**stream** 61:12 63:16
67:22 133:16
144:2 145:15
194:23
**street** 1:11,14,23
48:17 60:2
**stricken** 138:17
**strike** 138:15
196:20
**stuff** 44:19 58:23
**subject** 33:13 34:16
37:24 39:10 43:5
79:1,14 138:17
**submission** 23:24
208:8
**submit** 10:21 205:5

**submitted** 39:4,5
82:1 127:11
128:22,23 187:13
191:8 205:7,8
**submitting** 136:16
**subpoena** 12:16
**subpoenaed** 12:21
120:12 122:2,4
**subsequent** 44:23
**substance** 115:6
**substances** 79:2,15
98:9
**substantial** 95:5
128:8
**suggest** 86:5
**suggestion** 138:12
**suggests** 126:10
**Suite** 1:11,23
**summarize** 109:9
110:9
**summary** 95:25
**summation** 6:17
110:3
**sun** 196:11
**superseding** 51:7
52:11 212:11
**Supervisor** 116:11
**support** 17:6
**supporting** 7:23
**suppose** 44:3,6
**supposed** 43:17
56:15 149:19
158:5
**supposedly** 98:2
**suppress** 1:7 3:6,10
6:12 11:17 100:18
101:24 103:9
**suppressed** 101:10
197:12
**suppression** 3:3
5:18 6:10 10:18
138:15 197:1,24
198:17
**sure** 4:7 5:24 28:17
33:25 34:4,8,24
37:2 38:8,9,12
41:7 42:24 44:19

48:20 49:13 50:18
61:21 62:18,23,25
62:25 63:1,1 68:1
73:24 75:11,24
80:16 84:3 86:6
89:9,9 92:19
102:20 113:14
117:23 121:25
124:11 126:23
132:10 139:12
140:7,17 146:18
146:22 156:21
158:16 164:21
167:25 168:20
169:21 175:19
182:19,19,19
188:20,23 189:1
190:8 191:10
194:25 207:11
**Surely** 56:12
125:10 167:20
**surprise** 91:16
**surprised** 5:15
**surrounding** 173:1
**surveillance** 111:7
178:7
**suspect** 46:17 61:3
61:4,4 65:7 69:1
93:18 107:3
144:13,17,19
166:23
**suspected** 111:10
112:9 194:18
**suspicion** 42:17
148:12
**suspicious** 19:1
66:9,17 67:19,23
107:4,25 113:10
**sustained** 38:24,24
40:22 47:13 68:19
68:22 73:6 82:5
88:17 91:25 92:17
93:12 102:18
104:15,21 112:13
113:1 114:17,25
117:2 119:10
120:1 147:14

149:5 159:3
162:21 163:4,6,11
166:16,18 167:1
169:1,20 175:14
184:14,14 187:25
**swear** 18:18 116:5
**swore** 16:14 23:23
41:17 116:14
**sworn** 13:25 51:24
135:24 140:11
176:14
**system** 49:23 50:2
50:10 57:6,6,8
58:4,6,7,21,22
61:7 110:7 136:19
147:17,19,20,20
149:8 151:20,25
152:5,15,19
155:15 158:20
159:18 160:4
163:22 164:13
165:22 166:3,12
166:14 168:2,2,8
174:24 175:3
190:5 192:25
193:19 196:3,9,12
197:15 203:3
**systems** 153:15
173:24
**S-e** 13:15

**T**

**T** 2:9 78:4
**table** 28:16
**take** 16:23 33:1,1
55:17 99:3 118:11
124:16 132:8
133:20 138:24
144:11 148:8,16
157:13 163:20
167:22 203:15
209:8 216:19
**taken** 18:22 60:18
61:16 65:14 89:21
102:15 157:18,23
157:25,25 194:23
195:22 199:10

**talk** 68:2 86:2
189:13 190:18
198:24 217:17
**talked** 42:2 49:18
101:9 193:13
196:5
**talking** 6:22 17:19
18:7 21:24 26:24
26:25 75:2,17
76:23 82:25
110:10,18 116:22
128:24 131:9
133:21 135:17
146:13 153:2
156:9 164:21
179:12 194:1
209:2
**talks** 97:13,14
152:18,23 153:13
161:11
**tantamount** 138:4
**target** 144:10
171:16,21 172:2
172:11 180:12
181:12,17,24
182:5,14,15
**tarmac** 157:11
173:16
**task** 177:8 181:19
181:20
**team** 71:23
**technically** 210:23
**technique** 171:22
172:2
**techniques** 61:14
92:8
**tee** 80:1
**telephone** 18:15
26:10 27:9 31:3
84:4 199:12
**telephonic** 28:4
37:14 41:20
**telephonically**
17:17,23 21:25
22:1,2,3,14,16
23:19 29:13 41:10
41:15,17 70:3

**tell** 33:8 43:4 45:4,9
45:16,20 46:7,11
50:1 58:6 64:19
64:20,21 66:16
80:14 117:14
122:2 147:7,20,20
147:22,24 149:1
149:12,14 150:3,4
150:7,8,13 166:20
172:17 173:19
178:4,13,14
185:23 201:17
**telling** 73:25
106:23
**templates** 80:5
**ten** 74:6,18 82:24
84:23 124:21
216:19
**tens** 90:10
**term** 156:23 175:10
175:12
**terms** 27:13 94:2
96:19 107:6 127:9
131:10,25 132:2
164:1 169:17
207:18
**testified** 11:20
82:18 86:2 92:23
94:15 97:11,13
105:22 107:14,15
109:24 117:6
130:6 134:2 199:5
200:5
**testifies** 13:7
**testify** 12:21 22:16
22:21 82:23 126:9
129:21,22 130:2
134:7 136:14,17
137:1 164:5 199:3
207:13
**testifying** 22:9 47:4
163:16,20 187:20
**testimony** 96:8,22
96:24 97:19
100:20 102:14
117:23 119:20
121:20 126:25

128:19,20 129:13
131:1,7,11,25
133:25 136:10,13
137:15 140:24
141:14 173:24
192:4,22 193:2,5
194:14 199:8,9,9
200:9,13,16 206:1
212:15
**thank** 3:8 7:20 8:8
13:10,12,21 14:1
14:3,5 28:14,18
28:24 41:6 51:3,4
54:3,9,15 56:7,10
56:13,17,19,21,23
57:2,2,18,22 58:1
63:7 67:13 77:13
77:14,23 78:1
82:12,12 86:20
89:14 99:9,9
100:1,2,4 104:2
106:21 107:16
114:18 120:6
124:20,22,23
125:7 127:8
128:17 138:21
139:13,19,20
140:2,12 141:8,9
141:21,23 144:22
158:8 160:13
167:15 174:17
175:24 176:1,6,18
176:21 177:17,20
179:9,14 182:21
182:24 184:23
185:14,22 188:5,7
189:5,11 196:21
196:22 200:20
216:21 217:1,2
**Thanks** 186:1
**That'd** 87:10
**that's** 4:12 5:15,23
5:25 6:3,5,15 7:10
7:13,13,16,19 8:6
8:10 9:23 10:13
12:11 13:3 15:16
18:11 22:18 26:11

26:13 27:18 29:25
30:15,18 31:15
33:3 34:14,20
35:7,15,15,23
37:22 38:3 40:13
42:6,9,11 45:2
46:18,20 47:17
48:11 49:7,12
51:13 53:1,6,17
55:2,21 58:22
60:6,22 62:20
63:4 65:8 66:15
67:4 69:8,14
71:25 72:3 75:22
79:10,14 80:23
81:20,21,22,23
82:19 83:8 84:15
87:15 89:4 91:24
92:19 94:9,21
95:9,18 96:7,17
97:4 98:10 101:21
102:24 103:19
104:13,13,25
106:13,16 107:7,8
107:15,19 111:1
**theft** 143:5 173:15
**theirs** 194:22
**thereabouts** 129:7
**thereof** 28:25
103:15
**thereto** 127:25
**there'd** 5:17
**there's** 5:5 9:15,21
10:5 11:19 12:25
13:4 41:25 42:1
46:21 50:9 53:18
59:15,25 60:4,5
60:19 65:25 66:4
72:15 88:10 90:10
90:20 95:15 97:12
102:3,3,11 104:18
106:6 109:10,25
112:6,8,9
**they'd** 157:6
200:18
**they're** 21:4 37:6
47:7 59:4,15,18

59:22 60:13 69:2
78:6,19,22 80:14
81:17 83:22 95:25
96:15,16 98:7
106:6
**thing** 7:24 17:20
23:5 26:21 27:3,4
27:13 132:9
149:19,20 174:6
200:23
**things** 4:24 5:1
70:19,24 72:13
84:20 96:20
105:13 107:1,3
108:4 110:13
116:23 121:14
129:23 130:3
132:1 143:19,22
145:10 153:1
157:10 164:12,14
171:6,6,9 180:21
182:8 197:11,13
217:11,15
**think** 5:5 9:10,15
24:22 28:24 29:1
30:8 32:1 33:7,8
38:18 40:21 41:24
41:25 68:20 73:5
77:3,6,8 84:14
85:4 86:14 94:4
95:1,17 96:24
99:21 114:14
125:24 126:25
129:2,12,12
134:20 135:4
137:19 141:2
153:1 154:18
172:3 185:8 191:5
193:13 194:3
196:3,25 199:5
200:8,10,16
210:24 217:8,11
**thinking** 12:16
**third** 161:2 197:4
205:9
**thirty** 196:8
**thought** 22:14

139:1 190:21
**thousand** 84:23
**thousands** 74:7
90:10 147:13
**three** 6:22 7:19
9:13 20:9 25:4,9
79:6 159:20,21
160:5,7 173:18
178:16,23 179:20
192:7 204:9
**three-way** 23:13
**thrown** 95:16
**throws** 98:10
**tied** 107:7
**tight** 6:17
**till** 37:16 40:12
152:8,10
**time** 3:9 7:25 12:10
12:24 15:1 18:5
18:24 20:20,21
21:21 22:4 23:19
26:6 27:13 29:17
30:17 33:1,1,22
33:24 34:4,8,22
34:24 36:9,9,11
36:12,14 38:3,8,9
39:3,4,5,23 44:23
44:25 45:12 47:15
47:16 48:5,9 49:6
49:8 51:1,19
54:13 61:12,13
62:21 69:25 72:8
72:9,17,19 73:2
74:22,24 75:14
84:20 85:2 96:21
97:19,23 98:18
99:3 107:21 108:2
111:7,18,20 112:3
113:12,14,17,20
113:21 114:21,22
115:8 117:14,15
117:16 118:6,11
118:24 119:2,16
121:18 122:17,23
123:4,4,9 125:8
125:17 132:1,9,14
132:16 133:18,20

136:6 138:10
142:4,24 147:9,24
149:1,14,17,18
152:10,23 153:13
153:18,18,20
154:1,9 155:25
156:4,14 158:15
161:12 164:9
167:22 169:3
172:19 179:2,25
181:18,21,25
182:12,14,14
183:1,24 184:8,13
186:13,14,16,17
186:23 187:10
188:10,15 190:20
190:21 193:16
194:17 198:6
199:17,19 200:6,7
203:15,25 204:11
206:1,6 207:3
209:24 210:5
215:13 217:12
**timeline** 47:5 84:2
85:5,25 86:1,1
107:22 108:4,5,13
**timelined** 84:19
**timelines** 121:13
**times** 63:25,25
106:8,11 132:14
**timing** 62:11
114:14 197:19
**titling** 55:24
**today** 6:10 10:21
117:7 121:14
130:7 173:14
187:14,20 205:1
207:8 208:12
211:20
**today's** 206:5
**today's** 23:18
**told** 18:14 29:11
90:16 97:24
183:10 211:19
216:11
**tomorrow** 214:24
215:4,10,25 216:9

216:22,25
**tonight** 32:8 37:7
81:19 83:25
201:21
**top** 26:1 32:2 34:2
76:8 78:12 82:2
**totality** 94:15
**touch** 70:10 96:9
212:13 213:7
**touched** 110:12
**tough** 161:15
**township** 177:1,2
**trace** 149:13
**track** 58:8,18 168:2
**tracker** 17:10 18:8
18:9 100:19
**tracking** 9:22 49:23
50:2 57:6,6 58:4,7
58:9 62:20 64:11
66:2 78:21,23
98:5 99:14 100:15
101:12,16 103:20
111:4 143:24
144:1,3,11 145:8
147:16 149:8
151:20,25 152:5
152:15,19 153:14
155:14,15 158:19
159:15,18 160:4,6
163:21 165:22,25
166:3,11 168:1,2
168:8 173:24
174:23,24 175:2
190:5 191:21,23
192:25 193:19
196:3,9,12 197:15
203:3
**traffickers** 67:7
**trafficking** 52:18
177:19
**train** 181:22
**trained** 182:3
**training** 11:20 34:6
43:13 66:15 67:5
180:24 181:3,4,6
181:7,14 182:1
**transcribed** 203:12

**Transcriber**
218:11,17
**transcript** 203:16
203:17 208:7,10
218:4
**transfers** 154:10
**transit** 19:11
**transmittal** 20:24
**transmitted** 33:25
34:10 36:13
121:18,25
**transmitting** 20:21
**trial** 204:6,17,21
205:4 206:16,17
207:9,11,13,18
208:13 209:17,23
210:11,17 211:10
216:13
**tried** 212:12 213:7
**trouble** 54:23
**truck** 61:1
**trucking** 58:11
**true** 9:23 39:16
43:16 80:17,20
83:8,14 86:15,19
90:8 192:19,20
**truth** 83:16 105:8
126:16 128:10
130:11
**try** 47:10 95:20
106:2 125:25
126:1 166:11
**trying** 4:21 9:25
32:21 47:2,2
62:23 64:8 74:12
74:12 84:1,24
91:20 94:22 96:12
99:4 101:23
105:10 121:17
123:6
**Tuesday** 1:4 150:13
203:18
**Tulante** 1:10 3:24
5:14,20,23 6:3,19
6:25 7:3,10 8:3,16
8:18,24 9:19,24
10:17 12:5,13

13:3,8 14:5,7
15:10,23 16:7
17:25 19:6 20:6,8
20:11,14 22:9,11
22:18,23 23:1,12
25:1,13,19 26:15
27:2,10 28:5,10
31:10 32:12 38:22
40:20 46:25 51:10
54:21 55:23 57:10
62:6 68:18,20
69:18 73:4 75:10
77:3 82:3,6 84:13
85:19 86:18 87:5
88:14,18 91:18,23
92:15 93:10,19
94:25 96:24 97:4
97:10 100:5,7,10
100:14 101:8,22
103:25 104:11,16
105:23 106:5
112:11 114:13,24
115:17 117:1,8,10
118:7,9,13 119:11
120:2,7,15 121:15
121:16,23 122:13
122:15 123:13
124:1,7,10 125:24
127:2,16,19,21
131:5,6,23 133:8
133:10,13,19,24
134:15,21,24
135:4 137:6,7,9
137:25 138:18,24
139:7 140:21,25
141:4,7 147:11
149:3 152:25
153:7 158:24
162:12,16,19
163:3,9 166:15,17
166:25 167:2
168:24 169:5
170:4,14,17 172:8
174:15 175:13
177:10 179:7,12
184:12 185:5
187:24 188:3,18

196:23 200:3,25
201:3 202:2,14
207:5 211:11,12
211:22,24 212:2,4
212:6,25 213:3,6
215:11,17,20
216:2 217:1,10
**Tulante's** 40:9
**turn** 27:11
**twenty** 119:7
213:10
**twenty-five** 142:14
196:8
**twenty-four** 142:13
212:24 213:21
**two** 7:5 11:4,25
19:4,8 21:6 23:20
24:6 41:8 45:10
59:15,16 61:16
65:22 66:9,14
68:7 70:24 72:15
74:11 77:17,20
78:5,11 80:10
84:24 87:6,21
118:19 119:21
134:17 140:16
141:12 153:22
168:1 173:25
174:19 183:17,18
189:25 191:7
198:1 199:7
200:17 205:2,3
208:23 209:5,5
**type** 7:24 42:14
44:9 59:4,7
107:22 108:3
151:3 171:6 192:3
202:21 214:20
215:15
**typical** 155:14
**typically** 171:14

**U**

**uh-huh** 27:1 71:2
79:19,25 87:23
100:3 147:6
**ultimately** 18:21

21:1,11 63:3 67:1
138:11 214:25
**Umm** 122:10
**Um-hmm** 156:1
**unable** 146:4,4
**unavailable** 209:9
209:15,17,21
**unconstitutional**
104:18
**uncontradicted**
199:19 200:16
**uncontroverted**
132:13
**underlying** 169:18
**undermined** 138:2
**understand** 5:17
9:24 23:21 33:3
47:8 51:7 62:23
66:7 74:9 76:24
80:6 82:8,10
84:22 85:11,11
94:19 95:13,15
96:3,18 99:5
101:23 102:25
105:4 106:18,19
107:9 133:9,10
134:11 141:15
163:23 171:22
204:19 206:14
208:24,25 210:15
210:16,16,16
215:1
**understanding**
52:25 169:22
204:14
**understands** 63:1
**understood** 23:22
38:20
**unfamiliar** 174:25
192:24 196:11
**unfortunately**
207:6
**UNIDENTIFIED**
12:19 216:15,21
**union** 157:10
**unit** 177:7
**United** 1:1,3,10

10:25 14:11 34:17
37:25 39:11 52:13
52:16,18,21 55:11
58:7 69:17 74:18
110:11 115:16
128:11
**unpacked** 177:12
**unring** 138:9
**unsigned** 47:7
**update** 45:21
**updated** 44:17,24
45:3 46:4
**updates** 44:19
**uphold** 10:24
**UPS** 67:3,5
**upwards** 91:11
**use** 43:14 46:22
58:23 67:7 78:8
152:13 183:9
195:1
**uses** 58:8,18 71:14
**usually** 45:12,16
60:24 93:20
152:24
**utilize** 93:16
**utilized** 93:6
149:10 166:21
178:10,15 182:4
186:24
**utilizing** 194:7
**U.S** 1:10 8:7 13:18
14:22 15:8 16:14
17:14,15,18,25
19:12 23:12 55:23
67:25 71:4,10,13
116:1,4,4,8
121:10 128:13
130:24 151:9
166:14 167:5,10
205:17
**U.S.A** 155:16

**V**

**v** 10:25 52:19
127:24 128:11
**validly** 12:1
**Valley** 79:15

**various** 58:18 59:3
144:1,2 147:10
**vehicle** 60:15 96:12
**verbatim** 205:8
**verifying** 97:10
**Veritext** 1:22
**versus** 164:1
**VI** 52:19
**video** 148:13
**videos** 148:17
**view** 185:3
**viewed** 155:18
**Village** 79:16
**violated** 50:20
**violation** 52:13,16
52:18,21
**virtual** 43:10,14,16
67:6
**vis-a-vis** 132:16
**vitae** 167:6
**voice** 23:6,7
**voracity** 126:2,17
137:11,17
**vs** 1:4
**Vuzavorski** 131:15
199:15

**W**

**W** 140:8
**wait** 98:10 132:7,7
169:7
**waited** 116:1
**waiting** 130:1
211:12
**waive** 211:10
**waiving** 210:11
**want** 11:12,13
40:23 53:5 54:6
54:22 67:25 72:10
75:19 89:9,9
105:12,13 114:5
124:16 125:7
129:17 130:16
133:19 135:18
138:24 141:17
150:12 156:21
160:23 161:9

165:5 166:11
169:21 170:23
179:7 182:9
191:17 197:5
204:10 206:7
209:23 210:4
215:14,18,22
216:18,25
**wanted** 5:24 124:9
144:17 181:7
**wants** 167:10
177:11 207:15
**warrant** 2:12,12,14
2:14,16,16 3:11
3:13,14,14,18,20
3:21 4:2,6,12,14
4:16,17,22,24 5:2
5:21 6:18 7:12,15
10:2,4,4,19 15:6,7
15:22 16:1,1,9,13
16:15,16,20 17:2
17:10,12,13,24
18:3,6,8,9,21
19:13,19,25 23:24
23:24 24:15,17
25:2,3,7,8,23 29:8
30:3,5,9,10,12,20
30:25 31:2,9,11
35:1,2,5,9,10 37:1
38:4,5 39:24
62:12 69:4 78:9
80:4 84:8 87:21
92:6 93:25 94:6,7
94:16,17,21 95:5
96:5 97:3 100:15
101:3,13,17,18,25
102:21 103:15,16
104:6 106:11
107:6,11 110:21
112:20 115:14,14
115:15,24 116:3
116:11,14,18
118:15 128:11
189:16,17,18,22
191:13 193:24
194:2,8,11 197:9
197:10 198:10

**199:**20 202:15,19
**warrants** 4:15,20
  4:23 6:12,22 7:22
  10:25 11:4,25
  12:1 20:22 21:19
  23:17,20,23 24:1
  24:7,19 34:24
  36:23 41:8,14
  47:6 84:13 85:8
  159:21,22 189:13
  189:14 196:20,21
**wasn't** 124:13
  193:9 200:9 202:5
  213:8 214:14
**wasn't** 22:10 39:16
  44:7 46:2 71:17
  83:17 100:22
  102:20 111:11,12
**watch** 144:10
  175:17 188:6
**way** 63:11,24 102:7
  107:20 109:9
  110:3 113:10
  135:22 148:20
  155:13 171:14
  172:9 180:21
  182:8 197:10
  205:7
**ways** 46:14 50:9
  90:20 182:7
**weather** 72:13
  84:19
**website** 145:9
**week** 204:4,4
  205:22 209:5,13
  209:20
**weeks** 204:9 205:2
  205:3 206:23,25
  208:18,19,22,23
  209:3,4,6
**week's** 204:11
  206:1
**welcome** 13:22
**went** 16:13 18:20
  24:18 29:18,19
  30:11 74:2,19
  92:8 103:20

121:10 123:15
  184:6 187:3,3
  198:11
**weren't** 157:9
  171:11 172:13
**weren't** 92:3,13
**we'll** 127:14 148:1
  148:3 156:11
  215:10
**we're** 114:14
  124:15 132:24
  134:3 135:17
  146:13,16 153:1
  165:8 173:23
  189:20 191:13
  193:16 194:1
  199:7 205:1,2
  209:15,19 215:4
  216:15,24
**we've** 120:16
  194:21
**we'd** 8:21 111:6
**we'll** 8:22 11:23
  13:6 55:7 77:4
  86:12,18 112:4
**we're** 6:22 18:7
  21:24 41:25 50:25
  61:9 70:19 75:17
  91:21 93:11
  101:14 107:7,8
**we've** 40:21 42:2
  66:21 82:6
**whatsoever** 94:3
  206:8
**what's** 9:5 10:7
  11:18 20:4 82:15
  101:20
**when's** 14:25
**whereabouts** 147:8
**Whispered** 117:20
  215:24
**who's** 23:10 43:17
  70:20
**window** 148:19,20
**wish** 8:14 94:23
  128:15 139:9
  140:21

**wished** 84:9
**withdraw** 73:7,8,8
  88:16,19
**withstand** 134:24
**witness** 12:11,12,16
  13:1,7,25 14:3
  19:4 22:16 28:11
  31:7 54:12 57:11
  57:22 67:11,15
  77:2,5,8 81:5
  83:21 89:16 94:15
  100:4 120:6,11
  121:2 126:20
  128:19 129:21
  130:17 134:6,16
  136:1,2 138:19
  139:23,25 140:4,7
  140:11 151:2
  153:4 154:19
  158:9,12 160:14
  160:17,21 161:1,4
  161:6 162:16
  163:5,15 164:1
  167:6 168:7 170:7
  172:5 175:19
  176:4,10,14,17
  177:16,18 185:2,9
  185:15,18 188:7,8
  188:21 192:4,7
  195:21 207:11,13
  209:8 212:6,8,9
  213:17,24 214:13
  214:14,21 216:12
  216:12
**witnesses** 2:2 12:7
  126:17 135:25
  140:16 141:12
  188:10,14,25
  205:12 211:17
  212:16
**won't** 105:17,17
**word** 40:18 86:1
  119:23
**wording** 186:11
**words** 44:21 45:5
  47:7 60:17 130:12
  200:4 201:5,8

202:7
**work** 14:10 50:2
  145:20,21 150:3
  151:15,16 173:4
  207:16,25 208:4
  217:9,19,21
**worked** 145:17
  146:1 148:19
**worker** 142:25
**working** 18:24
  207:9
**wouldn't** 121:10
  207:16
**would've** 34:5,5,9
  34:10 36:21 39:20
  39:22 69:24
**wow** 71:13
**Wrap** 196:13
**write** 31:10 83:12
**writing** 37:12
**written** 127:11
  128:3 180:20,22
  184:17
**wrong** 36:4 172:17
  172:18
**wrote** 84:8 95:14
  100:21 101:8

──────────
**X**

**X** 2:1,9

──────────
**Y**

**yeah** 9:19 50:17
  72:8 76:14 77:3
  81:25 117:22
  118:9 122:15
  144:21,22 154:17
  155:14 182:3
**year** 45:15
**years** 130:1 135:11
  142:13,14,19,23
  145:23,25 151:1,4
  151:8,14 167:12
  170:25 173:18
  174:3 196:8 199:2
**yesterday** 95:2
  120:20 121:4

122:15,16,17
**you'd** 102:20
**you'll** 51:1
**you're** 13:22 17:19
  17:20 26:24,25
  30:23 33:9 37:11
  40:5 42:25 49:10
  49:22 53:19 58:3
  60:17 61:15,21
  65:2 67:24 68:1
  70:25 73:25 83:15
  84:14 87:13,15,16
  105:10 112:7
**you've** 91:7 99:5
  103:2,8,11

──────────
**Z**

**Za** 73:19
**Zavorsky** 73:12,15
  73:18 74:20 87:20
  88:12,25 89:17
  90:11,16
**zip** 109:16 110:7

──────────
**0**

**000** 5:9
**000072** 4:11
**000581** 3:17
**0014** 5:9
**0391** 79:7
**055** 5:9
**0581** 78:23
**0689** 6:1
**072** 4:10 7:19 9:14
  99:15 100:9,10
  101:4,19 104:5,5
  104:13 107:23
  108:16,16 110:19
  114:11 179:17
  192:21
**0857** 155:17

──────────
**1**

**1** 24:11 33:7 128:4
  155:21 161:10
  197:21
**1st** 150:13

| | | | | |
|---|---|---|---|---|
| **1-888-777-6690** 1:24 | 29:12,15 30:10 37:4 41:10,15 67:18,21,22 68:5 69:13,20 83:2 155:24 161:13 164:4 166:2,5 183:18,20 209:14 | 197:22 215:25 216:2,5,6,9,23 **2:01** 148:3 **2:02** 148:3 **2:03** 148:4 **2:04** 148:4 **2:13-cr-00669-C...** 1:3 | **3** **3** 32:17,24 33:6 37:22,23 76:2,15 128:12 161:10 197:22 **3rd** 128:12 **3:06** 124:24 **3:39** 124:24 | **500** 52:15 **5000** 3:17 4:5,11 **524** 1:14 **581** 3:13,15,16 7:13 9:10,14 25:10 41:22 42:7,10,12 54:19 61:17 75:20 |
| **1:35** 51:1 **1:48** 51:5 **10** 116:22 **10:30** 89:17 **11** 97:16 98:6 116:23 129:8,9 130:13 136:22,23 158:18 193:25 195:18 218:7 | **13-1285** 7:18 **13-1285-M** 2:13 4:12 104:9 **13-1293-M** 2:17 25:8 42:7 **13-1294** 2:15 25:3 **13-1294-M** 4:6 31:2 **13-293-M** 3:18 **14** 2:3 | **20th** 209:20 **2000** 145:21,22 173:8 **2006** 151:9,13,14 152:1 **201** 166:7 **2011** 152:8,10 156:18 163:22 164:16 195:24 | **30th** 45:17 **300** 204:9 **301** 5:9 **31** 177:8 **3313** 4:11 **3316** 3:17 **381** 41:1,2,4 **391** 4:3,5 6:18 7:16 9:10,14 25:5 31:1 | 82:9,25 83:7 87:10,11 90:6 98:20 118:16 129:10 130:13 133:6 160:6,7 168:3 173:25 192:19 193:13,15 193:23 197:25 200:13 |
| **11th** 108:21 183:16 183:20 **11/13** 26:9 27:9 28:4 87:14 119:22 **11:00** 158:20 **11:04** 122:13,14 123:10,11 | **14th** 24:13,14 26:5 26:18 67:18 207:21,22 208:3 209:12,15 **142** 2:4 **1479** 4:11 **148533** 4:5 | **2012** 14:13 45:10 45:14 91:8 205:10 **2013** 18:13 24:13 26:9 27:9 28:4 33:13 45:14,15 118:20 155:24 | 35:3,15,15 41:5 41:21 61:17 75:18 82:9 83:1 118:16 159:11,19 160:5 160:25 161:4 173:25 189:16,18 | **6** **6** 34:16 37:21,23 39:10 72:10 75:3 75:7,16 79:18,24 80:10 82:19 83:1 86:13,14 87:1 97:20 158:21 |
| **11:06** 129:9 156:5 169:8,14,16 170:3 199:17,17,22 **11:10** 166:2,4 **11:23** 169:3,7 **11:30** 132:2,17 **11:35** 1:5 **11:45** 116:14 | **15th** 208:1,2,4 209:12,15 **155-56** 128:13 **16** 2:12 **16th** 209:17 **16000** 4:5 **1640** 67:3,3 | 161:13 164:4 166:5 173:20 **2014** 1:3 120:19 123:11 125:5 127:13 218:7 **21** 52:13,16 **22nd** 206:19 | 189:25 191:5,19 192:5,18 193:10 197:25 200:13 **4** **4** 32:16,22,23 33:4 | **6:00** 158:21 **6:30** 72:11,14 84:18 **615** 1:11 **6576** 13:20 **673** 128:12 **676** 128:12 **689** 5:7,7,9 |
| **1103** 131:14 **1165** 3:17 **118** 2:3 **119** 2:3 **12th** 15:3,4,5 18:18 61:9 65:11,21 67:18 68:9 108:22 110:21,23 111:21 183:17,17,20,20 204:2,11 | **17th** 209:18 **170** 2:4 **174** 2:4 **176** 2:5 **18** 52:18,21 **1800** 1:23 **1801** 1:23 **19103** 1:24 | **22207** 176:17 **23rd** 204:6 206:18 208:13,23 209:3 210:1 211:11 **23:06** 87:15 155:25 156:5 169:8,10,16 170:9 | 33:5,6 37:22 43:4 86:16 161:10 **4.1** 11:8 198:8,16 **4201** 5:8 **438** 128:13 **5** **5** 32:20 33:11 52:12 | **7** **7** 78:24 79:12 158:22 **7th** 209:8 **7(2)** 194:13 **7:00** 158:21 **7:20** 38:15 **7:30** 39:20 40:8 **70** 104:4 **72** 101:19 |
| **12:35** 50:25 51:5 **123** 150:13 **1250** 1:11 **1285-M** 16:2 **1293** 7:6,11,13 11:4 **1294** 7:15,16 11:5 **13** 7:12,15 16:1 31:2 33:13 118:20 170:10 173:20 198:1 **13th** 18:13,20 | **19106** 1:12 **19144** 1:14 **1989** 151:9 **1993** 128:12 **2** **2** 16:20,22 24:9 65:12 66:13 160:25 161:10 | **23:08** 87:21 **23:10** 161:12,15 165:8 **23:18** 161:14 **24th** 209:20 **25** 2:14,16 **27th** 209:21 212:12 **28** 2:3 **28th** 209:21 **29th** 209:21 | 76:6,7,10 77:20 79:18,24 80:9 86:13,14 161:10 196:24 **5:30** 32:13 33:25 34:1,2,10,13 37:3 72:10,14 82:1 201:13 **5:34** 1:5 217:23 **50** 50:24 | **8** **8** 4:12 **8th** 120:19 123:11 123:11 125:5 |

127:13 207:1
209:9
**8:00** 158:21,22
**8:20** 38:15,15
**8:30** 47:20,20 96:25
96:25 97:9
**846** 52:14,16
**853** 5:9
**895** 5:8

---

**9**

**9** 1:3 75:5,7,16
82:19 83:1 87:1
97:20 111:20
116:22 129:6
136:24
**9th** 205:2
**9:20** 23:18 26:9
27:9 28:4 29:14
31:4,9 35:5,8,14
36:5,9 38:2,6,10
38:15 47:19 85:9
92:6 97:1,22,25
98:1,3 118:19,20
119:16,22 193:18
193:24 198:4
199:12
**9:25** 92:7 200:8
**9:30** 32:8 35:21
36:5,9,12,14,15
36:21 37:7,16
38:17 39:18 40:12
81:18 82:19 83:25
85:4,8,14,18 92:7
200:8 201:21
202:6,10
**901** 166:9
**922(g)(1)** 52:21
**924(c)(1)** 52:19
**942** 5:8
**9505** 3:17 4:5,11